## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

DEBRA HATTEN-GONZALES, Individually
and on behalf of all Others similarly
situated,

        Plaintiffs,

v.                                        Civil No. 88-0385 KG/CG

BRENT EARNEST, Secretary of the New Mexico
Human Services Department,

        Defendant.

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** comes before the Court upon the Court's *Order to Show Cause* ("OSC"), (Doc. 620), filed on January 6, 2016. Also before the Court for consideration is *Plaintiffs' Brief Documenting Defendant's Non-Compliance and Proposing Appropriate Relief* ("Plaintiffs' Brief"), (Doc. 651), filed February 22, 2016; *The New Mexico Human Services Department's Brief on this Court's Order to Show Cause (Doc. 620)* ("Response"), (Doc. 655), filed March 7, 2016; and *Plaintiffs' Reply* ("Reply"), (Doc. 659), filed March 21, 2016.

In February 2015, United States District Judge Kenneth J. Gonzales referred this matter to this Court to monitor compliance of Judge Gonzales' order dated May 20, 2014, (Doc. 500), and corresponding 6-month extension order. (Doc. 557). Since Judge Gonzales entered the *Order of Reference*, (Doc. 557), this Court has conducted a full-day conference to attempt to resolve numerous disputes between the parties and

regularly monitored Defendant's compliance with several court orders in addition to

those detailed in the *Order of Reference*. This Court ultimately conducted an evidentiary

hearing on its OSC on April 28, May 13, and July 6, 2016, during which the Court

received evidence and heard oral argument related to the OSC. Based on the briefs

submitted, evidence presented at the hearing, arguments from counsel, and the Court's

experience and involvement in facilitating Defendant's compliance with orders of the

Court, the Court **RECOMMENDS** that Defendant be found in contempt and that a

special master, to be paid by Defendant, be appointed to advise Defendant and the

Court on the issue of Defendant's compliance with the Court's orders.

## I.      Procedural History

This case originally challenged certain practices of the New Mexico Human

Services Department ("HSD"), Income Support Division ("ISD"), in processing

applications for assistance under the federal Food Stamps program, referred to as the

Supplemental Nutrition Assistance Program ("SNAP"), and Medicaid program. Plaintiffs

claim that HSD violates their federally-guaranteed right to receive a prompt SNAP and

Medicaid eligibility decision. Defendant Secretary of HSD ("Defendant") and Plaintiffs

negotiated a resolution of the issues before the Court, which was memorialized in the

*Modified Settlement Agreement* (the "Decree"), (Doc. 460), entered on August 27, 1998.

As part of the agreement between the Parties, this Court retained jurisdiction over the

matter to enforce the terms, conditions, and undertakings of the Decree. (*Order*

*Modifying Settlement Agreement* at 2). The Parties agreed to make good faith efforts to

resolve any differences that may arise in the prospective implementation of the Decree.

The Decree provides that, in the event the parties cannot resolve their differences after good faith negotiations, either party may seek a ruling from the Court. (Decree at 3).

Throughout the life of this case, the parties have sought several rulings from the Court in order to resolve disputes that have arisen out of the implementation of the Decree. Specifically, beginning in 2014, Judge Gonzales entered the following orders to resolve the issues of Defendant's non-compliance with the Decree and federal law: (1) *Stipulated Order Resolving Plaintiffs' Motion to Enforce Compliance with Decree for Newborn and Children's Medicaid*, (Doc. 475), regarding Defendant's processing of Medicaid renewals; (2) *Stipulated Order Resolving Plaintiffs' Motion to Hold Defendant In Contempt and for Sanctions*, (Doc. 477), regarding Defendant's processing of benefit applications for households with immigrant members; (3) *Order Granting Motion to Enforce Compliance*, (Doc. 500), regarding Defendant's delays and denials in processing applications for food and medical assistance, which was amended and updated in an *Amended Stipulated Order*, (Doc. 554); and (4) *Stipulated Interim Order in Lieu of Hearing May 28, 2014 on Motion to Enforce Compliance with Notice Provisions of Court Order*, (Doc. 506), regarding Defendant's notices used for processing food and medical assistance applications, which was amended and updated in an *Amended Stipulated Interim Order in Lieu of Hearing on Motion to Enforce Compliance with Notice Provisions of Court Order*, (Doc. 549), (together, the "Court Orders").

On March 27, 2015, Plaintiffs filed their *Motion for Order to Show Cause Why Defendant Should Not Be Held In Contempt and Sanctioned for Violating Three Court Orders: 2/10/15 Order (Doc. 554), 3/3/14 Order (Doc. 475), and 3/3/13 Order (Doc.*

*477)*, ("Motion for Order to Show Cause"), (Doc. 567), as to why Defendant should not be held in contempt and why a special master should not be appointed in this case for Defendant's failure to comply with the orders described above and the Decree. In an effort to resolve these issues, and to help bring Defendant into compliance with the Court Orders and the Decree, this Court conducted a full-day conference on April 29, 2015. At that conference, the Court revisited every aspect of Defendant's non-compliance with seven different representatives of HSD and, over Plaintiffs' objection, gave Defendant an opportunity to provide the Court with a timeframe within which HSD could come into compliance with the Court Orders. (Docs. 584 & 587). Defendant having provided the Court with proposed deadlines, and in the interests of justice, this Court held Plaintiffs' Motion for Order to Show Cause in abeyance until the expiration of those deadlines. (Doc. 587 at 2).

In the following months, the parties met extensively in an effort to bring Defendant into compliance, and submitted lengthy monthly joint status reports ("JSRs") updating the Court as to Defendant's efforts towards compliance through December 2015. (Docs. 590, 592, 595, 596, 608, 611, 614 & 618). Plaintiffs and Defendant were rarely able to agree on the extent of Defendant's compliance, and the JSRs often referenced the opposing party's failure to confer in good faith with the other side. (*Id.*). Additionally, the parties met with the Court monthly in order for the Court to address several issues that arose and to monitor Defendant's progress. (Docs. 599, 605, 609, 613, 616 & 619). Throughout this time, the deadlines for Defendant's compliance were extended twice, once upon agreement of the parties, (Doc. 601), and another upon

motion by Defendant over Plaintiffs' objections and after a hearing before the Court. (Doc. 606).

In light of the monthly JSRs, the fact that Defendant had not yet met the deadlines as set out by the Court Orders despite numerous opportunities to do so, and the inability of the parties to resolve the question of Defendant's compliance, this Court granted Plaintiffs' Motion for Order to Show Cause. On January 6, 2016, this Court entered its OSC ordering Defendant to show cause as to why it should not be held in contempt and sanctioned for failing to comply with the orders of the Court. (Doc. 620 at 2). This Court further ordered that the parties supplement their briefing on the issue, and update the Court on the facts relevant to the OSC, including Defendant's efforts to come into compliance with the Court Orders. (*Id.*; *see* Doc. 610). Upon completion of briefing, this Court received evidence and heard oral argument on the question of Defendant's compliance with the Court Orders on three separate dates: April 28, 2016; May 13, 2016; and July 6, 2016. The Court received evidence in the form of testimony from HSD case workers and higher-level management, HSD Cabinet Secretary Brent Earnest, and Plaintiffs' counsel. Additionally, the Court received over fifty exhibits.

In Plaintiffs' Brief, Plaintiffs do not request that this Court make a finding of contempt or impose sanctions for Defendant's non-compliance. Rather, Plaintiffs now ask this Court to place parts of HSD in a limited receivership, and to appoint an individual proposed by Plaintiffs and vetted by this Court with the skill and experience to bring Defendant into swift compliance. (Doc. 651 at 3). Plaintiffs insist that "nothing short of this type of remedy will allow Defendant to achieve compliance." (*Id.*). In response, Defendant emphasizes the extreme nature of the receivership remedy, and

argues that it has substantially complied with the Court's orders and that, as a result, there are other less drastic remedies available to ensure Defendant's compliance with those orders in the future. As a result, Defendant contends that it is inappropriate to appoint a receiver at this point in the case. (Doc. 655 at 4–5).

## II.    Findings of Fact

The record in this case is tremendous. Relevant to this OSC alone, there are over 500 pages of JSRs, over fifty exhibits, and nearly 700 pages of testimony received at the hearing. For the purposes of this recommendation, and to make a determination as to the question of receivership, this Court will only discuss the relevant areas of Defendant's non-compliance, as demonstrated by the record. In doing so, the Court will address each area of non-compliance by substantive topic, including the type of benefits and the stage in the SNAP and Medicaid application processes.

### A.  *Revisions of the New Mexico Administrative Code*

Throughout 2015, the parties agreed that Defendant would make several substantive revisions to the New Mexico Administrative Code ("NMAC") in order to bring it into compliance with federal regulations governing SNAP and Medicaid programs. (*See* Pls.' Ex. F). These changes include adding regulations regarding renewal of Medicaid, (*id.* at 14–16), revising regulations to explain who must provide a Social Security Number ("SSN") in order to receive Medicaid, (*id.* at 7), and regulations surrounding notice and time standards in processing applications for SNAP and Medicaid. (*Id.* at 8, 18–20). Case workers at HSD are directed to rely on the NMAC as a source of policy and procedure in their training. (Transcript of Hearing on April 28, 2016 ("Tr. 4/28/2016") at 65; Ex. B to Pls.' Reply).

Defendant was ordered by the Court to "provide Plaintiffs with his final position on the NMAC revisions, including the substance of the revisions he is going to make, as well as when he will issue a notice of proposed rulemaking to implement the revisions" by September 30, 2015. (Doc. 601 ¶ 1). Defendant later indicated that he would begin the promulgation process in October 2015. (Pls.' Ex. F at 24). By Defendant's own testimony, however, these revisions have not been made. (Tr. 4/28/2016 at 64–66). In lieu of these revisions, Defendant testified that he had instituted interim policies and procedures ("IPPs") on the topic of Medicaid renewals, which may also guide workers at HSD.[1] (Tr. 4/28/2016 at 65). To date, Defendant has not provided the Court with any IPPs indicating these policies have been communicated to workers, or the extent to which the IPPs override or reconcile any inconsistencies in the NMAC.

### B. *Backlog of Unprocessed Cases*

In the past, Defendant has had a backlog of thousands of cases that have not been processed within the federal timelines. In 2014, it was brought to the Court's attention that Defendant's computer system had been automatically and procedurally closing cases that had not been approved or denied within the appropriate federal timelines. Based on these findings, Judge Gonzales ordered that Defendant cease all procedural denials to ensure that no SNAP or Medicaid case is denied without individualized review, until the backlog was addressed. (*See* Doc. 500). Defendant was then ordered to begin processing cases in the backlog according to federal law and the Decree, first by March or April 2015, and then by October 1, 2015. (Doc. 554 at ¶¶ 3–5; Doc. 587 at ¶ 21). In addition, Defendant was ordered to provide Plaintiffs with a sample

---

[1] Defendant testified that the Centers for Medicare and Medicaid Services consider the IPPs to be state policy. (Tr. 4/28/2016 at 80).

of cases that are overdue and pending denial and closure in order for Plaintiffs to conduct a case file review. (Doc. 555 at ¶ 9; Doc. 587 at ¶ 22). Plaintiffs have identified several areas of concern based on these file reviews and Defendant's compliance with the Court Orders.

### 1. Individualized Notices of Delay

The Decree requires notices which provide individualized reasons for eligibility delay or information needed to verify an eligibility factor and identify any action necessary to remedy the delay or verify eligibility. (Decree at 21–23). Defendant was specifically ordered to confer with Plaintiffs' counsel to develop individualized notices of delays in processing as required by the Decree and federal law, and to ultimately release those notices by April 30, 2015. (Doc. 506 at ¶ 4; Doc. 549 at ¶ 5; Doc. 587 at ¶ 16); see also 7 C.F.R. §§ 273.2(h), 273.14(e)(1).

Based on Plaintiffs' case file review, however, in 20 out of 30 overdue and pending cases (66.7%), individualized notices regarding the delay in processing were not sent by HSD. (Pls.' Ex. AA at 2, 11–13). Defendant does not seem to dispute this finding. Defendant states that all households received a general backlog delay notice, as originally ordered by the Court. (Doc. 655 at ¶ 65; see Doc. 500 ¶ 8). In April 2015, HSD released the individualized notice, and asserts that the individualized notice has been sent to all necessary recipients after that time. (Doc. 655 at ¶ 65). Defendant further states that the individualized notice was not sent in cases where the general delay notice was sent prior to April 2015. (Id.; see Doc. 500 ¶ 8). Defendant's position is that "HSD does not believe it will be helpful to send [those who received the general notice] an individualized delay notice." (Doc. 655 at ¶ 65). Defendant represents that he

has otherwise continued to confer with Plaintiffs regarding the sending of delay notices. (Doc. 655 at ¶ 17).

The Court Orders do not indicate that the individualized notices of delay were contemplated for only those who receive notices after the individualized notices were implemented. (Doc. 506 at ¶ 4; Doc. 549 at ¶ 5; Doc. 587 at ¶ 16). Moreover, HSD's general notice of delay states only that the individual applied for SNAP benefits and that HSD is experiencing a backlog. (Ex. D to Pls.' Reply). However, federal law specifically requires that HSD take certain actions when it cannot process SNAP applications within the federal timeline, including notifying households who must supply additional information or verification in order to process the case. 7 C.F.R. § 273.2(h)(1). Defendant does not provide any insight as to why individualized notices, which are required by law and have been released as of April 2015, would not be helpful to those who have not yet had their applications processed within the federal timelines, or how HSD is otherwise notifying individuals how they may complete the application process.

### 2.  Procedural Denials

As stated above, in addressing HSD's backlog of unprocessed cases and procedural denials, Judge Gonzales ordered that Defendant cease all procedural denials for applicants who may have failed to attend an interview or provide proof of income, to ensure that no SNAP or Medicaid case is denied without individualized review, until the backlog is addressed. (*See* Doc. 500).

Defendant reports that the auto-denial function in HSD's computer system has been suspended and that as a result, those cases pending for a procedural reason generally remain pending indefinitely until they are afforded individualized review. (Doc.

655 at ¶¶ 7–8). Defendant also reports that, beginning in August 2015, HSD staff were directed to deny applications for procedural reasons after an applicant submits a new application within sixty days of an original application, and indicates that he or she did not complete the previous application process. (*Id.* at ¶ 8). Under those circumstances, HSD policy directs staff to procedurally deny the original application. (*Id.*; Pls. Ex. Y). Defendant did not notify the Court of this change in policy, or move for the Court to rescind or modify the order preventing him from doing so, until July 5, 2016. (*See* Doc. 725, *The New Mexico Human Services Department's Motion to Amend This Court's Orders Relative to Procedural Denial and Closing of Applications and Recertification-Applications for SNAP and Medicaid Benefits*). Defendant's motion to amend the Court's orders was filed only after an administrator from the United States Department of Agriculture's ("USDA") Food and Nutrition Service ("FNS") wrote to Defendant, citing severe compliance issues and warning that failure to take immediate corrective action could subject HSD to sanctions. (Doc. 710 at 1).

## C. Issues Surrounding Immigrant Applicants

In order to address issues with processing SNAP and Medicaid applications for households with non-citizens, HSD was ordered to develop training on benefit eligibility based on several types of immigrant classifications, and how to process those applications, in early 2014. (Doc. 477 at ¶ 6). This Court then ordered that Defendant update Plaintiffs on their immigrant eligibility training by September 11, 2015. Defendant represented that the immigrant eligibility training for new employees would be implemented by November 1, 2015. (Doc. 601 at ¶ 6). In addition, Defendant was to have determined how to fix its Automated System Program and Eligibility Network

("ASPEN") so that it does not require entry of an immigration document to approve immigration status for Medicaid eligibility, as documentary evidence is not necessarily required to be eligible. (Doc. 601 at ¶ 7); *see* 42 U.S.C. § 1320b-7.

Defendant provided Plaintiffs with an updated version of the immigrant eligibility training in November 2015, and again in March 2016. (*See* Pls.' Ex. H; Pls.' Ex. EE). Through cross-examination of HSD employees at the hearing, however, Plaintiffs identified several fundamental errors in both trainings which misstate legal standards in processing applications. (Tr. 4/28/2016 at 117–22, 171–95; *see* Pls.' Ex. FF (detailing errors found in training)).

HSD officials concede that the training provided to Plaintiffs and discussed at the hearing contains serious errors. (Tr. 4/28/2016 at 184–85, 192, 193, 195). HSD employees and Defendant himself have testified that they are no longer using this training, and that a new training is being drafted, but has not been implemented as of July 2016. (Tr. 4/28/2016 at 181, 195, 206–07). In the interim, they rely on IPPs, specifically IPP 1402 and 1403, and other materials to train staff on immigrant eligibility. (Tr. 4/28/2016 at 207; Rough Transcript of Hearing on July 6, 2016 ("Tr. 7/6/2016") at 160). Defendant has not further elaborated on the content of these materials, or provided copies to the Court to show whether they state the correct standards under the law. (Tr. 7/6/2016 at 89–90, 160).

As to the ASPEN system, Defendant reports that he has submitted a change request to modify the system so that it does not require entry of a document to approve immigration status. (Doc. 655 at ¶ 59). Defendant indicates that the change is scheduled to be implemented no later than June 30, 2016. (*Id.*). Defendant has not

updated the Court with any evidence as to whether the change has been made, or if it will be in the near future.

### D. *Medicaid and Medicaid Renewals*

Federal law requires that Defendant make a redetermination of Medicaid eligibility without requiring information from the beneficiary if he is able to do so based on reliable information contained in the beneficiary's account or other more current information available to HSD and, if so, administratively renew eligibility. 42 C.F.R. §§ 435.916(a)(2), (b). Defendant was also specifically ordered to do so by this Court in 2014. (Doc. 475 ¶ 5).

However, a case file review of random cases processed by HSD indicates that Defendant is not administratively renewing Medicaid eligibility in a majority of cases.[2] (Pls.' Ex. AA at 5, summary finding that in 19 out of 30 cases (63%), HSD had not attempted administrative renewal). Defendant has not provided any information or evidence to the contrary as to his compliance with this particular requirement. In fact, Defendant's own case file review, as provided by Plaintiffs, seems to largely match Plaintiffs' conclusions. (*Id.*, agreeing with Plaintiffs' error finding as to 17 out of 30 cases (57%)).

Additionally, Plaintiffs provide findings from file reviews which suggest that Defendant often requires additional information or documentation of income when income information obtained through electronic data is reasonably compatible with the information as provided by the applicant. (Pls.' Ex. D). This is in violation of 42 C.F.R.

---

[2] Defendant did not object to the admission of Plaintiffs' case file review findings, or to the substance of those findings. (Tr. 4/28/2016 at 322). Defendant has not presented any other record of its own case file review findings.

§435.952(c), and the Decree. While Defendant disputes the reasonably compatible standard, or whether it has authority to verify income in certain situations, (Pls.' Ex. D, Defendant's Analysis), Defendant does not dispute that it currently does not provide any training to its workers on the reasonable compatibility standard and applicability. (Tr. 4/28/2016 at 189–90). Moreover, as stated above, Defendant's regulations in the NMAC have not yet been updated to include the administrative renewal process for Medicaid. (*See* Pls.' Ex. F, indicating that HSD will promulgate rules as to administrative renewals in the NMAC).

In cases where HSD is unable to administratively renew eligibility based on information available, federal law requires that HSD provide the beneficiary with a pre-populated renewal form containing information available to HSD that is necessary to renew eligibility, and allow for at least 30 days to respond and provide any other necessary information. 42 C.F.R. §§ 435.916(a)(3), (b). This Court also specifically ordered that Defendant adhere to these regulations in 2014. (Doc. 475 ¶ 3).

Plaintiffs' case file review here also indicates that in 18 out of 30 cases (60%), the proper renewal form was not sent. Plaintiffs report that, up until June 2015, Defendant had sent Medicaid renewal applicants an incorrect form, ISD 122, which is a SNAP renewal form, and not the proper pre-populated Medicaid renewal form. Defendant's own review was consistent with Plaintiffs' findings in 15 out of those 30 cases (50%). (Pls.' Ex. AA at 5). Even assuming that Defendant is now using the proper Medicaid renewal form, cases which are pending closure may not have ever received that form.

E. *Notices*

The Decree establishes standards for notices of eligibility decision and delays which require that the notices adequately inform, at a sixth grade reading comprehension level, individualized reasons for eligibility delay or information needed to verify an eligibility factor and identify any action necessary to remedy the delay or verify eligibility. (Decree at 21–23). The Court specifically ordered that Defendant implement a compliant Notice of Case Action ("NOCA"), to be used for all approvals, denials, and case closures, by April 30, 2015. (Doc. 549 at ¶ 12). Defendant was to have implemented a complete set of notices that comply with the Decree by September 30, 2015. (*Id.* at ¶ 16). These deadlines were subsequently extended to December 31, 2015, over Plaintiffs' repeated objections. (Doc. 587 at ¶ 18; Doc. 606 ¶ 1).

The parties identified and evaluated 86 notices and forms that needed to be brought into federal compliance in August 2015. (Doc. 655 at ¶ 22). Defendant testified that he and Plaintiffs prioritized certain notices that required revisions, received feedback, and implemented some of the revised notices based on those meetings. (Tr. 156–60). However, Defendant indicates that the revisions have been complicated, and that, because of the lengthy revision process and coordinating the notices with the ASPEN computer system, not all of the notices that are currently in use have been returned from third-party experts, who are reviewing the notices for readability.[3] (*Id.*).

With regard to the NOCA, Defendant reports that after several rounds of revisions, a final NOCA which complies with the Decree was provided to the notice expert for a readability review. (Doc. 655 at ¶ 19). Throughout these proceedings,

---

[3] HSD reports that it is currently working with two notice experts to analyze the readability of HSD's notices, MAXIMUS and CTS. (Tr. 4/28/2016 at 45).

Defendant has represented that the NOCA is compliant, but for the completion of the review by HSD's literacy expert to ensure proper readability, and has been in use since December 23, 2015. (Tr. 4/28/2016 at 201). However, Plaintiffs have provided examples of NOCAs dated January 7, 2016, February 9, 2016, February 12, 2016, and February 18, 2016, which do not adequately inform beneficiaries of the status of their benefits, or how to remedy any issues with their continued eligibility. (Pls.' Exs. M & N). For example, in a sample notice issued January 7, 2016, the first page states, "[y]our Medicaid benefits are closed as of May 2015." (Pls.' Ex. N at 1). Yet on the following page, the notice lists both approvals and denials, indicating that the individual actually continues to qualify for certain coverage. (*Id.* at 2–3). When questioned as to how a beneficiary would understand such a NOCA, an HSD official stated that HSD recognized this as a problem, and that it had been changed. (Tr. 4/28/2016 at 201).

Similarly, in another NOCA dated February 9, 2016, the first page states that the beneficiary's SNAP benefits have changed and have been closed as of February 2016. (Pls.' Ex. M). On the second page, the NOCA states that SNAP benefits have changed because "the number of people included in your household has changed," and later that "[t]he household is denied because: The Department cannot make a determination on recertification because the information we have is incomplete." (*Id.* at 2). The NOCA asks that the individual call customer service. (*Id.*). The NOCA then lists four individual reasons for denial stating generally that the individual does "not meet program requirements." (*Id.*).

Finally, in a NOCA sent to a SNAP beneficiary on February 18, 2016, the first page states that the SNAP benefits "have changed," but does not indicate how the

benefits have changed or why. (*Id.* at 5). Representatives from HSD admitted during their testimony that the Decree requires individualized eligibility determinations, but that based on the example NOCAs before the Court it would be impossible for beneficiaries to determine why or how SNAP or Medicaid benefits are changing, and what they must do to remedy any issues with their eligibility. (Tr. 4/28/2016 at 201–204).

Defendant later testified that a newer, revised NOCA has been reviewed by the literacy expert, and is currently undergoing field testing. (Tr. 7/6/2016 at 161). Defendant has not, however, provided the Court with any examples of the revised NOCA as it is being sent to applicants and, as a result, the Court cannot assess the content of the revised NOCA and its compliance with the Decree.

As to the remaining notices, Defendant reports that approximately 10 notices were implemented on December 22, 2015, and one on January 31, 2016. Defendant states that another 11 were scheduled for release on April 30, 2016, well beyond the Court-ordered deadline. Yet, testimony elicited at the hearing indicated that, with regard to at least one of these notices, the "Help us Make a Decision" form ("HUMAD"), HSD has plans to make additional changes in order to make the form fully compliant with the Decree and federal law. (Tr. 4/28/2016 at 204–05).

In accounting for the delay in implementing compliant notices, it appears from the testimony that HSD originally sent non-compliant notices to the literacy expert for review, and that those notices have had to be resubmitted and reevaluated. (*Id.*; Tr. 7/6/2016 at 114–15). Additionally, the Court notes that in the midst of Defendant's deadlines with this Court, HSD implemented an additional set of eligibility criteria for SNAP applicants known as Able-Bodied Adults Without Dependents ("ABAWDs"), for

which HSD developed entirely new notices and employee training, and promulgated new rules in the NMAC. (*See* Doc. 623, *Plaintiffs' Motion for Injunctive Relief and Expedited Review and Hearing*; Doc. 658, *Memorandum Opinion and Order* granting Plaintiffs' request for injunctive relief).

As of July 6, 2016, Defendant testified that all but seven notices are fully compliant with the Decree. (Tr. 7/6/2016 at 153). However, Defendant was not able to provide the Court with a date by which these notices would be implemented, or provide samples of any of the notices to the Court. (Tr. 7/6/2016 at 153–55, 161). In addition, despite the fact that these seven notices must be returned to the literacy expert for readability review, Plaintiffs' questioning demonstrated that HSD's contract with MAXIMUS, the literacy expert retained by HSD, has expired. (Tr. 7/6/2016 at 106–08). At the hearing, Secretary Earnest was unaware of the expiration of the contract. (*Id.*). He could not provide any information regarding a future contract with MAXIMUS to continue to provide the literacy expert services it has been contracted to perform as required by the Court Orders. (*Id.*). As a result, the Court is unclear as to the status of the notices in use by HSD and their compliance with the Decree and federal law.

### F. *Expedited SNAP Benefits*

Federal law establishes that some SNAP applicants may be eligible for expedited service. 7 C.F.R. § 273.2(i). HSD is required to make SNAP benefits available to all households receiving expedited service no later than seven days after the application is filed. *Id.* at § 273.2(i)(3). In 2014, Defendant was ordered to "create a mechanism to prioritize expedited SNAP applications in order to ensure that all applications are screened for expedited SNAP benefits on the day they are submitted and that all New

Mexicans who are eligible for expedited SNAP benefits are processed ahead of all other applications." (Doc. 500 at ¶ 2). Subsequently, in 2015, Defendant was ordered to "provide the Court and Plaintiffs' counsel with monthly data on the percentage of applications eligible for expedited SNAP benefits that were timely processed. . . ." (Doc. 554 at ¶ 1).

Defendant states that he provides Plaintiffs with SNAP timeliness data, among other data, on a monthly basis. (Doc. 655 at ¶ 15). However, testimony elicited at the hearings indicates that this data may not be accurate, and that HSD staff have been altering applications in order to deny eligible applicants expedited SNAP benefits and improve HSD's timeliness statistics. Specifically, six current, and two retired, ISD case workers from across the state testified that, in some instances where an application for expedited SNAP will be reported as untimely processed, assets that do not exist in the application for benefits may be added to the case in order for it to appear to be ineligible for expedited SNAP. As a result, the case would then appear as timely processed by federal expedited service standards. (Tr. 4/28/2016 at 252–304; Transcript of Hearing on May 13, 2016 ("Tr. 5/13/2016") 5–19, 26–89).

Workers have stated that they have felt pressured, and even bullied, into modifying case application information in order for the case to appear ineligible for expedited SNAP, and that the directives to do so have come from higher management. (Tr. 4/28/2016 at 283). Indeed, one caseworker filed a formal complaint against the agency with her employee relations manager, documenting the practice of altering applications for expedited SNAP when they are not processed within the federal

timeframe. (Pls.' Ex. RR). In response, former ISD Director Marilyn Martinez[4] indicated that while an applicant's income and resources information may change throughout the application process, her initial review of the complaint did not determine that "employees or management were told to enter false information to avoid a late expedite." (*Id.*; Tr. 4/28/2016 at 102). However, when supervisors and high-ranking officials of ISD were questioned regarding this practice, they all pleaded their Fifth Amendment right against self-incrimination, (Tr. 5/13/2016 at 23–25, 94–117); including Marilyn Martinez and Laura Galindo, former Deputy Director of ISD. As a result, at this point, HSD caseworkers' sworn testimony that they were instructed by managers to fraudulently alter applicant information has essentially not been refuted.[5] Both Marilyn Martinez and Laura Galindo appeared before this Court several times and made representations regarding the status of HSD's processing of expedited SNAP applications and its compliance with the Decree and Court Orders generally, which this Court relied upon. (*See* Doc. 519 at 1; Docs. 584, 599, 609, 613 & 616).

The testimony has garnered state and federal congressional attention. Currently, HSD's Office of the Inspector General ("OIG") is conducting an investigation of the allegations in conjunction with the USDA. (Doc. 720 at 2). The OIG provided the Court with an *Interim Report of Investigation*, (Doc. 720), which summarizes the method by which the OIG is investigating the allegations, and a summary of the results. (*Id.*). Through interviews of HSD employees and case analysis, the OIG reports that

---

[4] Defendant moved Marilyn Martinez out of her position as Director of ISD during these proceedings. (Tr. 7/6/2016 at 92).

[5] *See Baxter v. Palmigiano*, 425 U.S. 308, 318–19 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]"); *LiButti v. United States*, 107 F.3d 110, 121 (2d Cir. 1997) (admitting a non-party's invocation of the Fifth Amendment as evidence of wrongdoing where the non-party was the plaintiff's former employee).

> [p]reliminary investigative results indicate what appear to be false statements made in ASPEN on some customer cases during the first few months of 2016. Specifically, it appears that some customer cases related to their submitted online SNAP applications, which qualified for expedite services, showed what appears to be the adding of assets that do not exist in the application or in a subsequent customer interview, if one was conducted and documented. The adding of assets caused these applications to be non-expeditable.

(*Id.* at 2–3). Interviews with caseworkers summarized in the report indicate that this practice has existed for many years.

The investigation is ongoing, and will potentially be presented to the New Mexico Attorney General's Office and the United States Attorney for the District of New Mexico for prosecutorial consideration. (*Id.* at 5). As a result, the OIG has not made any conclusions or findings at this time. (*See* Tr. 7/6/2016 at 44–45).

In response to the allegations, Defendant reports that he has developed organizational objectives and strategies which include "both short-term and medium-term goals that will help in developing organizational policies and help to determine the allocation of organizational resources." (Doc. 712 at 1). Among these actions, Defendant issued a directive to all ISD employees regarding expedited SNAP processing, intends to consult with outside experts on issues such as immigration, notices, and training, plans to conduct an ethics training for all employees, and has stated that HSD is willing to pay for an objective reviewer to assess the remaining outstanding issues of compliance. (*Id.*). Defendant has asked that the action items he has identified be embodied in a Court order, requiring HSD to follow through with these plans.

III.     **Analysis**

Plaintiffs originally moved for the Court's OSC, asking that the Court find Defendant in contempt and appoint a special master to assist HSD in taking all steps necessary to fully and promptly implement the Court Orders. (Doc. 567 at 9–10). Plaintiffs have since amended their request for relief, and now believe that a finding of contempt or the imposition of sanctions would not likely coerce Defendant into compliance. (Doc. 651 at 3). Rather, Plaintiffs ask this Court to place certain parts of HSD into a limited receivership and to appoint an individual with the authority of the Court to bring Defendant into compliance with the Court Orders and the Decree. (Doc. 651 at 3, 23–27).

Defendant argues that he should not be found in contempt because he has made "reasonably diligent efforts" to comply with the Court Orders and the Decree. (Doc. 655 at 3–5; Tr. 7/6/2016 at 178–79). Defendant emphasizes that, despite HSD's failure to fully comply with the Court Orders, HSD has made considerable progress towards doing so and has never willfully disregarded an order of the Court. *Id.* For the same reasons, Defendant argues that it would be inappropriate to appoint a receiver in this case, and proposes a less drastic remedy of appointing a special master who has expertise in the implementation of SNAP and Medicaid programs to act as a full-time advisor to Defendant in working towards compliance, to help resolve disputes between Defendant and Plaintiffs in the implementation of the Court Orders, and to provide the Court with an independent, objective assessment of Defendant's non-compliance. (Tr. 7/6/2016 at 179–80). Defendant contends that this case does not present facts which warrant the appointment of a receiver, and assures the Court that he and HSD are willing to put in

the work and make the changes necessary to come into full compliance with the Court Orders. (Tr. 7/6/2016 at 179–91).

While a finding of contempt is not necessary to appoint a special master or a receiver, the Court makes this recommendation based on its own OSC, which ordered Defendant to show cause as to why he should not be held in contempt and sanctioned for failing to comply with the Court Orders described above. Thus, the Court will address whether Defendant should be found in contempt.

A. _Whether Defendant Is In Contempt_

For a party to be held in civil contempt, there must be a demonstration, by clear and convincing evidence, that: (1) a valid court order existed; (2) the defendant had knowledge of the order; and (3) the defendant disobeyed the order. _F.T.C. v. Kuykendall_, 371 F.3d 745, 754, 756–57 (10th Cir. 2004). Here, there is no dispute that Defendant had the knowledge that the Decree and the Court Orders were in effect in this case. Thus, the issue here is whether there is clear and convincing evidence that Defendant failed to comply with the requirements of those orders.

Based on the evidence summarized above, it is clear that Defendant has not fully complied with the Court Orders. Indeed, Defendant concedes that he has not met all of the Court's deadlines. (Tr. 7/6/2016 at 178). As a result, the Court finds that Defendant has not fully complied with the Court Orders. Defendant has previously asserted that there are several provisions of the Court Orders which HSD is simply unable to comply with, and therefore should not be held in contempt for failure to comply with those provisions. (Doc. 570 at 19–21). This argument was raised by Defendant over two years ago, and while it seems to have been abandoned, it is unavailing nevertheless.

The Tenth Circuit "has recognized a defense when a defendant shows by clear and convincing evidence that he was 'plainly and unmistakably' unable to comply with the court order." *Phone Directories Co., Inc. v. Clark*, No. 05-4257, 209 Fed. Appx. 808, 815 n.6 (10th Cir. Dec. 20, 2006) (unpublished) (citing *Donovan v. Burgett Greenhouses, Inc.*, 759 F.2d 1483, 1486 (10th Cir. 1985)). However, to the extent Defendant is asserting this defense, over two years have now elapsed since the Court Orders were entered, the majority of which were stipulated to by Defendant. After voluntarily entering into these agreements, Defendant has never moved to vacate, modify, or amend these orders, or otherwise asked this Court to relieve it of its obligations. *See Cook v. Rockwell Int'l Corp.*, 907 F. Supp. 1460, 1463–64 (D. Colo. 1995) (finding the defendant's defense of impossibility to be untenable where defendant entered into the court order voluntarily and never moved for a protective order to be relieved of its obligations under the order). Rather, Defendant and Plaintiffs stipulated to extensions of the deadlines for compliance, (*see* Doc. 601), and Defendant moved for additional extensions, which the Court granted over Plaintiffs' adamant objections. (*See* Docs. 598, 602 & 606). It is undisputed that HSD has not come into compliance with many of the provisions of the Court Orders, and, considering the above findings of fact, Defendant has not provided any evidence as to why he is "plainly and unmistakably" unable to comply at this point.

Defendant also argues that he should not be found in contempt because he has made "reasonably diligent efforts" to comply with the Court Orders and the Decree. (Doc. 655 at 3–5; Tr. 7/6/2016 at 178–79). In support, Defendant cites to the standard for contempt in other Circuits, which only allow a court to hold a party in contempt where

"the party has not diligently attempted in a reasonable manner to comply." *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir. 1989). The Tenth Circuit has not adopted this standard, and, accordingly, this Court declines to do so. *Phone Directories Co.*, 209 Fed. Appx. at 815.

Even if the Court were to adopt this standard, the record does not reflect that Defendant has "diligently attempted in a reasonable manner to comply" with the Court Orders. Defendant acknowledges that he has not achieved compliance with the Court Orders in fundamental ways, including revising and updating the NMAC, promulgating new and necessary rules in the NMAC, developing correct and effective training surrounding immigrant eligibility, implementing notices that comply with federal law and the Court Orders, administratively renewing Medicaid benefits as required by federal law, and ensuring that applications for expedited SNAP benefits are timely and properly processed.

In addition, the record is replete with repeated mistakes in drafting trainings and developing notices which have further contributed to Defendant's ultimate non-compliance. Furthermore, Defendant has been unable to inform the Court as to when Defendant will come into compliance with regard to these remaining issues. After extensive efforts by the Court to facilitate compliance with the Court Orders, Defendant still cannot tell the Court the date by which he plans to make the appropriate NMAC revisions and promulgate new rules, whether Defendant is properly training his staff on immigrant eligibility for benefits, or when Defendant will issue fully compliant notices which have been reviewed by a literacy expert as required by the Decree. The Court is also concerned that HSD's contract with MAXIMUS, the literacy expert retained by

HSD, has expired, and Defendant himself was not able to provide any information on this issue. (Tr. 7/6/2016 at 106–08). Finally, sworn testimony before this Court and preliminary investigative findings indicate that HSD staff across the state have been manipulating case information in order to render otherwise eligible applications for expedited SNAP benefits ineligible, in an effort to improve timeliness data provided to this Court and other federal entities.

The Court would also like to emphasize that Defendant's inability to fully bring his application processing practices into compliance with the Court Orders has profound effects on the citizens of New Mexico. Indeed, when an eligible SNAP or Medicaid applicant is denied or delayed in receiving benefits, that individual loses benefits he or she may rely on to eat, feed his or her children, or to receive essential medical coverage. It is generally well-known, and Defendant often references, the number of New Mexicans who rely on these benefits. It is essential for this Court to acknowledge the need for these services to be effectively, efficiently, and properly rendered to those who are eligible in this state. Based on these findings, the Court cannot conclude that Defendant has "diligently attempted in a reasonable manner" to comply with the Court Orders.

Moreover, a finding of contempt and any related sanctions contemplates that such a finding could compel or coerce obedience of a court order. *O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992). Where contempt sanctions are imposed in an effort to coerce compliance, the "propriety [of those sanctions] depends upon the ability of the defendant[ ] to comply with the court's order."

*United States v. Prof'l Air Traffic Controllers Org., Local 504*, 703 F.2d 443, 445 (10th Cir. 1983).

The Court finds it important to note at this point that Defendant has previously represented that "[s]anctioning [HSD] will not change [its] ability to meet timelines necessary to accomplish these substantial tasks." (Doc. 655 at 4). Yet, from the record, it is apparent that HSD and its officials have not exhibited the leadership, oversight, or coordination necessary to implement the Court Orders. Throughout the course of these proceedings, HSD has yet to identify an individual that can address all of these concerns.

Defendant now acknowledges that he must make serious and fundamental changes in order for the SNAP and Medicaid programs in New Mexico to come into compliance with federal law and the Court Orders, and may need outside expertise in doing so. (Tr. 7/6/2016 at 92–94: *See* Doc. 712, Letter from Defendant outlining organizational objectives and strategies). While the Court appreciates this acknowledgement, the Court is troubled that it took over thirty hours of status conferences, over five hundred pages of joint status reports submitted to the Court, three days of evidentiary hearings on its OSC, and testimony by HSD employees alleging fraud on the part of HSD, to which high-level officials responded by pleading the fifth, for Defendant to discuss making these types of changes. For the question currently before the Court as to whether Defendant is in compliance with the Court Orders, Defendant's realization has come entirely too late.

There are absolutely steps that HSD can and must take in order to more efficiently and effectively come into compliance, and this Court concludes that a finding

of contempt for failure to comply with the Court Orders is appropriate to ensure that Defendant does so. For these reasons, the Court recommends that Defendant be found in contempt.

      *B.  <u>The Appropriate Remedy</u>*

Both parties have submitted proposed remedies to facilitate Defendant's compliance for the Court's consideration. Plaintiffs ask this Court to recommend appointing a limited receiver with the authority of this Court to take the necessary steps to bring Defendant and HSD into compliance with the Court Orders. (Docs. 651 & 659; Tr. 7/6/2016 at 194–95). Defendant, on the other hand, proposes that this Court recommend the appointment of a special master under FED. R. CIV. P. 53, who would act as a full-time consultant with specific subject-matter expertise on implementing public benefit programs, to assist and advise HSD in its efforts to come into compliance. (Tr. 7/6/2016 at 179–80). The Court will address each party's proposal in turn.

      *1.  Whether the Department Should be Placed in a Receivership*

Where the usual remedies in contempt proceedings and further injunctions "are inadequate, a court is justified in resorting to a receivership, particularly when it acts in aid of an outstanding injunction." *Gary W. v. State of Louisiana*, No. CIV. A. 74-2412, 1990 WL 17537, at *32 (E.D. La. Feb. 26, 1990) (unpublished) (citing *Newman v. State of Alabama*, 466 F. Supp. 628, 635 (M.D. Ala. 1979)); *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976). The remedy of a receivership has historically been used to vest a receiver with substantial authority to implement a court's order and, in some circumstances, to reform public institutions. *See Gary W.*, 1990 WL 17537, at *31; *Plata v. Schwarzenegger*, No. C01-1351 THE, 2005 WL 2932253, at *22–23 (N.D. Cal. Oct.

3, 2005) (unpublished). Ultimately, "[t]he decision whether to appoint a receiver is a function of the court's discretion in evaluating what is reasonable under the particular circumstances of the case." *Plata*, 2005 WL 2932253, at *23.

In cases where a court has appointed a receiver, the court has found that the use of less extreme measures of remediation have been exhausted or prove futile. *Id.* at *23. Specifically, courts have considered the propriety of less intrusive means of achieving compliance, such as regular formal and informal meetings with the parties and counsel, the appointment of a monitor, the appointment of a special master, and contempt with appropriate sanctions. *See Plata*, 2005 WL 2932253, at *24–28; *Gary W.*, 1990 WL 17537, at *28–29. To determine whether less drastic remedial means may be futile, Courts have relied on reports concerning compliance and recommendations as to remedial measures which have been provided to the Court by special masters and appointed court experts. *Plata*, 2005 WL 2932253, at *1, 27–28; *Gary W.*, 1990 WL 17537, at *6–11.

Here, the Court has exhausted many of these less intrusive remedies, including conducting a full-day conference, extending Defendant's deadlines, requiring the parties to meet extensively in an effort to bring Defendant into compliance and to submit JSRs updating the Court as to Defendant's efforts towards compliance, holding monthly status conferences on those JSRs, and entering this OSC providing warnings as to contempt and sanctions. However, the Court has not appointed a third-party expert, monitor, or special master to review and report on Defendant's compliance, apart from Plaintiffs' counsel.

While the Court is acutely aware of the role it has played for over a year in facilitating compliance, the Court also finds Defendant's argument that there has been no outside, objective review of his compliance to be well-taken. Indeed, throughout this process, the Court has relied on Plaintiffs to monitor and report on Defendant's compliance with the Court Orders. However, Plaintiffs have also simultaneously played several other roles, including Plaintiff, advocate, and even expert witness. The posture of this case has become increasingly and consistently litigious, and the Court believes that Plaintiffs' dual role as monitor and litigant may present a conflict. Even though the Court has presided over mediations and countless disputes between the parties, the Court does not have the capability of acting as a full-time monitor of Defendant's compliance with the requisite expertise that Defendant suggests. Thus, the Court cannot say that such a remedy has been exhausted or would be futile. Considering that other courts have exhausted this type of remedy before appointing a receiver, the Court agrees that not all remedies have been exhausted and that a less drastic remedy to enforce the Court Orders exists.

In conclusion, the Court finds that it has not exhausted less extreme measures of remediation, especially in light of Defendant's proposed remedy. *See Plata*, 2005 WL 2932253, at *23, 24–28. Accordingly, to appoint a receiver at this time would be inappropriate. Therefore, the Court does not recommend that Defendant be placed in a receivership.

### 2. The Court Should Appoint a Special Master

In lieu of a receivership, Defendant has proposed that the Court appoint a special master. Under FED. R. CIV. P. 53, the Court may appoint a special master to "address

pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." FED. R. CIV. P. 53(a)(1)(C). Considering the above findings, the scope of the question of Defendant's compliance with the Court Orders and the Decree, the litigious nature of the case, the burden on the Court's resources to manage and monitor Defendant's compliance and contentious disputes between the parties, the complex and technical nature of SNAP and Medicaid eligibility determinations and processing, and the fact that both Plaintiffs and Defendant agree that this Court alone cannot effectively manage and address questions of Defendant's compliance, the Court finds that the appointment of a special master in this case is warranted.

The specific duties of the special master, which have been largely adopted from Defendant's proposal, are outlined in detail in a proposed order appointing the special master, attached to these *Proposed Findings and Recommended Disposition.* (*See* Doc. 730-1). Generally, this Court finds that the special master should have subject-matter expertise in the processing of applications and making eligibility determinations for SNAP and Medicaid programs, and should serve as a full-time advisor and consultant to Defendant on how to effectively and efficiently comply with the Court Orders, the Decree, and federal law. The Court further finds that the special master should be appointed until January 1, 2018, and at that time will report to the Court on Defendant's compliance and whether the special master believes a receiver is necessary to achieve full compliance.

In appointing a special master, the Court "must consider the fairness of imposing the likely expenses on the parties . . . ." FED. R. CIV. P. 53(a)(3). Under the Rule, the

special master's compensation may be paid "by a party or parties," *id.* at 53(g)(2)(A), and the Court "must allocate payment among the parties after considering the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master." *Id.* at 53(g)(3).

Here, Defendant has proposed that a special master be appointed, and has agreed that the salary of the special master be paid by HSD. Given the Court's contempt finding above, and the fact that Defendant is more responsible for HSD's inability to process SNAP and Medicaid applications in accordance with Court Orders, the Decree, and federal law, the Court finds that Defendant should bear the expenses of the special master.

In conclusion, the Court recommends that an independent special master with relevant subject-matter expertise be appointed in this case to serve as a full-time advisor to Defendant as to how to achieve compliance with the Court Orders, the Decree, and federal law, and to report to the Court on the extent of Defendant's compliance and the question of whether a receiver may be necessary to do so. The Court further recommends that the special master be appointed until January 1, 2018, at which time the special master will report to the Court as to Defendant's ultimate compliance and the propriety of a receivership. Finally, the Court recommends that the expenses related to appointing the special master and his or her salary be paid by Defendant.

## IV.    Recommendation

For the foregoing reasons, the Court finds that after over a year of extensive

efforts in facilitating full compliance with the Court Orders, Defendant has neither

complied with those orders nor diligently attempted in a reasonable manner to comply.

**IT IS THEREFORE RECOMMENDED** that Defendant be found in contempt of

the Court Orders;

**IT IS FURTHER RECOMMENDED** that a special master be appointed to serve

as an objective advisor to Defendant and to report to the Court on issues related to

SNAP and Medicaid eligibility processes and Defendant's compliance with the Court

Orders, the Decree, and federal law, as outlined in the proposed order attached. In

addition, Defendant should be ordered to employ the organizational objectives and

strategies described in his letter to Plaintiffs dated June 2, 2016, (Doc. 712);

**IT IS FINALLY RECOMMENDED** that expenses incurred in appointing the

special master and the special master's salary be paid by Defendant.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a
copy of these Proposed Findings and Recommended Disposition they may file written
objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A
party must file any objections with the Clerk of the District Court within the
fourteen-day period if that party wants to have appellate review of the proposed
findings and recommended disposition.  If no objections are filed, no appellate
review will be allowed.**

---

THE HONORABLE CARMEN E. GARZA
UNITED STATES MAGISTRATE JUDGE