IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DEBRA HATTEN-GONZALES, et al.,

      Plaintiffs,

vs.                                                  No. CIV 88-0385 KG/CG
                                                     Consolidated with
                                                     No. CIV-88-0786 KG/CG

BRENT EARNEST, Secretary of the
New Mexico Human Services Department,

      Defendant.

## JOINT STATUS REPORT PURSUANT TO DOC. 658

Outlined below are the Court Orders that parties believe are the most important compliance pieces to be addressed.  Each party gives its position and corroborating documents within the categories listed.

## PLAINTIFFS' SECTION

The process of drafting this status report and Defendant's course of conduct over the last several months re-affirms the need for rigorous oversight, data provision and monitoring of Defendant's compliance with the Decree and federal law. In just the last few days of drafting this report to be filed into the Court record, Defendant has suddenly come forward with information that was not previously provided.  Until being confronted with data in this JSR, Defendant has actively denied that very serious delays in processing SNAP exist, despite reports and case examples provided by Plaintiffs' Counsel. See Exhibit 1. Instead of discussing the status of case processing when Plaintiffs inquired at every meet and confer, Defendant accused Plaintiffs of "ambushing" Defendant with client examples and denying that the cases were representative of Defendant's processing times. *See* correspondence on this issue attached as Exhibit 1.  Only after Plaintiffs' Counsel combed through weeks of USDA data, was it apparent that the case examples brought forth by Plaintiffs were in fact representative of tens of thousands of New Mexicans who have gone without food assistance to which they are entitled because of Defendant's failure to comply with the Decree and federal law. Defendant now acknowledges these delays. Defendant's denial of the severe problem exemplifies the importance of the Decree and its monitoring provisions. Further, Plaintiffs believe that it is critical that status reports continue to be filed into the Court Record as an added and necessary accountability measure.

The parties agreed to exchange drafts of the JSR on February 2, 2015. Defendant's first draft is attached as Exhibit 15. The document is not in the format of any previous JSRs and in fact purports to be in part a document that was previously provided to the Special Master. It

1

contained incorrect information, which Defendant chose not to include in his section of this JSR. Plaintiffs are concerned that some of this mis-information may have been submitted to the Special Master, as referenced in the draft document. Plaintiffs asked Defendant to share exactly what was shared with the special master relative to the consent decree, so as to verify whether any of the misinformation should be corrected. The Special Master gave the same instruction to the parties in a February 3, 2017 email stating "[you] have given me a document with your position on the Consent Decree. You were to contact the other party and share your document. If this was not completed, I am requesting that you complete this ASAP." Defendant only provided Plaintiffs with a document concerning specific data requests. Defendant has refused to share the document he sent to the special master on consent decree compliance, despite this instruction. Defendant's concerns about JSR format are unfounded. Plaintiffs sent Defendant a draft JSR in the standard format of every other JSR previously filed. Each of Plaintiffs' JSR drafts uses the same format. Plaintiffs believe this process would be more efficient if Defendant was forthcoming in meet and confers and shared information as it becomes available, rather than waiting to see what non-compliance Plaintiffs document.

I.     **Medicaid Renewals**

**Doc. 475 Stipulated Order Resolving Plaintiffs' Motion to Enforce Compliance With Decree for Newborn and Children's Medicaid**

This Stipulated Order was entered to address the Defendant's continued violation of the Decree's requirements that the application and renewal process not deter people from applying by requiring them to submit unnecessary and excessive information. Specifically, Defendants were terminating Medicaid for participants who became ineligible for one category of Medicaid without determining whether the participant was eligible under another category. Instead of simply renewing a families' Medicaid, the Department was terminating the Medicaid and making the family begin the application process anew. For example, when an infant turned one year old and was no longer eligible to receive Medicaid in the newborn category of eligibility, the Department illegally required a full new application for children's Medicaid, including proof of citizenship, identity, and age. This type of improper closure and request for documents extends to every category of Medical assistance.

The Stipulated Order requires the Department to review information electronically available and on file to determine if a participant can continue receiving Medicaid in another category. This process is called administrative renewal. Nothing should be required from the participant to renew Medicaid, unless administrative renewal is not possible. In that situation, a prepopulated form must be sent to the participant asking for a confirmation of information the Department has on file in order to renew Medicaid. The Order requires the Department to issue notices and forms, train staff, and promulgate policies and rules that conform to this process.

The Court entered Doc. 587 and Doc. 601 with specific requirements related to Medicaid renewals to facilitate Defendant's compliance with Doc. 475. Specific paragraphs for which Defendant is not in compliance include:

*Doc. 475*

**¶ 3 – On or before March 14, 2014, Defendant will submit to Center for Medicaid/Medicare Services ("CMS") for approval the form attached hereto as Exhibit A which, upon approval by CMS, shall be the only form used for the redetermination of eligibility of MAGI and family based Medicaid categories. Pending approval of the attached form by CMS, Defendant will continue the redetermination process of automatically cascading eligibility for the existing members who are currently active to another assistance category, such as SNAP, TANF, or Medicaid.**

1) A case review completed by Plaintiffs showed that Defendant did not send out the appropriate renewal form prior to closing out cases for failure to renew. The Court found that Defendant had violated this paragraph and HSD did not object to that finding. *See* Doc. 730 at 13. Since this finding, HSD has provided no information to demonstrate that it has remedied this error. The process described in HSD's training materials was in place prior to the last case review, yet data showed the process was not being followed. Automating administrative renewals is one promising strategy that has been discussed between the parties and HSD has secured federal funds to program this change. However, following a recent meet and confer, HSD would not commit to the programming change.

2) Data from Defendant demonstrates that over 1,000 renewal forms were not sent to families receiving SNAP benefits between 12/23/2016 and 2/3/2017. Defendant refuses to provide data on Medicaid renewal processing, however this information indicates systemic problems in properly issuing renewal notices that likely extends to Medicaid. Defendant has not documented that the MAD 608 that is currently in use has been reviewed by a literacy expert and that appropriate language changes were made incorporating the literacy expert's language.

3) Plaintiffs are concerned about recent changes to the MAD 608 renewal form. HSD recently sought to change the renewal form to require proof of income for the last thirty days whenever an individual attests to fluctuating income. However, federal law clearly states that if the pre-populated information on the form is correct, the individual need only sign and return the form.[1] This means that if a renewal form is pre-populated with information about fluctuating income that the Department previously had on file, and the client agrees that the information is correct; he or she only has to sign and return the form. There is no requirement to provide verification. *See* Exhibit 3, correspondence from Defendant. Plaintiffs agree that if the individual is attesting to fluctuating income for the first time on the renewal notice or reporting a change in fluctuating income, verification may be required. However, Defendant's own training states that this request will happen with a request for verification form. Further, federal law clearly states that if income from electronic sources indicates a client is over the eligibility threshold, a reasonable explanation will be sought from the client. Only if the reasonable explanation is not sufficient, will Defendant request further documentation. Information about

---

[1] 42 CFR §435.916(3)(i) and 42 CFR § 435.916(d)(1)(i).

fluctuating income may in fact provide such an explanation. Plaintiffs believe that Defendant is confused about the distinction and we look forward to discussing it in the next meet and confer.

**¶ 5 – Prior to sending a family a notice of Medicaid termination or redetermination, Defendant will continue to conduct its own timely review of the family's information, contained in its own files or otherwise available, in order to determine whether the children or other family members currently enrolled in Medicaid are eligible for other categories of coverage. If such eligibility is determined, Defendant will administratively renew eligibility for each family member without requiring the family to take any action.**

1) Plaintiffs completed two case reviews showing that a large share of Medicaid cases up for renewal were improperly slated to close without any administrative renewal attempt in the file. The Court found that Defendant was not in compliance with this paragraph. *See* Doc. 730, Proposed Findings and Recommended Disposition, p. 12. (Defendant did not object to this finding). Defendant has not provided evidence that this problem has been remedied. Rather than documenting a plan to come into compliance or documenting compliance, the Department states that it does not need to do so. Plaintiffs are pleased that a training was provided in October of 2016. However, the renewal process described by Defendant below purportedly existed before Plaintiffs' last file review, yet the results show that Defendant was not in compliance with this Court Order. Further, the current widespread delays in the renewal process indicate non-compliance with this provision.

2) Defendant is not properly notifying families of their administrative renewal in the Notice of Case Action.  This violates paragraph 3 of Doc. 475. Federal law requires that HSD inform families when their case is renewed and include information about the household that was used to determine eligibility. The family is required to notify HSD if any of the information on the form is incorrect. The parties agreed that HSD would include a calculation table that includes income information on file for the household. This is to be used as a reference for the household to determine if the information HSD used to renew Medicaid is correct and allows the household the opportunity to notify HSD if the information is incorrect. The notice itself references a calculation table. However, the notices routinely do not contain the referenced table with income information the state has on file with the household. *See* Exhibit 4, Medicaid Notices without the calculation tables that were recently sent to members of the Plaintiff Class.  Defendant's excuse for this violation of the law is that the department has a policy of not sending calculation tables is to "authorized representatives". This is concerning and illegal because authorized representatives often complete renewals for clients and act on the client's behalf. This is further evidence that Defendant does not have a Notice of Case Action or renewal process that complies with the Decree and orders of the Court. Defendant asserts that this will be fixed "when the new NOCA is released" but does not indicate when it will be released.

Defendant has been under Court order for three years to bring the NOCA into compliance with federal law and the Decree.

**Doc. 587 –**

**¶ 2 NMAC - Defendant will inform Plaintiffs whether Defendant agrees that the NMAC needs to be revised, and if so, when he will launch the revision, by no later than June 15, 2015. If the parties cannot reach agreement on the content of the policy, and the changes needed in the NMAC, Plaintiff will file a motion with the Court to seek a ruling on the matter. If such a motion is filed, the date for Defendant to take action shall be suspended pending the outcome of the motion and shall be extended as necessary.**

After HSD failed to comply with this paragraph, the Court Ordered Defendant to by *September 30, 2015 "provide Plaintiffs with his final position on the NMAC revisions, as well as when he will issue a notice of proposed rulemaking to implement the revision."* Doc. 601, paragraph 1. Defendant's non-compliance is detailed under this paragraph below.

**¶ 5 requires that Defendant complete and implement the Notice of Case Action containing provisions related to administrative renewal.** The Notice does not contain the required information, as explained in paragraph 2 under Doc. 475 above.

**Doc. 601-**

*¶ 1 – By **September 30, 2015**, Defendant will provide Plaintiffs with his final position on the NMAC revisions, including the substance of the revisions he is going to make, as well as when he will issue a notice of proposed rulemaking to implement the revisions. Once Plaintiffs have that information, Plaintiffs will determine whether they are going to file a motion with the Court. If such a motion is filed, the date for Defendant to take action shall be suspended pending the outcome of the motion.*

Defendant sent Plaintiffs his final position on NMAC changes on September 24, 2015. This letter is attached as Exhibit 5. HSD did not inform plaintiffs as to when he would issue a proposed notice of rulemaking by the Court ordered deadline. HSD issued a notice of rulemaking concerning some of the agreed SNAP regulations in April of 2016. [2] Defendant has not notified Plaintiffs' Counsel of any other notices of proposed rulemaking or provided Plaintiffs with information as to when a notice would be issued since that time concerning the agreements described in Exhibit 5. Defendant's assertions that Medicaid renewal regulations have been proposed and commented can only refer back to rulemaking initiated before the parties came to an agreement. Plaintiffs are learning this information for the first time having read Defendant's draft of the JSR. Plaintiffs look forward to documentation of this progress. In the meantime,

---

[2] The notice of rulemaking was issued just before a hearing on Plaintiffs' Motion to for Order to Show Cause. It is available here
http://www.hsd.state.nm.us/uploads/files/Looking%20For%20Information/General%20Information/Procedures/ISD%20-%20MRs/Proposed_NMHSD_HSR_Vol%2039%20No%2009.pdf

Judge Gonzales and Judge Garza found that Defendant is not in compliance with any provisions related to fixing the administrative code. *See* Doc. 730 at 6–7 and Doc. 757 at 10. Judge Gonzales specifically stated "IPPs are interim process which do not demonstrate compliance, or diligence in attempting to comply, with the Court's requirement." Doc. 757 at 10. The Decree requires that "the parties will agree upon any revisions to or supplementations of the ISD regulations which are necessary to confirm the regulations to the requirements of the Decree." Decree, p. 26, ¶ 9. Defendant has not provided a plan for when his regulations will be brought into compliance with Court Orders.

## II.   Application Processing for Households that Include Immigrants

### Doc. 477: Stipulated Order Resolving Plaintiffs' Motion to Hold Defendant in Contempt and for Sanctions.

This Order required Defendant to stop illegal requests from applicants for Social Security Numbers and immigration status information and to properly process applications for assistance made by applicants from immigrant families. The Order directs Defendant to remove blanket requests for social security numbers and immigration status information from phone messages, forms and any other standard form documents. The order also requires repeated training and issuance of policies as well as changes to the application for assistance. Many of these requirements were already addressed by Judge Conway in a 2010 Order of the Court that Defendant continues to violate.

Almost three years have passed since Doc. 477 was entered by the Court and critical changes to the application process have not been implemented as required. Plaintiffs have alerted the Department to violations of this Order as Plaintiffs became aware of them. The Court entered Doc. 587 and Doc. 601 with specific requirements related to immigrant eligibility to facilitate Defendant's compliance with Doc.477. Specific paragraphs for which Defendant is not in compliance include:

### Doc. 477:

**¶ 6 On or before April 30, 2014, Defendant will train or re-train all of its supervisors that many immigrants are eligible for benefits, so long as they are lawfully residing and that no one should be discouraged from applying based on immigration status, in accordance with Federal and State regulations. Defendant will include in this training the details of the many different immigrant classifications that are eligible for benefits and how to process those applications. Defendant will incorporate this information into its regular training programs, which it shall update as required to reflect changes in federal and state law.**

The Court found that Defendant's training materials do not accurately explain immigrant eligibility for benefits and contain numerous errors. *See* Doc. 757 at 12 and Doc. 730 at 10-12. The parties have created interim policies and charts that accurately state immigrant eligibility. Since the court ordered implementation of Doc. 477. However, Defendant has other training

materials that contain inaccurate and incomplete information that directly conflict with the materials developed to implement Doc. 477. The Court ordered Defendant to remedy these errors and engage in subsequent training to meet the requirements of this paragraph.  Instead of documenting a plan to fix the new employee training, Defendant maintains it is in compliance using evidence presented and rejected in Court prior to the contempt ruling. *See* Doc. 757 at 11. Plaintiffs have consistently provided high quality information to Defendant on immigrant eligibility and the alleged inaccuracy Defendant refers to below is based on a conflict between federal statutes and regulations. Complete correspondence on this matter is attached as Exhibit 6. Plaintiffs fully agree that Defendant should have staff competent to accurately create training and legally asses eligibility materials related to immigrant families. Defendant stated an intention to retain an expert since June of 2016, and in the last 24 hours has announced a plan to contract with an immigration attorney for assistance "in the very near future."

**Doc. 587:**

**¶ 9 Training New Employees: Defendant is currently re-vamping his training materials (26 modules) for new employees. Defendant will provide Plaintiffs with a draft of these materials by July 15, 2015. Plaintiffs will provide comments by August 1, 2015. Defendant will begin training their trainers on these new employee training materials by September 1, 2105 and then train new employees hired after September 1, 2015 periodically.**

Defendant's own assertions in this JSR document that only a draft training exists for new employees for more than year after this Court Ordered deadline.

**Doc. 601:**

**¶ 6 Requires Defendant to implement a training for new employees by November 1, 2015.** Defendant remains out of compliance with this paragraph for the same reason as it is out of compliance with Paragraph 6 of Doc. 477and paragraph 9 of Doc. 587.

**¶ 7 – Defendant will determine how it can fix the ASPEN system to that it is not requiring entry of a document to prove immigrations status.**

This requirement was put into a court order after HSD identified the immigrant details data entry section of the ASPEN system as the source of frequent worker error in correctly determining eligibility for immigrant families. The ASPEN system requires entry of an immigration document type to determine eligibility because workers must enter a "document type" to verify immigration status. This court order required HSD to cease requiring entry of a document to prove immigration status.  The parties have worked extensively on this issue and agreed upon a process that allows workers to enter "other" when a document type is not provided and provide other verifiable information. Deloitte confirmed that this process resulted in accurate verification of status through the SAVE system. Correspondence between the parties is attached as Exhibit 6. Plaintiffs created an IT process for Defendant to utilize in verifying immigration status and collecting information from applicants, met with IT staff and continue to provide assistance in

ensuring the IT system will properly determine eligibility based on immigration status, rather than the type of immigration document an applicant has in every instance. Defendant does not have staff with expertise or capacity to work on this project. HSD's IT contractor requested specific information to be provided to fix the programming and Defendant's counsel has been forwarding documents for Plaintiffs' Counsel to work on. The last meeting between the parties included a plan for Plaintiffs' and Defendant's Counsel to match immigration documents to immigration statuses and eligibility criteria for the IT staff to complete a "change request" in the ASPEN system. Further, workers have not been trained on the appropriate verification process for immigration status. Plaintiffs consulted with the federal agency that verifies immigration status and showed HSD that when an individual does not have a document or is not aware of his or document type but has other identifying information (an Alien Number, date of entry and date of birth), the worker can enter the document type as "other" and accurately verify status. This process has not been disseminated to workers and the IT process is not complete.

**¶ 8 Defendant was required to train long term employees on immigrant eligibility.** Defendant is not in compliance with this paragraph for the same reason as paragraph 6 of Doc 601 and  477 above. Defendant was required to develop a specific training for long term employees after the Department determined these workers were not following current policies on immigrant eligibility. No such training has been developed. HSD cites instead to interim policies and charts created as a reference for workers. If the creation of those materials were sufficient, HSD would not have been ordered to create subsequent trainings.

### III.   Notices

### Doc. 549: Amended Stipulated Order in Lieu of a Hearing on Motion to Enforce Compliance with Notice Provisions of Court Order

The Decree and federal law require Defendant to provide eligibility notices that are detailed and individualized. For over 30 years, Defendant has not created notices that comply with the Decree and federal law. Defendant assured Plaintiffs that when the Department began implementing a new computer system, the notices would meet the requirements of the Decree and federal law. Unfortunately, that has not been the case. Deficient notices are a significant reason why the Decree has never been fully implemented by the Department. As such, this work is critical to the full implementation of the Decree. Doc. 549 represents an agreement between the parties to work together to revise all notices to ensure they meet the requirements of the Decree and federal law.

Work between the parties under Doc. 549 has been consistent but very challenging. The parties began meeting in April of 2014 and began revising over 100 notices for use in SNAP and Medicaid.  The Court entered Doc. 587 and Doc. 601 with specific requirements related to notices to facilitate Defendant's compliance with Doc. 549. Doc. 606 was entered to extend the deadlines related to Notices for Defendant and information to be provided as to each notice. Specific paragraphs for which Defendant is not in compliance include:

**Doc. 549**

**¶ 1 and ¶ 2: Defendant is required to include Plaintiffs' Counsel in a notice work group that is creating SNAP and Medicaid model notices.**

Plaintiffs worked extensively with the notice workgroup in 2014 and 2015. However, since the initial review of notices in that group, Defendant has not included Plaintiffs' Counsel in any current notice workgroup meetings.  Plaintiffs' Counsel has been able to listen in and observe some meetings with Insight, the contractor FNS hired to review SNAP related content in some of Defendant's notices. However, Plaintiffs are not permitted to participate, do not receive information about all meetings and frequently are notified the day before a meeting as to when it will take place. It is Plaintiffs' understanding that Defendant continues to have a group of HSD employees working on notices independent of work with Insight and Plaintiffs' Counsel has not been provided an opportunity to participate as further revisions are made to model notices. Plaintiffs' counsel received reports from Insight recommending changes to notices. Plaintiffs look forward to receiving HSD's planned revisions to the draft notices following Insight's recommendations, as required by the Decree in order to provide comments.  The process ordered by the court would include Plaintiffs' counsel in the group of HSD workers that is reviewing and deciding what recommendations to accept from the contractor, but HSD has excluded Plaintiffs from that process.

**¶ 3: Defendant will continue to provide Plaintiffs' Counsel with notices, factors that trigger use of particular notices, story boards, reasons, and eligibility determination language until otherwise ordered by the Court.**

Plaintiffs are concerned that Defendant's work on notices is highly disorganized. As a result, Plaintiffs do not receive reliable and accurate information about notices. When Defendant began utilizing a new contractor for literacy review, Plaintiffs completed a review of the notices that the company had reviewed. Plaintiffs discovered that  1) the literacy reviews contained numerous errors and changes to content that made the notices unintelligible and 2) that HSD had sent the contractor incorrect versions of multiple notices. Plaintiffs wrote to Defendant about the problems with each notice and Defendant never responded. Plaintiffs further noted concern that CTS uses a computer program, rather than a literacy expert to review language. The Decree requires a notice expert. When Plaintiffs brought this up in a meet and confer, Defendant requested that the information be re-sent and then never responded after being sent the information a second time. *See* Exhibit 7, correspondence between the parties.  Plaintiffs are concerned that Defendant continues to go forward with incorrect versions of notices that were never reviewed by Plaintiffs' Counsel and Defendant makes significant changes to notices following review by Plaintiffs' Counsel and then does not always circulate those changes. The Notice of Case Action is an example of a critical notice that Plaintiffs get a chance to review and HSD represents changes as accepted, and then later continues to change and edit without consultation with Plaintiffs' Counsel.

**¶ 4 Reiterates the requirements of the Decree that prohibit Defendant from making changes to standard form documents adopted pursuant to the Decree without 30 days-notice and an opportunity to comment.**

Plaintiffs frequently discover problems and changes when they are already being sent to members of the Plaintiff class. For example, Plaintiffs recently learned that HSD has an online renewal form for SNAP and Medicaid that was never provided to Plaintiffs' Counsel for comment, as required by the Decree. The SNAP renewal form has at least one very serious error that does not allow participants to accurately report their income.  Defendant previously asserted that it had provided Plaintiffs with an opportunity to comment on the online renewal form when Plaintiffs reviewed YES NM 2.0 on January 9, 2015. Now HSD asserts that it did not give Plaintiffs an opportunity to comment because HSD did not believe the renewal fell within the confines of the Decree at that time.  This new argument is incorrect. By that date the parties had worked together on a paper renewal form and the Court had entered multiple orders concerning renewals. HSD does not have a process to determine what actions require notice and opportunity to comment by Plaintiffs' counsel.

**¶ 7: Defendant must provide the Notice of Case Action and all denial and closure reason codes to MAXIMUS Corporation for a 6th grade literacy review, translation from English to Spanish, as well as review for Doc. 504 compliance**.

Defendant ceased working with MAXIMUS. Defendant's assertions that FNS and Insight are reviewing the entire NOCA and reason/denial codes is incorrect. Insight and FNS are reviewing SNAP related content in the notices.  *See* Exhibit 2. The NOCA is used for Medicaid as well as SNAP. Plaintiffs have not seen changes to the NOCA that indicate HSD adopted the recommendations of MAXIMUS. Plaintiffs continue to see reason codes populate in notices that were never provided for review.

**¶8, 9, and 10 Defendant must provide the NOCA to Plaintiffs' Counsel for final review after it is reviewed by a literacy expert.**

A final version of the NOCA that has been reviewed by a literacy expert, along with reason codes has never been provided to Plaintiffs' Counsel for comment. Defendant implemented an "interim" NOCA in January of 2016 and continued work on the NOCA that is now being looked at by Insight. The NOCA that client receive is incomplete and does not meet the requirements of the Decree and federal law. See Exhibit 8 with examples of confusing and partially populated notices. These problems must be addressed.

**¶11-16 Defendant did not meet the deadlines in these paragraphs for completing notices. Plaintiffs have been excluded from further work at HSD on notices.**

Defendant asserts that several notices were implemented on November 27, 2015. Plaintiffs have not received verification that a literacy review was completed for these notices. Plaintiffs' concerns related to CTS computer review of notices and numerous errors were never addressed.

Defendant has not documented what changes it adopted and/or corrected following CTS' inadequate work. Plaintiffs believe it is crucial that the parties have a meeting to discuss the current status of notices and arrive at a mutual understanding of what additional steps must be taken to make the notices compliant with federal law and this Court's orders.

**Continued Concerns Regarding Notices listed in Defendant's "Exhibit L"**

1) Defendant asserts today that many of the notices in Defendant's Exhibit L are "not DHG notices." This has not been agreed between the parties. The parties have been working off of this list of notices for two years and HSD now refuses to provide the status of notices that "are not DHG notices." Several notices, including the food stamp issuance schedule for example, fall squarely within the confines of the Decree.
2) Online application and renewal forms are not listed on the list and Plaintiffs have not been provided information about these forms.
3) Defendant admits that a literacy review has been completed for only a handful of notices in the Exhibit.
4) Plaintiffs' Counsel have not received documentation that a literacy expert has reviewed the notices listed and noting what changes have been adopted.
5) Defendant has not responded to the letter and list of notices with errors caused by the CTS literacy review of certain notices and the fact that CTS reviewed several incorrect versions. *See* Exhibit 7.
6) Defendant does not provide implementation dates for the notices:
   a. HSD states some notices are "ready for implementation" but gives no implementation date. Defendant's section indicates these notices will not be implemented for at least 6 months.
   b. HSD states some notices are scheduled for implementation 3.2 – it unclear if this is a date or refers to some other implementation plan.
7) Defendant asserts changes have been made to the Medicaid Renewal form, but does not document that those changes will be reviewed by a literacy expert.
8) Defendant has created at least one new notice related to future implementation of the ABAWD 3 month time limit. It was provided to Plaintiffs on January 24, 2016, not months ago as Defendant asserts. *See* Exhibit 9. This notice is not included on the list.

In the meantime, the Notice of Case Action continues to populate with incorrect and confusing information. *See* Exhibit 8. For example, the notices in exhibit 8:

1) Provide conflicting and confusing reasons for a negative action on a case.
2) Contain incorrect information stating that HSD has a mandatory Employment and Training Program for SNAP.
3) Populate information stating on the first page that the household is approved only to show a denial on subsequent pages.
4) Show blank information boxes on the first page.

Plaintiffs' concern is that the IT system is not populating notices that meet the requirements of the Decree and federal law. Indeed, New Mexico's case and procedural error rate show that 26% of improper actions to deny, terminate or reduce SNAP are driven by incorrect notices.[3]

**Doc. 587 ¶ 15-18 and Doc. 601 ¶ 10-11 concerning dates for implementation of notices.**

Defendant did not meet the deadline requirements of these paragraphs for implementation of notices for the reasons stated above.

## IV.   Doc. 554: Amended Stipulated Order (following Doc. 500 and Doc 548).

This stipulated order was entered as a continuation of two prior court orders (Doc. 500 and Doc. 548) and concerns the resolution of Defendant's unlawful delays and denial of food and medical assistance in violation of the Decree. The order required that Defendant refrain from closing or denying SNAP and Medicaid cases for procedural reasons (i.e. failure to complete an interview or turn in documentation). Judge Gonzalez extended his original order on the backlog - Doc. 500 - for another six months and asked that the parties enter a stipulated order concerning the continued work towards compliance.  Defendant stipulated to Doc. 554, which orders the Department to re-work SNAP and Medicaid cases pending for closure and denial by specific dates and provide the Court with evidence of how many files were reviewed and how many of those cases were approved. Then, the parties are to agree on policies and procedures for Medicaid and SNAP processing and workers across the state are to be trained. Defendants must also report data to the Court and Plaintiffs on the timeliness of SNAP and Medicaid processing, the status of the phone system and county error rates.

The backlog of applications and resulting improper termination of food and medical assistance to tens of thousands of New Mexicans was in large part due to the Department's improper and overly burdensome application processing practices and policies. As such, it is critical that Defendant revise its policies and practices so that New Mexicans eligible for food and medical assistance can apply for and receive benefits to which they are entitled. Defendant must also provide data and information demonstrating improved processing and procedures, all of which are enumerated in Doc. 554.

**Current delays in processing**

1) Defendant received permission from the Court to close and deny cases for procedural reasons in September of 2016.  This Court Ordered and Defendant agreed to follow an individualized manual review process for each case, denying and closing cases only after a worker has completed a checklist certifying that the case was accurately processed. Defendant is reporting regularly on this process to the USDA as it relates to SNAP benefits. Defendant agreed to provide Plaintiffs' Counsel with the data that is sends to

---

[3] See page 6 of HSD's most recent SNAP performance report.
http://www.hsd.state.nm.us/uploads/files/Looking%20For%20Information/General%20Information/Procedures/ISD%20-%20GIs/GI%2017-02%20Eleventh%20FFY%202016%20SNAP%20Performance%20Report.pdf

FNS under the corrective action plan.  Defendant's data shows that more applications are denied without an individualized review each month.

| SNAP Denied Without Complete Individualized Review | | |
|:---:|:---:|:---:|
| **November** | **December** | **January** |
| 22% (19/88) | 39% (50/129) | 40% (20/48) |

Defendant is not doing case reviews to track Medicaid denials. However, because most families eligible for SNAP are eligible Medicaid, it is likely affecting just as many Medicaid applicants. Denial of benefits without an individualized review violates the Decree and Docs. 500 and 554.

Defendant has informed Plaintiffs that an automatic function called a "mass update" in HSD's computer system causes cases to improperly close and thus terminate benefits because of a client's purported failure to complete a procedural step. Defendant's JSR section documents that this occurs even when clients timely return a renewal form if a worker has not documented that the form is received. This includes documents that are not logged by ISD workers as received. This is another example of a procedural closure taking place without an individualized review in violation of the Decree and Docs. 500 and 554. Defendant has not identified a plan to address these systemic violations of the Decree and federal law.

**Defendant's weekly SNAP Recertification reports show that over a six week period, 42% of overdue renewals are unprocessed because of HSD delay.** This means that between 12/23/16 and 02/02/17, alone, 16,403 cases or 36,087 New Mexicans (average of 2.2 individuals per case) went without food they were entitled to because of Department delays in processing.  Data from Defendant's weekly reports are summarized below. Defendant acknowledges the delay below, but refused to do so at a Meet and Confer in December. To the extent these delays are caused by a well-known influx of applications that occurs annually during this time: it is not acceptable for tens of thousands of New Mexicans to go without food and medical assistance until the number of applications decreases. Defendant has not stated a plan to adequately staff offices or timely process applications. Instead, he intends to wait until there are fewer applications. Defendant must have a plan going forward for allocating resources accordingly so that field offices and caseworkers can consistently and timely process cases when LI-HEAP and Medicaid enrollment are known to increase.

| DELAYED RENEWALS CAUSED BY HSD FAULT | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total Overdue Cases | Pending tasks | Renewal packet not sent | SNAP interview scheduled | SNAP packet received timely | Total | % |
| 12/23-12/29 | 3,980 | 698 | 113 | 94 | 337 | 1,242 | **31%** |
| 12/30-01/05 | 9,238 | 2,845 | 264 | 550 | 510 | 4,169 | **45%** |
| 01/06-01/12 | 7,531 | 2,250 | 207 | 361 | 449 | 3,267 | **43%** |
| 01/13-01/19 | 5,905 | 1,504 | 159 | 239 | 379 | 2,281 | **38%** |
| 01/20-01/26 | 4,609 | 965 | 111 | 179 | 299 | 1,554 | **34%** |
| 01/27-02/02 | 8,163 | 2,803 | 231 | 589 | 267 | 3,890 | **48%** |
| TOTAL | 39,426 | | | | | 16,403 | **42%** |

Defendant continues to prohibit caseworkers from approving SNAP cases where the family is eligible for expedited benefits and the case has been pending for more than 7 days. Instead of having workers immediately approve benefits, the cases are sent to management for further review. This change to the application process was put in place without consultation with Plaintiffs' Counsel, as required by the Decree. The investigation by the Office of Inspector General found that certain managers and staff added assets into the case files, so the case did not seem eligible for expedited SNAP and would appear to be properly pending for an interview or verification. Plaintiffs have repeatedly inquired as to why workers cannot process SNAP benefits as required by law and the Decree and Defendant insists on this secondary review. Defendant has not taken any disciplinary action against supervisors that the investigation shows repeatedly entered false information into case files during this secondary review process.   Defendant states that this is outside the role of Plaintiffs' Counsel, however Defendant did not address this problem and in fact ISD directors ignored reports of the practice until Plaintiffs' Counsel acted on information that Defendant was not processing cases in compliance with the Decree.   This practice violates federal law and the Decree and further delays benefits to the very poorest families in New Mexico.

In recent months, Plaintiffs have received information from HSD caseworkers and clients that indicate HSD is behind in processing applications and renewals. Plaintiffs asked HSD for data showing the timeliness of application and renewal processing for SNAP and Medicaid. Plaintiffs' are particularly concerned about the timeliness of renewals, as families have their benefits terminated without notice when HSD experiences a delay in processing renewals. Plaintiffs requested data on timeliness and delays pursuant to the Decree at p. 25-26. Defendant, however, refuses to provide data that it does not already provide and stated an intent to have the Special Master advise Defendant as to whether

Defendant must comply with the Decree. Defendant must seek the Court's permission to cease compliance with Orders of the Court.

2) Defendant's phone system continues to be out of compliance with the Decree at 11, ¶ 6. Data from Defendant shows that in December of 2016, Defendant answered just 26% of calls to its customer service center. Again, the anticipated increases in call volume and applications that occurs during this time of year does not justify violations of the Decree and federal law. Defendant's phone system has never complied with the Decree and Defendant has not stated a plan for coming into compliance. The Department has been closing field offices for a half day each Wednesday to catch up on processing. Further, the Department informed the State Legislature that it is evaluating whether or not to completely and permanently close certain field offices. Plaintiffs are concerned that office closures have and will continue to severely restrict access to assistance for low-income families.

**V.** **Doc. 712 is a letter stating actions that HSD must take. This letter was incorporated into Judge Gonzales Order (Doc. 730)**

1) ¶ 4 Requires that Defendant continue to consult with outside experts, including but not limited to Covington and Burling, Maximus, the Center on Budget and Policy Priorities, and the National Immigration Law Center on issues such as immigrant eligibility, notices and training. Defendant is not receiving expert assistance from any of the entities described above as to notices.

2) ¶ 5 Requires Defendant to complete an ethics training for all staff – In the November 2016 Meet and Confer, Defendant's Counsel said they were reviewing an ethics training and that it would be complete by the end of the year. Defendant's confirmation of this is attached as Exhibit 10. As of the date of this JSR, Plaintiffs' Counsel has not been provided with the training materials. Defendant now asserts the training will take place in the spring of 2017.

3) ¶ 8 Doc. 757 (712) – Requires Defendant to issue a request for proposals (RFP) for assistance in developing an effective and accurate training program and worker manual. Defendant told the Court in June of 2016 that the RFP process would take up to 10 months. To date, no RFP has been issued and Defendant has indicated that it will only hire consultants based on funding from the NM legislature. The Court Order was not contingent on funding. It has been 7 month since Defendant stated it would initiate this RFP and no action has been taken. Based on Defendant's description on

page 6 of his section of the JSR, the Department will not create a worker manual for at least two more years.

## VI. Time limit for Able Bodied Adults Without Dependents and  Related Work Requirements – Doc 658

In September of 2015, the Court issued an order prohibiting HSD from implementing the three-month time limit on SNAP for "able bodied adults without dependents" and other related work requirements until at least January 1, 2016. HSD had sought to implement the three-month time limit for ABAWDs and a mandatory Employment and Training (E & T) program for other adults, ages 16-60 with children over age 13.  The Court determined that HSD could not implement the eligibility changes without causing eligible New Mexicans to lose food assistance. The Court ordered the parties to meet quarterly and submit status reports to the Court. Four status reports have been submitted. Defendant has suspended plans to implement ABAWD requirements and a mandatory E & T program, but continues to plan for a possible future implementation.

The Department continues to argue that requirements that individuals engage in E & T as a condition of eligibility for SNAP do not fall within the Decree. The Department argues that E & T requirements do not fall within the Decree because HSD and FNS argue that they concern "ongoing eligibility." HSD has stated this position in writing to the Special Master. Defendant continues to ignore this Court's finding that "in order to ensure that all eligible New Mexicans apply for, and are properly receiving SNAP benefit, the "application process" must include the processing practices leading up to an eligibility decision, ***regardless of whether an individual is already receiving SNAP benefits***."  P. 6 Doc. 645.  Defendant continues to violate the Decree and orders of this Court by refusing to consult and discuss changes to the SNAP E & T program. Specifically, Plaintiffs inquired if Defendant would remove the incorrect information on the NOCA, which states E & T is mandatory and repeal regulations which state E & T is mandatory. Defendant maintains that E & T does not fall within the confines of the Decree because it concerns "ongoing eligibility." Defendant also admits he is developing a notice, but refuses to share it with Plaintiffs' Counsel. This violates the Decree. Plaintiffs are concerned that HSD does not have program staff developing notices.

## VII.   Continued Compliance Issues

### 1)  Data Required by the Decree

Plaintiffs have requested data reports that Defendant is required to provide under ¶3, p. 25 of the Decree. Defendant has refused to provide any reports that do not currently exist and has sought advice from the Special Master as to whether they have to follow provisions of the Decree concerning data collection.  Plaintiffs believe this is an effort to evade monitoring and delay compliance.

The Decree requires the following statistical data summaries to be provided every 6 months for

16

SNAP (food stamps) and Medicaid for Women and Children (MAWC) for each month of the time period under review.

1. *The number and type of applications filed, by office.*
2. *Office, district and statewide timeliness rates for each program and for expedited food stamps;*
3. *Average caseload levels by office;*
4. *Average caseload comparisons, by office;*
5. *The number of food stamp applications that appear eligible for expedited services, but did not receive timely emergency benefits by office;*
6. *The approval, withdrawal and procedural and need based denial rate by office.*
7. *Case closures and denials by reason:*

**Data on Medicaid**
Defendant incorrectly notified the Special Master that MAWC categories of Medicaid no longer exist and asserts that full compliance is achieved with a limited amount of data on SNAP. In essence Defendant is asserting that Medicaid no longer falls within the confines of the Decree, because "MAWC" is not used to describe the categories of Medicaid that serve families. In fact, federal eligibility rules were adjusted for some populations on Medicaid and the program was expanded in New Mexico to include more adults. Defendant's own worker training materials document how individuals receiving Medicaid under "MAWC" categories continue to be eligible for Medicaid, along with the expanded adult population. *See* Exhibit 11. These changes in federal eligibility rules do not exclude Medicaid from the reporting requirements of the Decree. In fact, Defendant has stipulated to Court Orders since the State ceased using "MAWC" terminology and was found in contempt for failing to comply with orders of the Court related to Medicaid under the more expansive eligibility rules. In fact, the Court Ordered Defendant to provide data on the timeliness of Medicaid processing over two years ago in Doc. 554 (see ¶7) and then again in September of 2015 Doc. 601(see ¶12). Defendant began providing reports on the timeliness of Medicaid processing on initial applications in October of 2016. The data shows that around 96.5% of Medicaid approvals are timely, but only 68.9% of denials occur within the required 45 days. In at least one county, less than half of denials occur within 45 days of application. FY 2017 Report from Defendant is attached as Exhibit 12. Defendant does not provide data on Medicaid cases required to be processed within 90 days, as required by paragraph 7(c) of Doc. 554 and Defendant does not provide any county level data on Medicaid caseloads, as required by the Decree.

**Applications for Renewal**
Defendant incorrectly asserts that he does not need to provide data on the timeliness of renewals because "the Decree never uses any language about renewals." However, Judge Gonzales has explicitly rejected Defendant's argument that the Decree is limited to just initial applications; stating that the Decree should not be "narrowly defined as to only include the initial application and initial eligibility determinations, as the question of eligibility for benefits extends far beyond an initial application." *See* Doc. 645, p. 7. Defendant has consistently stipulated to Court Orders under the Decree concerning renewals of benefits (*see* Docs. 475, 554, 549, 606, 587, and 601.) Defendant must provide data on all application processing and this includes renewals. The limited amount of data that Defendant currently provides indicate widespread delays in renewal

processing that causes eligible families to go without food and medical assistance. Accurate data will allow the Special Master and parties determine compliance and strategies for improvement.

**Procedural and Need Based Denial Rate by office**
Defendant provided data on the procedural and need based denial rate by office in the past. Plaintiffs requested information on procedural closures and denials from the Department because Defendant began closing and denying cases for procedural reasons. Defendant provided over 800 pages of raw data on case closures and denial by reason. Many of the reasons for denial and closure on the reports are general and Plaintiffs cannot determine if they are procedural or based on eligibility. Defendant asserts that he should not have to provide this data because he does not currently collect it through the Department's IT system and the data is not necessary and/or appropriate because "the Decree was written a long time ago." In fact, Defendant's failure to accurately determine eligibility for SNAP and Medicaid has been and continues to be central to Defendant's non-compliance. This Court has entered 12 different orders since March of 2014 concerning illegal procedural barriers in the administration of SNAP and Medicaid that result in eligible families being denied Medicaid and SNAP for procedural reasons, including improper requests for documentation, illegal notices, and automatic termination and denial of benefits. The Court went as far as to prohibit Defendant from closing and denying cases for procedural reasons because of these failures and held the Defendant in contempt for failure to comply (*See* Doc. 730, p. 9-10). Defendant must immediately begin collecting data on the procedural and need based denial rate for initial and renewal applications and provide this data to the Special Master and Plaintiffs. As added support, Plaintiffs have pointed out that federal law requires Defendant to provide this data whenever he initiates a "major change" under 7 C.F.R. § 272.15.

**Delays caused by the State agency:**
After receiving some limited data from Defendant on application and renewal processing, Plaintiffs requested information showing how many cases had benefits suspended because of delays caused by the State agency in November and December. In these cases clients receive a delay notice but their benefits stop until HSD processes the case. This is identical to a procedural closure because benefits are terminated without a determination of eligibility. The Department agreed in the meet and confer to investigate ways to provide this data. HSD provided some information about when notices of delay were sent, however that data is unintelligible for the reasons set forth in Section IV(3) above.

**Interview and renewal application timeliness rates**
Plaintiffs have also requested data demonstrating the timeliness of interview scheduling. The Department has not provided this data and refuses to provide any data that does not currently exist in current reports. However, the Decree requires that the Department report on office, district and state-wide timeliness rates. Interview timeliness falls within this paragraph. Decree, p. 26, ¶ 3 (b). Data the Department does publish on overall renewal timeliness indicates severe problems, with timeliness rates as low as 33% in some counties and a statewide rate of 87.9%.

**List of dates, locations and types of monitoring activity conducted by New Mexico and federal agencies**
Paragraph 5, p. 25 requires that Defendant provide information about all monitoring activities conducted by the state and federal agencies. HSD has not provided this information. Instead,

18

Plaintiff's Counsel becomes aware of some federal monitoring activity and specifically requests records and some may be provided. Plaintiffs do not receive information documenting all monitoring activities. After receiving this information, Plaintiffs' Counsel may request documents evidencing state and federal monitoring activities. Decree, p. 26, ¶ 6. With limited information about the scope of state and federal oversight, Plaintiffs' Counsel has requested that the Department share all data provided to FNS with Plaintiffs. However, there is data described in the FNS corrective action plan that HSD is collecting but does not send to FNS. This includes tracking delays in application and renewal processing and messages to Regional Managers documenting delays each month. The Decree requires that HSD share all documents related to federal monitoring and corrective action plans. Defendant has not responded to Plaintiffs' request for this data.

**2) Incorrect Termination of SNAP Due to Intentional Program Violations (IPV)**

In 2015, Plaintiffs became aware of an automatic benefit termination process occurring due to an error in Defendant's IT System. The process affected individuals who had previously been disqualified from SNAP for intentionally violating a program rule. Benefits stop even if the IPV was entered due to Departmental error and even when the individual had fully served his or her disqualification period.

Workers report that there is no way to change or correct IPV disqualification information appearing on the case in ASPEN.  As a result, workers must manually issue benefits each month and manually suppress the notice that incorrectly tells clients their case is closed. Workers must remember to do this each month for every case that includes a household member previously disqualified for an IPV.  Many people fall through the cracks. Plaintiffs wrote to defendant about this problem in 2015. *See* Exhibit 13.

Defendants incorrectly state that a system fix was instituted in April 2016.  Plaintiffs have evidence of this problem occurring in November of 2016. Plaintiffs notified Defendant of an elderly and disabled client that stopped receiving food assistance because of this exact error when HSD improperly applied an IPV to her case.  Even though a NM District Court Judge overturned the IPV in 2014, the ASPEN system continued to disqualify the client.  In November of 2016, the client did not receive her SNAP benefits.  When the client called to inquire as to the status of her case, a worker told her that "she will need to call in every month to request SNAP benefits because she has an IPV which does not allow ASPEN to issue out automatically."  *See* Exhibit 14.  Plaintiffs have asked Defendant when this will be fixed and have not received a response beyond a denial that the problem exists. Defendant provides no evidence that the "problem fixed in April 2016."

**3) Combined Application Project**

In 2014, the Department terminated a SNAP application process for disabled New Mexicans receiving Supplemental Security Income (SSI). The process is called the "combined application project" (CAP). Defendant implemented this change to the application process without notifying Plaintiffs' Counsel as required by the Decree, p, 26, ¶10.  The combined

application option allowed individuals receiving SSI to apply for SNAP using a simplified application process. For many participants, the benefit calculation under the CAP option allowed for a higher benefit amount than would be available through the standard application process and every participant was certified for 3 years at a time. This is longer than the standard certification period. The Department created this program through state regulations after obtaining permission from the federal government through a pilot project. Defendant informed Plaintiffs that the pilot project was set to end in May if 2014, with the option to renew. Defendant stopped taking applications under this program in March of 2014, despite having regulations that state the application option is currently available.

Defendant asserts that participants were notified of the program termination. However, Defendant has not provided evidence of this to Plaintiffs' Counsel, despite promising to do so.  Notices sent to participants that Plaintiffs' Counsel have seen incorrectly state that the benefits changed because "your household's countable unearned income has changed" and "your household's allowable deductions have changed" in violation of federal law which requires that notices contain the reason for the proposed action." These notices do not meet the legal requirements for adequate notice. [4]

The Department's own data reveal that termination of the program resulted in loss of part or all food assistance for the majority of participants. Of the 5,540 former program participants who continued to receive benefits, 22.5% of the program participants stopped receiving benefits after the program was terminated and over 49% of them receive a reduced benefit. Defendant has not documented any of the information described below, despite agreeing to do so.

**HSD'S POSITION:**

**Throughout this document, HSD has provided the precise language of the court order. HSD objects to Plaintiffs continued use of paraphrasing and quoting out of context in order to confuse the plain language of the Court orders and the status of HSD compliance. Requiring parties to use the precise language of the court order will make compliance determination a more objective task.**

**HSD agrees that the process of drafting this JSR is an indicator of a need for a mediator and reiterates its request to the Court to appoint Judge Torgerson to act as a mediator. Plaintiffs have substantially changed format and language with a refusal to send such changes tracked.  HSD accepts Plaintiffs refusal to send new language and substantive changes without tracking such changes but such a practice is unprofessional.  Plaintiffs have highlighted an error made by Ms. Campbell in a draft document, conceded by Ms. Campbell as being an error – going further to falsely accuse HSD of sending the error to the Special Master when such an action did not occur.**

---

[4] *See* 7 C.F.R.  § 273.13 (a) (3).

Relative to new information in this JSR, previously not provided to Plaintiffs, HSD wrote in the JSR that it has reached an agreement to have Ms. Pamela Kennedy act as consultant and subject matter expert for immigration eligibility issues.   This information was provided within 10 hours of HSD learning that Ms. Kennedy accepted such a position.  All other allegations that HSD has provided new and previously withheld information is false and HSD will provide corroborating data and documents to the Special Master to confirm this.

Contrary to Plaintiffs' assertions, data demonstrating HSD's current untimeliness relative to processing renewals has timely been provided to Plaintiffs.  HSD has never denied this temporary state.  Plaintiffs provide no corroboration of their allegation of such denial.  No corroborating document exists because it has not occurred.   Plaintiffs assert in their introductory paragraph that until recently HSD has actively denied that very serious delays in processing SNAP exist.  This statement is not true.  HSD has informed Plaintiffs at multiple meet and confers that the department expected a decrease in timeliness rates as the department began to process the overdue pending SNAP applications and recertifications that existed due to the May 2014 court order (Doc. 500).   HSD has an approved corrective action plan with USDA FNS that requires all overdue pending SNAP applications and recertifications from before October 31, 2016 to be processed by the end of April 2017.  Untimeliness for processing Medicaid renewals is tied to this issue because case worker resources are finite.  HSD has shared multiple reports with Plaintiffs on a monthly basis that include timeliness data for both SNAP and Medicaid.   HSD also publishes timeliness data monthly on its website.   \

I.      Medicaid Renewals

<u>Doc. 475</u>

¶ 3  *"On or before March 14, 2014, Defendant will submit to Center for Medicaid/Medicare Services ("CMS") for approval the form attached hereto as Exhibit A which, upon approval by CMS, shall be the only form used for the redetermination of eligibility of MAGI and family based Medicaid categories. Pending approval of the attached form by CMS, Defendant will continue the redetermination process of automatically cascading eligibility for the existing members who are currently active to another assistance category, such as SNAP, TANF, or Medicaid."*

Currently the MAD 608 has been approved by CMS.   It is written at a 6th grade reading level. (Exhibit A.)[5]  The literacy review was completed by Maximus. (Exhibit B.)  HSD believes that this Court Order has been fully complied with.

---

[5]  HSD's exhibits are void for "Exhibit K" because that section was discarded based upon revisions of different versions of this JSR.  There is also no Exhibit L because both parties refer to an old "Exhibit L" that is Exhibit Q in this document and HSD decided that inclusion of a document title Exhibit L different from references to the old document would be confusing.

Plaintiffs' concerns listed in their section as 1-3 go beyond compliance with this court order. Old case file reviews are not relevant to current HSD compliance.

1) HSD is "pushing out" Medicaid cases so that no Medicaid case is closed until it is due for renewal. This process is different than how HSD is handling SNAP cases. Medicaid cases that have been overdue pending are not procedurally closed, but, instead, remain active with benefits until they come to the end of their certification period. 120 days prior to the end of the certification period, administrative renewal is attempted by caseworkers. If the administrative renewal is successful, the case is recertified without use of the MAD 608 or any interaction with the recipient beyond the NOCA that notifies them of the renewal. If an administrative renewal is not possible, either because data is not available or is not reasonably compatible with what HSD has on file, then a MAD 608 is sent asking the recipient for additional information or a reasonable explanation.

A training explaining this process was approved by CMS. All ISD caseworkers were trained on this process beginning in October, 2016.[6] HSD has trained its workers to document this process in case comments. HSD is not under court order to "demonstrate" or "prove" this process to Plaintiffs, although the process has been explained to Plaintiffs. The Department will work with the Special Master (Mr. Parker, "SM") and the Compliance Specialist (Ms. McKissic, "CS") to confirm that this compliant process is currently in effect.

2) HSD has recently added language to the MAD 608 asking for information about fluctuating income. As set out above, an individual will only receive the MAD 608 if the attempted administrative renewal demonstrates a need for the department to gather more information. Thus, not "all participants" are asked about their income. Only participants who cannot be administratively renewed based on a lack of necessary information relative to their income receive a MAD 608 asking for information. It is appropriate to ask for this information when an administrative renewal cannot occur. In fact, CMS' model renewal form includes such a request. (Exhibit D-1.)

Plaintiffs have provided contradicting positions on this issue. In February 27, 2015 Plaintiff specifically wrote:

> "The Income Section should include all sources of income. The form must include all information in the recipient's account and available to HSD through other electronic sources. 42 CFR 435.916(a)(3)(i)(A). Also, please include space for a recipient to note fluctuating income. Some recipients have income sources that fluctuate. However, there is no space on the form to clearly note fluctuating income. An example of the language that meets this request is:
>
> Fluctuating Income
>
> You told us that your income changes from month to month and gave us an estimate of what you thought your income would be for the past 12 months. Last year, you told us your income would be _____

---

[6] Exhibit C is a copy of the relevant pages for the Medicaid Renewal process as currently trained and implemented.

What do you think your income will be for the next 12 months?_____."

See Exhibit D-2.

The designed, but yet to be implemented MAD 608 asks if the client has fluctuating income, asks them to attest to that income and provide proof:

**Fluctuating income**

Do you have fluctuating income? Fluctuating income is income that changes.

Yes or No _____

If you answered yes above, what do you think your income will be for the next 12 months? _____.

Please send proof of your income for the last **30** days <u>if your income fluctuates</u>.

HSD's State Plan for Medicaid, approved by CMS has the following policy in place: When the applicant's income attestation is below the applicable income standard but data sources indicate that income is above the applicable income standard, then additional documentation of income will be requested. If no electronic data sources are available, paper sources will also be used. When an applicant attests to income above the applicable income standard and data sources indicate that their income is below the standard, a reasonable explanation will be requested. This includes a verbal or written statement from the applicant clarifying the difference. If additional verification documentation is needed, then it will be requested at that point.  The State Plan is Exhibit D-3.

3)     The currently implemented MAD 608 was put into production on December 22, 2015. This version contained New Mexico Center on Law and Poverty input and recommendations.  The storyboard demonstrating NMCLP's input into the current MAD 608 is available for review by the Special Master and/or Compliance Specialist.

The MAD 608 was then reviewed by Maximus as a notice expert.  Maximus' input was received by HSD on February 17, 2016.  HSD incorporated Maximus' recommendations. Plaintiffs had full participation throughout the Maximus review process.  Recently, HSD

has added two small sections into this MAD 608.  The MAD 608 with new language is the notice Plaintiffs reference in their section.   The new language was sent to Plaintiffs for their review and they have been given 30 days opportunity to conference. Plaintiff has responded in writing to this new language. The new language has been reviewed for 6th grade literacy by CTS as a notice expert.  CTS' reviewed version was received by HSD on December 27, 2016.  It is set to go into production in March of 2017.  In HSD's initial draft for this JSR, Ms. Campbell erroneously stated that the MAD 608 was being reviewed by FNS. That was not correct and HSD let Plaintiffs know of the error. Plaintiffs then made a written allegation that "Defendant has asserted in written correspondence to the Special Master that the Medicaid renewal form is being reviewed by the Food and Nutrition Service (FNS) and FNS' contractor Insight."  This is false.  It was a one-time error in a draft document that was not shared with the Special Master. Plaintiffs seem to find that this error is worthy of continued comment in a JSR even though Ms. Campbell has admitted to making an error in a draft document.

**Doc. 475**

¶ 5  "*Prior to sending a family a notice of Medicaid termination or redetermination, Defendant will continue to conduct its own timely review of the family's information, contained in its own files or otherwise available, in order to determine whether the children or other family members currently enrolled in Medicaid are eligible for other categories of coverage. If such eligibility is determined, Defendant will administratively renew eligibility for each family member without requiring the family to take any action.*"

Before HSD sends a MAD 608 an administrative renewal is attempted.  If an administrative renewal is not completed, the MAD 608 is sent so that HSD can obtain the necessary information or a reasonable explanation of why information from the applicant is not reasonably compatible with what is found in the trusted databases.

The concerns listed in Plaintiffs' section go beyond compliance with this court order, but are addressed as follows:

1)   Old case file reviews are not relevant to current HSD compliance. Relative to the additional issue of NMAC, the MAD sections are in the final stages of revision and have been published with SRCA.  These revisions have already received public notice and comment.

2)   Plaintiffs were active participants in drafting clear and useful calculation tables, which are currently being reviewed by FNS in Washington, DC ("National FNS") and Insight. An example of an actual redacted NOCA showing the current calculation tables is attached as Exhibit E.  The examples seen by Plaintiffs are NOCAs sent to authorized representatives who, based on previous policy, do not currently receive a NOCA with the calculation tables.[7]  When the new NOCA is implemented, there will no longer be different policy for participants versus authorized representatives

**Doc. 587**

---

[7] See Exhibit E, NOCA sent to recipient showing calculation table(s).

¶2    "**_NMAC - Defendant will inform Plaintiffs whether Defendant agrees that the NMAC needs to be revised, and if so, when he will launch the revision, by no later than June 15, 2015. If the parties cannot reach agreement on the content of the policy, and the changes needed in the NMAC, Plaintiff will file a motion with the Court to seek a ruling on the matter. If such a motion is filed, the date for Defendant to take action shall be suspended pending the outcome of the motion and shall be extended as necessary._**"

HSD has informed Plaintiffs about what parts of NMAC needed revision.   This has been an on-going process that began before June 15, 2015.  HSD has attached a  spreadsheet documenting that work was being done in March of 2015.  Exhibit F.[8]

Many of the NMAC changes initially demanded by Plaintiff did not, indeed, need to be changed.  Plaintiffs' May, 2015 letter attached as Exhibit G[9] demonstrates the number of NMAC revisions demanded by Plaintiffs, but then conceded as not being needed.  HSD has evaluated the NMAC, consulted with Plaintiff, engaged in extensive written and verbal communication and taken steps necessary to begin changes to NMAC.  These actions establish that HSD is in compliance with this Court Order.

The additional letters sent by Plaintiffs on this topic are attached as Exhibit H.  It is important to note that if Plaintiff truly felt HSD was not compliant with this provision, they had a duty to file a motion , which would then suspend and extend the date for HSD to take action.  Plaintiffs did not file such a motion.  After many conversations and extensive written positions from Plaintiffs, the parties have agreed on needed revisions. The final sections for ISD will be sent to SRCA on or about February 16, 2017.  The final sections that are specific to MAD do not have a date to be sent to SRCA.  No court order creates a deadline for this action.

This Court Order is fully complied with.

The additional concerns raised by Plaintiff are not part of the plain language of the Court Order, however, they are addressed below:

(1)    Plaintiffs are aware that Medicaid renewal language is being changed in NMAC.  See HSD's letter to Plaintiffs, dated September, 2015, pages 14-16 (Exhibit I.)  This promulgation process has already moved through public notice and comment.  Plaintiff was an active participant in the open comment process.  HSD has addressed each of the concerns raised by Plaintiff.  The final step is for MAD to submit these sections to SRCA.  This process will begin next week.

Plaintiffs' assertion that "HSD has no regulatory content related to the Medicaid renewal process" is, at best, misleading.  IPP 15-06 which was released to all caseworkers in June, 2015, is an interim policy put into place pending final promulgation of NMAC updates.  "IPP" stands

---

[8] As a static exhibit document, Ex. F cannot be read in its entirety.  Any reader of this document who would like it in excel format can request such by sending an email to Natalie.Campbell@state.nm.us.

[9] The version of this letter as attached shows hand numbering that was added by N Campbell as a tracking method as this was the 3rd letter sent by Plaintiffs on the same set of NMAC issues

for Interim Policy and Procedure.  IPP 15-06 is used as interim policy by workers until NMAC is finalized and published.  IPP 15-06 is attached as Exhibit J.

Relative to the concern about necessary policies being in place while the NMAC revisions pend, IPPs do exist for Medicaid renewals and such information has been provided to Plaintiffs and the Court.  IPPs provide interim policy where NMAC is silent or until a revised NMAC is finalized through SRCA.

The IPPs addressed in Judge Garza's findings have in fact been in place since June 12, 2015.[10] HSD attached the relevant IPPs to the 9th JSR, 10th JSR, and 11th JSR, along with an explanation of how employees were trained.  This information was filed with the Court over multiple months beginning in May of 2015.[11]   Additionally, Mr. Pearson testified that IPPs were used as interim policy until NMAC is finalized and published.[12] Although HSD may disagree with findings of the court, this does not mean we are in conflict with court orders.  HSD objected in the appropriate manner, and continues to disagree with these specific findings as facts in the record contravene such findings.

**¶ 5 –**

The NOCA that is currently being reviewed by National FNS and Insight contains necessary provisions related to administrative renewal.

**Doc 601:**

¶1     *NMAC – By **September 30, 2015**, Defendant will provide Plaintiffs with his final position on the NMAC revisions, including the substance of the revisions he is going to make, as well as when he will issue a notice of proposed rulemaking to implement the revisions. Once Plaintiffs have that information, Plaintiffs will determine whether they are going to file a motion with the Court. If such a motion is filed, the date for Defendant to take action shall be suspended pending the outcome of the motion.*

See HSD full response to Doc. 587, ¶ 2 above.  This is a redundant issue in this document.

**II.  Application Processing for Households that Include Immigrants**

**Doc 475:**

¶ 6     *On or before March 31, 2014, Defendant will issue an updated version of the directive attached hereto as Exhibit B on the Medicaid renewal process for newborns and for children and family members on Transitional Medicaid that comports with the above requirements. This directive will be re-sent in September 2014 and in March 2015 and again thereafter as necessary*

---

[10] Judge Garza stated in her findings that, "to date," HSD had not provided these IPPs to the Court and had not provided information about the policies being communicated to workers, or the extent to which the IPPs override or reconcile any inconsistencies in the NMAC -
[11] Docs. 590, ¶¶ 1 and 3; 592, ¶¶ 1 and 3;  and 595, ¶¶ 1, 3, and ¶ 17
[12] Tr. Of 4.20.16 Hearing, Page 65, lines 10-14; Page 80, lines 10-15.

*to ensure staff knowledge of the proper procedures for renewal. Defendant will also conduct training sufficient to bring its staff into compliance with the policy set forth in the directive.*

HSD has trained all eligibility workers on the correct law regarding immigrant eligibility using charts and IPPs that have been approved by Plaintiff. This set of materials is attached as Exhibit M. Ms. Vida Tapia-Sanchez testified that IPPs 14-02 and 14-03, compliant with immigration eligibility law, were issued on February 28, 2014 and reviewed with workers by County Directors.[13] The use of IPPs as training materials is compliant with federal law and is a practice approved by both FNS and CMS. HSD will request written confirmation from FNS and CMS' outlining their position on use of IPPs as policy and for training purposes if the Special Master requests it. These IPPs were reissued to case workers in September, 2014, March, 2015, and again every six months thereafter.

The court's finding cited by Plaintiffs related to training that Plaintiffs knew/know was in <u>draft</u> form and was never used as a training tool. In fact, Plaintiffs and the National Immigration Law Center participated in the development of this draft training. HSD pointedly added (and contrary to Plaintiff assertions, "documented" a plan for immigration training) by including the need for an immigration expert to finish this training in its 9 point plan adopted by the Court. HSD has confirmed its immigration expert as Ms. Pamela Kennedy, the premier immigration attorney in New Mexico. HSD will be working to get her contract in place in the very near future. Ms. Kennedy will assist in the development of a larger training module that will be finalized from the draft training and will also be involved in notices and policy relative to immigration eligibility for SNAP and Medicaid. This process is documented in Doc. 712.

The immigration issue is complicated and evolving. FNS has indicated to HSD that additional policy changes are currently being considered (ex: changing requirements to actually require collection of a document instead of allowing information processed through SAVE.) SAVE is the acronym for Systematic Alien Verification for Entitlements Program used by the U.S. Department of Homeland Security to verify immigrant status. Although these new polies are not now in effect, if implemented, it will require additional change in HSD policy and procedure.

Although Plaintiffs have held themselves out as "experts" in this area, HSD has found that the information Plaintiff provides is often incorrect or incomplete.[14] [15] This has resulted in hours of wasted effort on behalf of HSD and SAVE to provide primary sources to Plaintiffs in order to defend current and legal practices by HSD.
(See Exhibit N for HSD's response to Plaintiffs' incorrect assertions about immigration eligibility determination.)

HSD brings these issues to the Court's attention not to criticize Plaintiffs. In fact, HSD also concedes that while Ms. Campbell has worked hard with Homeland Security, SAVE, NILC, and local immigration attorneys, she is also not an expert on immigration law. HSD addresses this because we feel it is indicative of the lack of objective, open-minded observation needed to

---

[13] Tr., 4.20.16 Hearing, Pages 145-147.
[14] Plaintiffs continually mis-used one sentence out of context from CMS sites to assert that New Mexico could not require the applicant to provide document type information. This was incorrect.
[15] Plaintiffs attempted to assert that the process was the same for both Medicaid and SNAP – which is not the case.

resolve this case.   Plaintiff's assertion is that the primary cause of problems on this issue is HSD requiring documents.  This is wrong.  HSD does not require provision of documents, HSD requires a self-attestation to the document type that a non-citizen holds.   For example, a student visa.  This mischaracterization is an example of the unnecessary exaggeration and bias that has plagued this case.  That is why HSD is working towards hiring an immigration expert to get the training complete, correct, finalized, and trained in an appropriate manner for our caseworkers.

## Doc 587

¶ 9 - See HSD's positions to Doc. 475 above, ¶ 5.   In Plaintiffs' parallel section, they allege that HSD states a training for new employees is still in draft form.   This is incorrect.   The immigration training is in draft form.   It has been sent to Plaintiffs and to HSD's new immigration consultant, Ms. Kennedy, for review.  It has also been sent to NILC for review.  The training for new employees has been in use for a substantial amount of time.  The training for new employees was reviewed by Plaintiffs and their input was incorporated where appropriate.

## Doc. 601

¶ 6  See HSD's positions to Doc. 475 above.  This is a redundant issue in this document.

¶ 7     *ASPEN - Defendant will determine how it can fix its ASPEN system so that it is not requiring entry of a document to prove immigration status.*

After careful review with Deloitte and work with Homeland Security/SAVE, it has been confirmed that no change request is necessary as the system does <u>not</u> require entry of a document unless required by FNS, CMS, and the U.S. Department of Homeland Security.

The system as it currently works is federally compliant.  HSD uses SAVE correctly and pursuant to the terms of our current Memorandum of Understanding ("MOU") with the U.S. Department of Homeland Security.  Plaintiffs are incorrect about what federal law allows and prohibits relative to collection of information for immigrant eligibility.  This is further example of the wasted hours spent gathering primary sources necessary to support HSD's position and refute incorrect assertions by Plaintiff.

ASPEN does not require "entry of a document." Aspen appropriately requires full name, date of entry, numeric identifier (i.e. A-number), and "document type."  All four of these are allowed by federal law and are <u>required by our current MOU approved by the U.S. Department of Homeland Security</u>.  ASPEN does not require entry of a document, and ISD workers only request the document when SAVE requires it as a secondary or tertiary step.  This is a legal and appropriate process.  Further explanation is provided in HSD's Letter to Plaintiffs, attached as Exhibit O.

HSD is in compliance with federal law and ¶ 7 of Doc. 601.

¶ 8     *Training Long Term Employees – Defendant is going to implement an immigrant eligibility training for long term employees. Defendant will provide Plaintiffs with information about the status of this in the September 2015 JSR.*

28

See HSD's position for Doc. 475 ¶ 6.  This is a redundant issue in this document.

## III.  Notices

### Doc 549

### ¶¶ 1, 2

*Defendant will include plaintiffs' counsel in the Human Services Department work group that is creating SNAP and Medicaid model notices. Plaintiffs' counsel will serve on this workgroup until otherwise ordered by the Court;*

*Defendant will confer with plaintiffs' counsel in setting all Notice work group meetings in order to ensure plaintiffs' counsel's participation;*

Plaintiffs' argument is that the current work with National FNS and Insight does not provide them with full participation.   Plaintiff is aware that HSD requested full participation for Plaintiffs and National FNS is the entity that prescribed the limitations on Plaintiff participation. FNS is the entity that has limited their participation allowing them only to listen to calls dealing with content of notices.  Since the contract for this expert notice work is between National FNS and Insight for the benefit of NMHSD that is their decision to make.   Plaintiff has exercised their rights to communicate directly with FNS when they wish to.   HSD has never interfered with this right.

Plaintiffs have charged HSD more than $13,000 for input on notices between October 2015 and December 2016.Referenced invoices are attached as Exhibit P.  This is but an example of a little over one year's worth of such invoices.  Plaintiffs' assertion that "Defendant has not included Plaintiffs' Counsel in any workgroup meetings" and "Plaintiffs' Counsel has not been provided an opportunity to participate as further revisions are made to model notices" is untrue.[16]

Plaintiffs have been provided with the version of each notice that was sent to Insight at the time it was sent to Insight.  Plaintiffs have been notified of scheduled meetings when they are scheduled.  Admittedly, sometimes the scheduling is tight, but scheduling is not controlled by HSD.  Plaintiffs have also been provided with the complete set of reports and materials that it receives back from Insight on each notice.  Except for the ability to speak during calls with Insight, Plaintiffs have the same participation as HSD in this process.

It is noteworthy that Plaintiffs have not sent HSD any letters or notes on their position relative to Insight's reports they've received.  HSD has thus moved forward incorporating Insight's comments to finalize and implement the notices. It is not reasonable for HSD to have to spend money on a 2nd notice expert to do the same work and benefit as this notice project offered and financed by National FNS.

---

[16] If the Special Master and/or Compliance Specialist is interested in the full amount invoiced for participation in the formal notice workgroup meetings that ended in 2015, the invoices and complete records of Plaintiff participation can be provided.

**¶ 3**  *Defendant will continue to provide plaintiffs' counsel with notices, factors that trigger use of particular notices, story boards, reasons, and eligibility determination language until otherwise ordered by the Court;*

Plaintiffs, in their section on this issue, are referencing work done by CTS.  One document, the HSD 100, was sent to CTS incorrectly in an older version.  This was an HSD error.

The final HSD 100 that is implemented is compliant.  CTS did not have significant problems with any other notice reviews.  In fact, when Plaintiffs demanded that HSD do a full analysis of the work done by Maximus versus the work done by CTS, it was found that language errors made by the two literacy review entities were similar.[17]  HSD responded to Plaintiffs letters at Meet and Confers, and addressed all Plaintiff input as part of the internal process of working on notices.

**¶ 4**  *HSD will not make changes to standard form documents adopted pursuant to the Decree without providing plaintiffs' counsel at least one month's advance notice and an opportunity to conference in the matter, as required by page 26-27 the decree;*

All notices in the document commonly referred to as "Exhibit L" were agreed by the parties to be the notices for collaborative work.   Each of these notices have been sent to Plaintiffs by HSD. Plaintiff has reviewed many of these notices multiple times.  HSD most recently sent Plaintiffs the new changes it is making to the MAD 608[18].  Plaintiffs attended multiple notice work groups between 2014 and 2016.   Plaintiffs also participated in Maximus and CTS reviews.  Plaintiffs have participated with National FNS and Insight at levels dictated appropriate by National FNS.

Relative to Plaintiffs' concern about the online renewal for SNAP issue, the online software is YesNM.  YesNM was designed in 2013 and early 2014.  The current version of the income screens (Plaintiffs' concern centers around the income screens) was implemented in early 2014, before the Court had ruled that renewal processes fell under the scope of DHG.

Plaintiffs were not a part of the design of the renewal pieces of YesNM because prior to May 2014, there had been no court order relative to renewal pieces for software, notices, or related issues.  It was not until May 2014 that HSDs responsibilities related to the scope of this litigation changed.  There is no mention in the consent decree of renewal processes.  Moreover, there is no record of Plaintiffs invoicing for work on renewal issues, or filing motions on the same.

HSD believes that the income screen issue is a best practice issue, not a compliance issue. Renewal applicants do not have to fill out income information for ISD to process their renewal for SNAP, unless their income has changed by more than $50.00.  YesNM functions correctly on this legal requirement. The income screens can be skipped.  Although the screens can be skipped, HSD acknowledges that the current set of income screens does not explain this option clearly to the applicant. HSD is working with YesNM to improve this.  This process has begun internally, with the new proposed language having already gone through the readability phase.

---

[17] If the Special Master and/or the Compliance Specialist want to review this work from 2016, HSD will make these notices and reports available.
[18] New revisions to the MAD 608 and Plaintiff participation is described at Doc. 475 ¶ 3.

*¶ 7   By December 3, 2014, the Notice of Case Action ("NOCA"), which is used for all approvals, denials and case closures, and the list of denial/closure reasons will be presented to Maximus Corporation for translation into Spanish, at a 6th grade literacy review in both English and Spanish, and Section 504 compliance;*

The proposed Notice of Case Action ("NOCA"), which is used for all approvals, denials and case closures, and the list of denial/closure reasons was reviewed by Maximus. Maximus reviewed the notice for both SNAP and Medicaid. Plaintiffs are aware of this as they were full participants in the process. Additionally, Maximus conducted a field test with the NOCA. The full Maximus report and redesign of the NOCA was sent for a secondary review by National FNS and Insight for SNAP compliance. The secondary review by FNS and Insight is not yet completed. Once HSD receives their report, it will need to create an entire release packet just for the NOCA as the changes in design and language with all of the triggers and reason codes is a massive IT project. HSD will prioritize putting the NOCA into production.

**¶¶ 8, 9, and 10**

*By January 15, 2015, defendant will provide the final draft NOCA and denial/closure reason codes language to plaintiffs' counsel for final review. The parties will have reviewed the NOCA design with Deloitte or other IT expert present and discuss ongoing concerns, including but not limited to: 1) notices being issued outside of ASPEN concurrent with ASPEN notices causing confusion; 2) modification and/or removal of calculation tables; 3) Spanish language notices; and 4) guidelines for manual notices;*

*By February 16, 2015, defendant will meet and confer with plaintiffs' counsel regarding the Notice of Case Action (NOCA), as finalized by private contractors and the Department. The parties will review the NOCA design with Deloitte present and discuss ongoing concerns with the NOCA;*

*By February 27, 2015, defendant will provide to plaintiffs' counsel defendant's proposed final NOCA for plaintiffs' final review and opportunity to comment;*

Currently, National FNS and Insight are reviewing a NOCA with added triggers for client fault delays, and more reason codes. When HSD receives the NOCA back from Insight, all Insight reports and documents will be shared with Plaintiffs. HSD will send the NOCA with all Insight feedback and comments incorporated 30 days before it is implemented. Plaintiffs will be given an opportunity to conference on the FNS approved NOCA at a meet and confer. .

Plaintiffs raise the issue that they have not received the NOCA, with Maximus input incorporated. This is a misrepresentation of the facts. The NOCA that went to Maximus was co-created with Plaintiffs. The notice expert provided input. Plaintiffs had full participation in this process and received copies of all of Maximus' input. If Plaintiffs objected to Maximus' input, they should have notified HSD. However, Plaintiff provided no feedback on Maximus' input, therefore, HSD moved forward by sending the NOCA and Maximus' full report to National FNS and Insight.

31

Plaintiffs have taken the position that all of the input and meetings they are given up front is only the "initial" review.   Their complaints are premised on their belief that each time any other entity reviews content and offers suggestion, that the clock completely restarts and the process is back to square one, allowing them a complete and total new review. HSD disagrees with this characterization.   Plaintiff is given a full initial review.   After that, they are copied on all reviews by other entities. Plaintiff is welcome to add additional comment at any time, but at some time, the document needs to move forward. There is no obligation for ongoing edits and final approval from Plaintiff. HSD should be allowed to move forward based on previous comments from Plaintiffs and then notice expert input.   Another complete review after Plaintiff has already reviewed the document and HSD has incorporated the notice expert input is not productive.   HSD's position is that the Consent Decree allows Plaintiffs one 30 day period to review a notice and an opportunity to conference on that notice. HSD is always open to information from Plaintiffs, but will not pay for more than one conference on a particular notice, and will not hold up its implementation of said notice past an initial 30 day period for Plaintiff review and opportunity to conference.

## ¶¶ 11-16:

¶ 11    *By March 1, 2015, defendant and plaintiffs will plan a timeline and priority work plan for the remaining Notices;*

¶ 12    *By no later than April 30, 2015, defendant will implement the NOCA, and reason codes;*

¶ 13    *By no later than April 30, 2014, defendant will implement the individualized delay notices as discussed in paragraph 5 above;*

¶ 14        *By August 30, 2015, plaintiffs and defendant will finalize the remaining notices, factors that trigger use of particular notices, storyboards, reasons and eligibility determination language that will result in individualized and detailed eligibility decisions written at the sixth grade reading level;*

¶ 15        *By September 1, 2015, the parties will meet and confer regarding the new version of the NOCA. The parties will evaluate how the new version is functioning, and discuss concerns;*

¶ 16    *By no later than September 30, 2015, defendant will implement a complete set of notices that meet the standards of the decree.*

Many of the specific requirements in this set of Court Orders have been fully complied with as they indicate intermediate steps towards final implementation of all notices that fall under the scope of DHG.

HSD acknowledges that it has not fully implemented all notices that fall under the scope of DHG.  A subset of notices is going through a second review by National FNS and Insight.  The notices that are being reviewed by Insight have a notation next to them in the table attached as

Exhibit Q.  This table is an updated version of what Plaintiffs refer to as Exhibit L.  Plaintiffs' concerns with the set of notices from "Exhibit L" are addressed below.

Plaintiffs' also raise concern that they did not receive confirmation that the notices implemented on November 27, 2015 received literacy review.  Plaintiffs' concern stems from the language sent to Plaintiffs by HSD as quoted below.

> "On November 27, 2015, the ISD 122 Recertification Form was implemented. On December 22, 2015, the following notices were implemented: **HSD 1210**; **ISD 122, HSD 1240**, suppress **HSD 1230, ISD 120, MAD 608, ISD 408, ISD 626, ISD 215, ISD 211** (notice workgroup changes only), and the **ISDB 464** (Dec 23 2.11a ASPEN Release Notes). On January 31, 2016, **ISD 211** (immigration status verification checklist) and **71 text only reason codes** (3FEB_2.12_ASPEN Release Notes) were implemented."

The entire set of notices reviewed by CTS was discussed with Plaintiffs at multiple meet and confers.  Additionally, HSD sent everything received from CTS to Plaintiffs.   The entirety of Exhibit R referenced below was sent by HSD to Plaintiffs. It is unfortunate that Plaintiff would indicate that they have not had proof that this notice was reviewed for literacy for months.  The single notice that HSD stated was released on November 27, 2015, was the ISD 122.  Verification that this notice was reviewed by CTS is attached as Exhibit R-1.  Exhibit R-2 demonstrates that the notices received by HSD from CTS were shared with Plaintiff.  Additionally, the implemented ISD 122 was attached as Exhibit B to Doc. 622 (14th JSR).  Plaintiffs have seen the CTS recommended changes incorporated, as appropriate, into the current ISD 122.

### HSD's Response to Plaintiff Concerns, 1-7 relative to Exhibit Q:

HSD is not asserting that all of the notices in Exhibit L (Exhibit Q for this document) are not DHG related notices.   The document specifically notes which notices are not DHG notices.  The parties have not been working off the entire list since  the first meet and confer on the issue when the 86 notices listed in exhibit L were discussed as to which ones were DHG notices.   In fact, one of the first tasks the parties undertook in 2014 was to identify which notices listed in the original Exhibit L were DHG notices, and then, from that subset, to prioritize a set that would be worked towards compliance.  HSD has always maintained that many of the notices listed in the original Exhibit L were not part of DHG.  This is documented in the 12th JSR (Doc. 596, pp. 18-19, from August of 2015):

> **"HSD's Response:** *Plaintiffs continue to be a part of the Notice Work Group. The Notice Work Group evaluated 86 notices and forms for federal compliance and for readability. Plaintiffs have had representatives at the Notice Work Group and have had input on the review and modifications of all 86 notices. Below is break down of the 86 notices.*
>
> ☐ *68 of 86– Require a change request to modify ASPEN*
>
> ☐ *16 of 86 – did not require a change request either because they are forms that are available outside of ASPEN such as the HSD 100 Program Application form or they are*

*information documents that are reviewed with the applicant or recipient at their initial application or recertification interview.*

*☐ 25 of 86 – Relate to Initial Application or Recertification*

*☐ 37 of 86 – Relate to Post eligibility verification such as IEVS or out of state benefit matches, restitutions or client medical travel*

*☐ 17 of 86 - Relate to Fair Hearings*

*☐ 7 of 86 – Relate to TANF and SNAP Work Program compliance*

*Below is the breakdown of the 25 notices and forms that relate to initial application or recertification.*

*☐ 21 – required an ASPEN Change Request to modify*

*☐ 3 of 21 – HSD completed the Level of Effort (LOE) Joint Application Design (JAD) sessions. These notices are pending prioritization at the Change Request Prioritization meeting to be held in late September 2015.*

*Upon implementation of the order HSD had every intention of meeting the September 30, 2015 deadline. Based on the amount of modifications and types of modifications and re-drafts of the notices or forms, the level of effort has increased to implement this project.*

*HSD will be filing a motion to extend the timeframe for implementation of the notices. The motion will be filed by September 4, 2015. This motion will include resource expenditures and a detailed explanation of the process to make these changes to notices, including an explanation of the contract resources to make the requested changes to ASPEN. The resources available include all changes for all HSD divisions that utilize ASPEN. Therefore, it is important that not all of the change requests can be processed simultaneously and must be prioritized for release. Plaintiffs have provided input on the prioritization of the notices and forms."*

In the spirit of cooperation and resolution, and recognizing Plaintiffs position as an advocacy group, HSD has allowed Plaintiffs the greatest participation possible, without specifically worrying or formally protesting input that did not fall under the scope of DHG. However, Plaintiffs have made considerable issue of compliance with court orders and decree requirements. In addition, Plaintiffs have taken such offers and openness from HSD and used it to argue in legal briefs that HSD now concedes any issue it discusses with Plaintiff as fitting under the scope of DHG.

HSD must focus its resources on compliance with the issues required in court orders and the decree. HSD will continue to carefully cite objections and clarifications relative to what it believes does and does not fall under the scope of this case.   To that end, the notices listed in

exhibit L (instant Exhibit Q) specifically notes particular notices HSD believes are not DHG notices. HSD welcomes the Special Master and/or Compliance Specialist to review the notices and make an independent determination regarding this subject.

Over half of the notices listed fully on Exhibit Q are at a 6th grade readability. This includes both DGH and non-DHG notices. Any notice scheduled for implementation or noted as ready for implementation has been confirmed to be at a 6th grade reading level. Any notice going through a 2nd review by Insight, is already at a 6th grade readability from the review done by either Maximus or CTS.

100% of DHG notices went through readability with Maximus and CTS last year, and were sent, *post review,* to Plaintiffs. There is documentation that a literacy expert has reviewed the notices.

Plaintiffs are correct that HSD did not respond in writing to their CTS concern. At request of Plaintiff, HSD spent days doing a full review of Maximus versus CTS literacy reviews and found no significant difference in the types of language errors made by both reviewing entities. Despite objections from Plaintiff, HSD is confident in the advice it receives from CTS and believes them to be a competent and professional partner.

HSD incorporated the recommendations, when correct and appropriate, from both entities. HSD also had years-worth of input from Plaintiffs that are incorporated in this current set of notices. Plaintiff has open door access to HSD. HSD and Plaintiff communicate several times each week, often many times a day. Plaintiffs billing demonstrates that they are robust letter writers. HSD frequently receives letters in excess of 10-15 pages each week. Although HSD tries to respond in writing each time, it is simply not feasible. HSD is not required to write responsive letters back to Plaintiff every time they write to us. Plaintiff cannot say that their concerns are ignored. Plaintiffs' letters are read and analyzed and acted upon when necessary.[19]

Notices in Exhibit Q that are noted as "ready for implementation" do not have a release date. This is because the release dates are filled for the next 6 months. However, the notices prioritized collaboratively by the parties (the "super 8") will be put into production as soon as possible. Some of the "super 8" are already scheduled into release packets as noted on Exhibit Q.

The MAD 608 was reviewed for literacy (only the brand new language of 2017) by CTS. 98% of the MAD 608 is the same as what Maximus reviewed.

The potential new notice for the Time Limit Rule is the FSP 014. It is unknown if this document will be used as a notice or as a checklist for workers. It is not on Exhibit R because it was not part of exhibit L and Plaintiffs' recent request was for an update on exhibit L.

---

[19] As one example of this never-ending cycle, the NOCA is a notice that Plaintiffs *co-created with HSD in a notice work group in 2014.* Since that time, Plaintiffs have written more than five letters and charged hundreds of dollars for their work on this notice - requesting more changes and offering criticism.

Plaintiffs were provided a copy of the draft of FSP 014 months ago. They have been given 30 days to conference on this "notice"[20] before its implementation. It is important to note that this is not a "notice" in use at this time because New Mexico has a statewide waiver and the program the "notice" would be used for is not in effect. Plaintiffs have a draft of the FSP 014. National FNS and Insight are reviewing the FSP 014 for potential use for the Time Limit Rule when the rule is implemented in March, 2018. Plaintiffs have been given their 30 days to conference on this "notice."

## Doc. 601, ¶ 10

¶ 10  *Notice Expert – Defendant has agreed to retain a notice and literacy expert. At the September 21, 2015 hearing, Defendant will provide further information concerning the status of the contract with the notice and literacy expert.*

HSD retained Maximus and CTS to serve as experts in this capacity. The status of the contract has been provided[21]. HSD is in compliance with this court order. Court orders do not require HSD to work with only one service provider and to maintain contracts with any specific service provider. The contract with Maximus expired. Currently, HSD is working with National FNS and Insight for expert advice on notices.

## Doc. 606, ¶ 6 cited by Plaintiffs is presumed to be a typo as this Court Order does not track Plaintiffs' listed concern.

Doc. 606, ¶ 6 - *The Court will conduct a monthly status conference telephonically (or in person when possible and at the option of the Court and the parties) regarding the implementation of the notice provisions of Doc. 587.*

The concern presented in Plaintiffs' section Doc. 606 ¶ 6 relates to arguments about Plaintiff access to National FNS and Insight and Plaintiffs' Exhibit 7. HSD has addressed Plaintiffs' access to National FNS and Insight at Doc. 549, ¶¶ 1 and 2. This is a redundant issue in this document.

The second issue raised in this section by Plaintiffs is that the current NOCA is not populating correctly. HSD will review Exhibit 7 and see if changes can be made quickly with a work request, or whether the necessary changes will be part of the implementation of the new NOCA currently with National FNS and Insight. HSD will discuss this further with Plaintiffs and the Special Master and Compliance Specialist at February's meet and confer.

## IV.  Doc. 554: Amended Stipulated Order (following Doc. 500 and Doc 548).

## Current delays in processing

---

[20] Quotes are used to demonstrate that this may not even be a notice for purposes of this litigation. It may be used as a checklist
[21] HSD can provide a timeline to the Special Master as necessary.

HSD has sent Plaintiffs a copy of every reports it has sent to FNS.

HSD acknowledges an increase in delay in processing renewals and that as a result, a number of recertifications are overdue because of HSD delay. The delay is caused by a combination of the open enrollment period which annually creates a significant increase in the number of applications received; LIHEAP season which takes worker resources away from application processing, and a 300% increase in phone calls. At the same time, HSD is under a mandate from FNS to procedurally close cases that have pended in an overdue status since the Court's May 2014 Order (Doc. 500). HSD is addressing these spikes in need for worker resources by shifting resources and creating special teams more experienced to address the more difficult tasks. HSD is confident, and the data demonstrates, that while the numbers peaked for the week of December 30th to January 5th, they are now decreasing.

As one moves through the four time periods listed in Plaintiffs' table titled "Delayed Renewals Caused By HSD Fault," the numbers roll over from one period to the next; thus, each time period is not represented as its own set of isolated data. It will include roll overs from the periods before, plus new overdue cases created in that period.

Plaintiffs are attempting to infer wrongdoing by HSD because HSD is not doing case reviews to track Medicaid denials. Plaintiffs do this despite being fully aware that Medicaid cases are being handled differently than SNAP cases. Medicaid cases are retaining benefits until they come up for renewal. At that time, the legal procedure of administrative renewal is attempted, and, if that is not possible, then the MAD 608 is sent for required information from clients. Procedural denials for Medicaid cases occur only at recertification and only if administrative renewal is not possible and clients do not complete the required actions (i.e. respond to the MAD 608) timely. These procedural denials occur as a manual process and they are noted as to the reasons why in the case comments section. HSD will provide case files for review to the Special Master and/or Compliance Specialist to confirm this.

**Plaintiffs' concerns relative to Mass Update Effects:**

At the January 24, 2017 meet and confer, it was explained to Plaintiffs and the Special Master that, in general terms, when mass update "x" runs, it first uses certain criteria to find the subset of cases that it needs to impact. This subset of cases is opened by mass update "x" and is acted upon based on the programming of mass update "x." For example, the admin renewal mass update, AD001 (row 11 of the spreadsheet), opens and impacts all cases where any member of a household has Medicaid benefits that are at the end of the certification period. A case that fits this criteria is opened by the AD001 and ASPEN attempts an administrative renewal for Medicaid. The spreadsheet listing the titles of different mass updates was provided to Plaintiffs on January 25, 2017.

Process:

1. HSD receives update of information from a federal agency, such as SSI income

2. HSD/Deloitte updates ASPEN database with that information

3. The updated information triggers the associated mass update to run

4. Renewal cases "opened" by the mass update, with those programs it will impact, can be closed for a procedural reason if the renewal packet is not marked as received.  Initial applications will not be affected.  If the renewal case is in a "mode" (there is a pending HUMAD) – the case will not be closed.  Thus, the only cases that may be closed due to this process are renewal cases wherein the renewal packet is not marked as received and the certification period has ended.  This will happen for Medicaid cases that have a MAD 608 that was sent and not marked as received as the MAD 608 functions as a renewal packet for cases that cannot be administratively renewed.

**Timeliness of renewal processing**

HSD acknowledges that application processing timeliness decreased in October and November of 2016.   This was due to open enrollment period, an increase in number of applications received, LIHEAP season which takes worker resources, and an approximately 300% increase in phone calls.   HSD addressed this issue by shifting resources and is confident its timeliness numbers will significantly increase going forward.   It should be noted that the numbers that Plaintiffs utilized to document the overdue renewals is duplicated.   These are cases that are extracted weekly to determine what is still overdue at the end of that week.   As is expected the number of overdue renewals decreases each week as cases are processed.   Below is a breakdown of the unduplicated overdue cases.

| Total Overdue (HSD and Client Delay) | 21,385 | |
|---|---|---|
| **Overdue** | 8,791 | 41% |
| Pending Task | 5471 | 62% |
| Packet not sent | 609 | 7% |
| Interview Scheduled | 1544 | 18% |
| Packet Received Timely | 1167 | 13% |

HSD's current policy on expedite cases that have already pended for more than 7 days, is to have the case sent to a line manager to review and make a final decision on processing.  The directive for this review is to get it done the same day.   Having a more experienced worker review the case does not create any additional delay.  This is an FNS approved process.

**Current Issues with Phone System**

HSD experienced an approximate 300% increase in phone call volume.

**Doc  712**

¶ 4 - HSD is not using these entities right now for notice work. HSD consulted with the National Immigration Law Center (NILC) for some time, however, HSD discontinued that relationship after discovering flowcharts for immigration eligibility approved by NILC contradicted SNAP C.F.R.  NILC did not understand immigration eligibility determination for SNAP and HSD is circumspect of further work as to notices and immigration issues with NILC.

The contract with Maximus ended and based on work product received, HSD does not intend to work with them in the near future. HSD is working with the National FNS office and their contractor, Insight, on its major notices.  HSD also works with the Washington DC firm of Covington and Burling. Covington is nationally recognized for their expertise in compliance assistance and policy interpretation. HSD consults with Covington on policy matters and notice matters whenever necessary.  HSD disagrees with Plaintiffs position that HSD must work with all of these entities on all matters listed regardless of other opportunities that present themselves (i.e. FNS' offer of the notice project with Insight).   HSD also has the freedom to contract and choose vendors that provide the best value and service for the state.  HSD is happy to further discuss the matter with the Special Master and/or the Court.

¶ 5 - HSD did not state that ethics training would be "complete" by the end of the year.   HSD is not obligated under any court order to provide the ethics training materials to Plaintiff for review prior to its implementation.   Plaintiff has not requested an update on this item since November 2016.

HSD has developed ethics training.   This was completed before the end of the year.   Specific management team members have completed the training, reviewed the materials, and made requests for changes in content, methodology and organization.   The revised ethics training has been circulated to management for final review.  It is expected that this revised training will better meet the needs and responsibilities of the Department and should be available to all employees on the Department's "Blackboard" in the next few weeks.  HSD welcomes the Special Master and/or Compliance Specialist to review this training.

¶ 8 - HSD has drafted an RFP and has requested a special appropriation from the State Legislature to fund the services covered in the RFP.  In addition, HSD has requested a change to the department's cost allocation methodology from the Federal Government to allow for additional federal funds.   When HSD's request is approved, the department intends to use the additional funds so that the RFP can be released. Without a special appropriation from the State Legislature or the additional federal funds, the scope of the RFP will need to be amended.

## V.    Time limit for Able Bodied Adults Without Dependents and Related Work Requirements – Doc 658

Plaintiffs are well aware the E&T Program is currently voluntary.  HSD will develop a potential notice for a mandatory E&T Program, the FSP 015, but has not begun this work.  HSD has developed and shared with Plaintiffs the FSP 014 for the Time Limit Rule (another program that is currently waived and not implemented).     Ms. Campbell emailed the drafted FSP 014 to

Plaintiffs on January 24, 2017). Plaintiffs are thus given their 30 days before implementation of any notices for both the E&T Program and the Time Limit Rule with a chance to conference. The notices for these two programs are not being developed in a notice work group. Natalie Campbell wrote the FSP 014. The draft was sent to Plaintiff for input at the same time it was sent to Insight for review. Natalie Campbell likewise will write the FSP 015. The draft of the FSP 015, when done, will be provided to Plaintiffs with 30 days opportunity to review and an opportunity to conference.

There is not a notice work group designing model notices. Plaintiffs have worked with the notice work group throughout its life. Currently, Natalie Campbell is drafting notices. Recently, MAD policy workers drafted new language for the MAD 608, this team of two people was not a notice work group. That new language was also provided to Plaintiffs with a 30 day window to review and opportunity to conference.

## VI.   Continued Compliance Issues Raised by Plaintiffs

### 1)     Data required by the Decree

It is simply not true that HSD has "refused" to provide data. HSD has declined to create new data sets that do not already exist. HSD sent a letter to the Special Master:

(1)             Explaining HSD's position on Plaintiffs' request for data and assertions that 7 C.F.R. 272.15 requires the specific data to be provided to USDA/FNS;

(2)             Outlining the data as currently provided to Plaintiffs;

(3)             Itemized specific data that is not currently provided to Plaintiffs; and

(4)             Requested the Special Master's recommendation about whether the 1998 Consent Decree document's language in Section IV(3) was still appropriate and necessary given the changes to federal law, USDA/FNS requirements of data reporting, and the Court's Orders relative to renewals.

HSD is awaiting response from the Special Master and will comply accordingly. Plaintiff has alleged that this data was previously provided to them in the formats they describe. This is not true.

HSD accepts that the letter to the SM

HSD's position is that MAWC doesn't exist is a statement of fact. That means that MAWC data cannot be provided as such. However, Plaintiffs assertion that HSD has not provided Medicaid data is false. The letter to the SM specifically outlines both SNAP and Medicaid data as currently provided; and requests his recommendation as to the need to provide more data.

### 2)   Intentional Program Violations (IPV) Issue

The IT issue was fixed in April 2016.   The single case Plaintiffs note in their section is a different issue.   It is not a case where the IPV time ran and the person should again have been eligible for benefits.   This case went through multiple fair hearings and was appealed to the District Court.   The District Court found that the information was not sent to the correct parties. This finding did not represent an IT problem.   It was human error that occurred in a single case. Plaintiffs know this case is significantly different and have received a response to the actual IT IPV issue multiple times.

### 3)   Combined Application Project:

In November 2008, HSD submitted a waiver request to implement the NM combined application project.   In January 2009, FNS approved the waiver request, subject to certain conditions.   The project was approved for a five-year period from the date HSD began issuing benefits.

Plaintiffs state that HSD "terminated" this program is incorrect.   The program, by FNS terms was finite and contingent upon criteria.   HSD had to end the program 3 months before its term ran out because cost neutrality could not be maintained.

Approval of the state's waiver was contingent on the following:

1. Increase SNAP enrollment among target population, while remaining cost neutral.
2. Development and implementation of acceptable evaluation plan for measuring projects success.
3. Requests for extension must be submitted 6 months from the expiration of the waiver.
4. FNS will work with HSD to phase out the project.

The waiver was approved by the federal government for a 5 year period from the date the State begins issuing benefits under the project.   HSD began issuing NMCAP benefits in June 2014.

In May 2009, FNS approve HSD's evaluation plan, with contingencies.

1. Program must maintain cost neutrality
2. State agency will conduct a random sample of 300 NMCAP households beginning in the 6th month of NMCAP benefit issuance to determine what the SNAP benefits would be using current SNAP rules and compare them to the NMCAP benefits received by the sampled cases.

3. The state agency will then adjust allotments to remain cost neutral.

An NMCAP household was defined as a one or two person household whose only income is SSI. If a two-person household, then both individuals had to be on SSI.   HSD reached out to individuals identified through an interface with SSI.   Individuals who were not currently receiving SNAP were sent a letter and a simplified application to apply to receive NMCAP benefits.   Active SNAP participants were sent a letter informing them of the opportunity to opt to receive NMCAP benefits.   NMCAP benefit levels were determined based on the household's shelter costs.   Households whose shelter cost was equal to or greater than $315 per month

received the high benefit amount.  Households whose shelter cost was less than $315 per month received the low benefit amount.  The initial benefit amounts were High = $90 and Low = $70.

Late in 2013, the data demonstrated that this program was not going to be able to maintain cost neutrality.  HSD began working with FNS to determine the best course of action.  HSD and FNS determined together that the program should close to new applicants because the program was not maintaining cost neutrality.  Between June 1, 2009 and November 1, 2013, the benefit amount decreased three times due to the requirement that the program remain cost neutral.  The benefit amounts as of November 1, 2013 were High = $68 and Low = $33.

2/5/14 – HSD's Initial Close Out Plan submitted to FNS

HSD submitted its initial close out plan to FNS in February 2014.  This plan provided HSD would cease sending new applications as of May 15, 2014.  Because NMCAP eligibility was determined based on FNS waivers of the federal requirements, active participants were not able to be transitioned without the submission of a new application for regular SNAP benefits.  Active participants were sent a letter in February 2014, explaining that the program was going to end March 31, 2014 and instructing them to submit an application to receive SNAP benefits ongoing.

3/11/2014 – Close out Plan

FNS revised the Close Out Plan to cease sending new applications for NMCAP immediately.  In mid-March, active recipients were sent a new notice informing them their NMCAP benefits would end at their next recertification.  At recertification, the participant would receive a notice that would provide information on continuing to receive benefits under the regular SNAP program.

HSD reviewed NMCAP participant benefit data from January 2014 through August 2016.  January 2014 was chosen as a baseline for active participants.  HSD reviewed the active participants in each month to determine if they received regular SNAP with three months of the last NMCAP benefit and to determine the change in their benefits.  Below are the results:

| NMCAP | | |
|---|---|---|
| **Did Not Receive SNAP After Last NMCAP Benefit** [1,2] | **1,610** | 22.50% |
| **Did  Receive SNAP After Last NMCAP Benefit** [1,2,3] | **5,540** | 77.50% |
| *Benefit Increased*[4] | *2,525* | 35.30% |
| *Benefit Decreased*[5] | *2,715* | 38% |
| *Benefit Remained the Same* | *300* | 4.20% |

[1] Last NMCAP Payment Between January 2014 & August 2016
[2] Received SNAP Benefit Within Three Months of Last

NMCAP Benefit
[3] Average Change in Benefits: +$8.58
[4] Average Benefit Increase:  +$50.01
[5] Average Benefit Decrease: -$23.90

Respectfully submitted,

/s/ Sovereign Hager

Gail J. Evans and Sovereign Hager
New Mexico Center on Law and Poverty
924 Park Ave. SW, Suite C
Albuquerque, NM 87102
(505) 255-2840 FAX (505) 255-2778

Jane B. Yohalem
P.O. Box 2827
Santa Fe, NM 87504
(505) 988-2826 FAX (505) 982-6692
Daniel Yohalem
1121 Paseo de Peralta
Santa Fe, NM 87501
(505) 983-9433        FAX (505) 989-4844

Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 17th day of February 2017,  I filed the foregoing pleading electronically with the United States District Court, causing the same to be electronically served on opposing counsel, Christopher Collins. A copy of the foregoing Motion and this certificate were also served this day on these counsel by emailing a copy to Christopher.Collins@state.nm.us

*/s/ Sovereign Hager*
Sovereign Hager