IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DEBRA HATTEN-GONZALES, et al.,

      Plaintiffs,

vs.                             Civ. No. 88-0385 KG/CG

BRENT EARNEST, Secretary of the
New Mexico Human Services Department,

      Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court upon the Special Master's Report (Report), filed

January 31, 2018.  (Doc. 810).  On February 20, 2018, both Plaintiffs and Defendant responded

to the Report.  (Docs. 812 and 813).  These responses contain, *inter alia*, objections to the

Report.

Also, on February 20, 2018, Defendant filed a motion to modify the Report (Motion to

Modify).  (Doc. 814).  Plaintiffs responded to the Motion to Modify on February 28, 2018, and

filed a supplemental response on March 9, 2018.[1]  (Docs. 822 and 830). Defendant filed a reply

to that response and to the supplemental response on March 16, 2018.  (Doc. 831).

On March 1, 2018, the Court held a hearing on the Special Master's Report and

objections to the Report.  *See* Fed. R. Civ. P. 53(f)(1) (in acting on special master's report, "court

must give the parties notice and an opportunity to be heard" and "may receive evidence").

Daniel Yohalem, Jane Yohalem, Sovereign Hager, and Gail Evans represented Plaintiffs at the

---

[1] Plaintiffs seek in their supplemental response an order sanctioning Defendant for his continuing
noncompliance with the Consent Decree, court orders, and federal law.  Plaintiffs also seek other
relief to further compliance.  Those requests, however, fall outside the purview of the matter
before the Court:  whether to adopt, reject, or modify the Special Master's Report.  Plaintiffs, of
course, may seek that kind of relief in a separate motion subject to full briefing.

hearing while Christopher Collins, Paul Kennedy, and Jessica Hernandez represented Defendant. Defendant Secretary of the New Mexico Human Services Department (HSD), Brent Earnest, was also present at the hearing as were Sean Pearson, Natalie Campbell, Mary Brogdon, Shanita Harrison, the Regional Operation Managers, and 10 County Directors. *See* Amended Order Setting Hearing (Doc. 815) (requiring certain individuals to attend March 1, 2018, hearing). Defendant, Ms. Brogdon (the Director of the Income Support Division (ISD)), and Mr. Collins testified at the hearing. The Special Master, Lawrence Parker, and the Compliance Specialist, Ramona McKissic, were present at the hearing as well and both presented testimony.

Having reviewed the Special Master's Report, the objections and other responses to the Report, the Motion to Modify and its briefing, the admissible evidence, and the testimony and argument at the March 1, 2018, hearing, the Court sustains the objections, in part; overrules the objections, in part; and grants the Motion to Modify, in part. The Court, therefore, adopts the Special Master's Report, in part, and modifies the Report as described below.

A. *The Special Master's Report*

1. *The Special Master Appointment*

On November 17, 2016, the Court appointed Mr. Parker, an expert in the federal benefits programs at issue, as Special Master.[2] (Doc. 762). Aside from providing expertise and advice to Defendant on issues related to compliance with the Consent Decree, court orders, and federal law, the Court tasked the Special Master to report to the Court, by January 31, 2018, on Defendant's compliance with the Consent Decree, court orders, and federal law, including the propriety, if any, of a receivership. (Doc. 751) at 2; (Doc. 803) at 2. On January 31, 2018, the

_____

[2] On January 2, 2018, the Court extended the appointment of the Special Master until January 1, 2019. (Doc. 809).

Special Master filed his Report, together with the Compliance Specialist's Compliance Review Report. (Doc. 810).

### 2. The Special Master's Report

#### a. Background[3]

The Special Master first described the background of this lawsuit, the parties, and the Consent Decree. The Special Master included the Consent Decree's definition of the class: "present and future applicants." (Doc. 810) at 5. The Special Master then commented that there is no "end date for applicants to be included in this class action." *Id.*

The Special Master further described Plaintiffs' counsel and their monitoring activities as follows:

> Plaintiffs' advocate and counsel has extended the scope of the Consent Decree to include all SNAP and Medicaid programmatic changes made by the agency and federal oversight agencies. This effort allows the Plaintiffs' involvement in all aspects of the ISD operation, including ISD daily business operation. Plaintiffs' advocate, through a network of ISD employee confidential informants keeps tabs on the ISD operation and program issues. The information received from these ISD staff is used by Plaintiffs to demonstrate failures in the eligibility system. The evidence often indicates that the Defendants are making errors in processing applications. The Plaintiffs usually do not bring the issues identified to the immediate attention of the Defendant due to an inherent lack of trust between the parties.

*Id.* at 4.

#### b. Findings

Next, the Special Master made several "Findings." First, the Special Master found that, although Defendant has historically not met the requirements of the Consent Decree, court orders, or federal law, there were times when Defendant complied with part of the United States Department of Agriculture's Food and Nutrition Service (FNS) regulations. (Doc. 810) at 6.

---

[3] The Court only describes the portions of the background at issue in Plaintiffs' response to the Report.

FNS actually had, in the past, "awarded enhanced funding bonus money for HSD's performance in the areas of timeliness and Quality Control accuracy," areas corresponding to a section of the Consent Decree. *Id.* The Special Master noted that when Defendant received these awards neither "party filed a motion or sought relief from the court to demonstrate improvement or movement towards a resolution of the Consent Decree." *Id.*

Second, the Special Master found that "Defendant's current executive management team experiences difficulties in managing the ISD program in a positive manner." *Id.* The Special Master acknowledged that the current Defendant, appointed in December 2014, and the previous Deputy Cabinet Secretary, appointed in January 2015 with his tenure ending in December 2017, inherited an ISD "program with a history of failure related to the Consent Decree and execution of the program requirements and during times of major operational change (Affordable Care Act and ASPEN implementation)." *Id.* at 7. Nonetheless, the Special Master found that the former Deputy Cabinet Secretary, who was "responsible for administration of the ISD program," had "distinct responsibility" for the following five program failures or crises, *id.* at 7-8,:

1. a September 26, 2016, FNS advance warning directive and request for a corrective action plan "for failure to meet FNS requirement in providing SNAP [Supplemental Nutrition Assistance Program] services to clients," *id.* at 7;

2. a January 20, 2017, Centers for Medicaid and Medicare Services (CMS) request for a corrective action plan "for failure to meet requirements in providing services to clients," *id.*;

3. the statewide denial of benefits when employees violated the law by adding "resources to client eligibility screens in ASPEN," *id.*;

4. an April 6, 2017, backlog of 36,622 SNAP applications, recertifications, and interim reports; and

5. an April 6, 2017, backlog of 63,141 Medicaid applications and recertifications.

The Special Master then found that "[a]ccountability at all levels is almost nonexistent, creating an environment where failure is an accepted part of the ISD operation and culture." *Id.* at 8.

Finally, the Special Master found that "[t]imelines and deadlines for meeting expectations have little or no relevance in the ISD business operations, processes, or methods of administration" as evidenced by Defendant's actions with respect to "court orders, and federal requirements, including Plaintiffs' requests" and by the fact that Defendant did not meet time requirements and timeframes set forth in the Consent Decree in 1998. *Id.*

### c. Conclusions

The Special Master then came to several conclusions as a result of his Findings. First, he concluded that Defendant is not in full compliance with the Consent Decree, court orders, and federal law. Specifically, the Special Master concluded that client services and employee development have not progressed because of deficient management decisions and communications. Even so, the Special Master recognized that since July 2017 Defendant has improved in "Consent Decree reporting, hiring of Family Assistant Analyst level staff, and performance in the area of eligibility determination approval timeliness." *Id.* Nonetheless, the Special Master concluded that "management continues to struggle with strategic decision making and implementation of changes" due to a "reactionary management philosophy," and due to a lack of "sufficient knowledge, skills and abilities (KSA's) to appropriately manage the program or bring it into full compliance with the Consent Decree." *Id.* at 8-9.

Second, the Special Master concluded that despite "limited progress by the ISD program management," instituting a receivership, at this time, would "not result in immediate resolution of the ISD program deficiencies." *Id.* at 9. The Special Master supported this conclusion by

noting that "there is no evidence of immediate and irreparable harm to the class members." *Id.*

The Special Master further stated that "the issue of receivership should be reconsidered" if

Defendant makes "limited or insufficient progress in meeting the requirements of the

recommendations for improvement…." *Id.*

### d. Recommendations

The Special Master then made the following nine Recommendations.

1. Remove from any position that directly or indirectly impacts ISD Field Operations: Assistant General Counselor, Former Deputy Cabinet Secretary, Income Support Director, Field Operations Deputy Director, and a Regional Operations Manager. After the changes are implemented, an assessment of County Directors and Line Managers will be completed to determine additional changes required.

   **Implementation Timeframe:** 45 Calendar Days from the order

2. Revise the Consent Decree to give recognition to the parts that have been completed, update requirements, close the class (if allowed by law) and dismiss all court orders, in which the requirements have been met.

   **Implementation Timeframe:** 30 Calendar Days from the Order

3. Implement an unbiased case review process to assist in validating that the ISD program is meeting the requirements of the Consent Decree. The case review process should include:

   a) An independent random selection of the case sample.
   b) A case sample that includes all case action types.
   c) An independent dispute resolution process.

   **Implementation Timeframe:** April 1, 2018

4. ASPEN-Develop and Implement ASPEN refresher training to include functionality and known work arounds for staff success.

   **Implementation Timeframe:** 120 Days from Order

5. Reinstate auto denial and closure functions within ASPEN and eliminate manual eligibility review and completion of the Individual Eligibility Review form by workers.

**Implementation Timeframe:** March 1, 2018

6.  Training-Enhance new employee training to align with realistic job expectations. Improve the accuracy of the training materials (e.g., streamline reporting and Immigration Training).

    **Implementation Timeframe:** 180 Days from Order

7.  Implement an agreed upon tolerance level for determining compliance in the area of timeliness to allow for client services and human error.

    **Implementation Timeframe:** 60 Days from Order

8.  Appoint knowledgeable subject matter experts for the ISD program areas for SNAP, Medicaid, and Immigration. The three positions will have exclusive responsibility for serving as liaison between Plaintiffs, Defendant, and the Special Master.

    **Implementation Timeframe:** 60 Days from Order

9.  Failure to complete or make sufficient progress by the Court's standards on these recommendations will result in additional recommendations for the Court's consideration.

(Doc. 810) at 9-11.

*e. Compliance Review Report*

To support the Report and Recommendations, the Special Master attached a Compliance Review Report compiled by the Compliance Specialist. The Compliance Specialist based her Compliance Review Report on seventeen onsite office reviews (51.5% of HSD's offices). (Doc. 810) at 18. The Compliance Specialist reported on timeliness of eligibility decisions, using a 95% tolerance level for timeliness. *Id.* at 19. She also reported on quality control performances, office processes, eligibility determination processes, notices, culture/management, and barriers to service.

*B. Plaintiffs' Response to the Report*

*1. Comments on the Compliance Review Report*

Plaintiffs provide a section in their response to the Report labeled "Comments on the Compliance Specialists' [sic] Report." (Doc. 812) at 5-10. Because Plaintiffs have separate sections specifically referring to objections to the Report, *id.* at 10-16, the Court does not construe this comments section as setting forth objections to the Special Master's Report. Consequently, the Court does not find it necessary to address the Plaintiffs' observations as reported in the comments section. *See* Rule 53(f) (providing that court decide "objections" to special master's report).

*2. Objections to the Report*

Plaintiffs do not object to the Special Master's Recommendations, but they do seek to "fine-tune" them. Transcript of March 1, 2018, Hearing (TR) at 144.[4] Since Plaintiffs did not file a motion to modify the Special Master's Report, the Court will not consider any requests by Plaintiffs to "fine-tune" the Recommendations.

Plaintiffs, however, do specifically object to statements the Special Master made in his background description of the class and Plaintiffs' counsel. Plaintiffs also object to the statement in the Special Master's Findings regarding past FNS awards of enhanced funding bonus money, and the statement in the Special Master's Conclusion concerning lack of evidence of irreparable harm to Plaintiffs. Finally, Plaintiffs object to the Special Master's use of the word "reinstate" in in Recommendation 5 to describe implementing automated (auto) closures and denials. As provided in Rule 53(f)(3) and (4), the Court reviews the Special Master's factual findings and legal conclusions *de novo*.

---

[4] The Court's citation to the hearing transcript refers to the court reporter's original unedited version. Any final transcript may contain slightly different page and/or line numbers.

> *a. Description of class as consisting of "present and future applicants" and that there is "no end date for applicants to be included in this class action." (Doc. 810) at 5.*

Plaintiffs object to the statements in the background portion of the Report regarding the class definition to the extent they mean that this case can never end. Plaintiffs note that a class definition of "present and future applicants" is "common in cases involving administration of public benefits programs and has been consistently upheld by Courts." (Doc. 812) at 12. *See, e.g., D.G. ex. rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1192 (10th Cir. 2010) (affirming certification of class defined as "all children who are or will be in the legal custody of [Oklahoma Department of Human Services] due to a report or suspicion of abuse or neglect or who are or will be adjudicated deprived due to abuse or neglect…."); *Robidoux v. Celani*, 987 F.2d 931, 939 (2d Cir. 1993) (remanding with instruction to certify class defined as "[a]ll current and future Vermont applicants for assistance from the Food Stamp and ANFC … and Fuel Assistance Programs."). Plaintiffs further note that the Consent Decree provides a process for terminating this lawsuit. *See* (Doc. 460-2) at 6, ¶ 1 ("Within 30 days of completion of the review of implementation procedures, the applicants will request from the Court dismissal with prejudice of all such issues actually resolved by this Agreement."). Although the Court understands the Special Master's concern about how long this case has been open and the fact that it has yet to be resolved, Plaintiffs' objection regarding the class description is well-taken and, therefore, is sustained.

> *b. Description of Plaintiffs' counsel:*

> *Plaintiffs' advocate and counsel has extended the scope of the Consent Decree to include all SNAP and Medicaid programmatic changes made by the agency and federal oversight agencies. … Plaintiffs' advocate, through a network of ISD employee confidential informants keeps tabs on the ISD operation and program issues. … The Plaintiffs usually do not bring the issues identified to the immediate attention of the Defendant due to an inherent lack of trust between the*

*parties.*

*(Doc. 810) at 4.*

Plaintiffs object to the background portion of the Report describing their counsel's monitoring of this case. Plaintiffs specifically deny that their counsel have extended the scope of the Consent Decree and, instead, contend that counsel monitor the Consent Decree as the Court has interpreted it through the years. Plaintiffs also assert that counsel have only received information from confidential informants twice and took that information directly to the Court and the Special Master, without informing Defendant, when: (1) Defendant's staff was falsifying SNAP applications, and (2) Defendant's management directed staff "to lie to applicants and deny them access to a phone interview."[5] (Doc. 812) at 15. Finally, Plaintiffs state that counsel has "always promptly informed" Defendant of issues they discovered through monitoring, as evidenced by the Joint Status Reports, reports to the Court, "letters to Defendant and data provided to the Special Master." *Id.*

The Court notes as an initial matter that the description of counsel's monitoring is not material to the questions presented to the Special Master for his Report: has Defendant complied with the Consent Decree, court orders, and federal law, and is a receivership warranted. The Court, nonetheless, agrees with the Special Master's key concern about the "inherent lack of trust between the parties." (Doc. 810) at 4. As the Court personally observed over the last four years, this lack of trust, communication, and cooperation between counsel has hamstrung timely progress toward compliance with the Consent Decree, court orders, and federal law. For these reasons, the Court overrules Plaintiffs' objection concerning the description of counsel's monitoring to the extent it relates to immaterial statements and the Special Master's finding of

---

[5] Plaintiffs note that Defendant was required to inform Plaintiffs of these two changes to the application process before implementing them.

lack of trust.

> *c. Finding that neither "party filed a motion or sought relief from the court to demonstrate improvement or movement towards a resolution of the Consent Decree" when FNS awarded Defendant "enhanced funding bonus money" for timeliness and quality control accuracy. (Doc. 810) at 6.*

Plaintiffs object to the Finding regarding the past award of FNS enhanced funding bonus money by pointing out that the Court has not considered Defendant's receipt of performance bonuses as evidence of compliance with the Consent Decree. *See* (Doc. 812) at 16 (description of orders). The Special Master is not suggesting that merely receiving FNS enhanced funding bonus money demonstrates compliance with the Consent Decree. Instead, the Special Master simply notes that when Defendant received such money neither party acknowledged, through the filing of a motion, Defendant's "improvement or movement towards a resolution of the Consent Decree." (Doc. 810) at 6 (emphasis added). The Court, therefore, overrules Plaintiffs' objection regarding the Special Master's mention of awards of FNS enhanced funding bonus money.

> *d. Statement in Conclusion that "there is no evidence of immediate and irreparable harm to the class members." (Doc. 810) at 9.*

Furthermore, Plaintiffs object to the statement in the Conclusion that "there is no evidence of immediate and irreparable harm to the class members." *Id.* Plaintiffs cite the March 18, 2016, Memorandum Opinion and Order in which the Court found that "[a] SNAP beneficiary's loss of food assistance is irreparable." (Doc. 658) at 14-15 (citing, *e.g.*, *Beltran v. Myers*, 677 F.2d 1317, 1322 (9th Cir. 1982) (finding risk of irreparable injury where enforcement of California rule may deny plaintiffs' medical care)). The Court, moreover, held that "[w]hen eligible individuals do not receive food assistance, it puts pressure on other entities and state programs such as food banks and shelters, and family members and friends to provide for the individuals the SNAP program is meant to assist." *Id.* at 22. Plaintiffs also cite other cases

wherein courts have granted preliminary injunctions after having found irreparable harm to persons denied subsistence benefits. *See, e.g., Abreu v. Callahan*, 971 F. Supp. 799, 821 (S.D.N.Y. 1997) ("While welfare benefits are money or money's equivalent, their denial almost universally has been regarded as irreparable injury because welfare recipients depend on them not merely as a convenient medium of exchange, but to sustain life."); *Morel v. Giuliani*, 927 F. Supp. 622, 635 (S.D.N.Y. 1995) (regarding food stamps and cash assistance, court stated: "To indigent persons, the loss of even a portion of subsistence benefits constitutes irreparable injury."); *Moore v. Miller*, 579 F. Supp.1188, 1192 (N.D. Ill. 1983) ("For those in the 'grip of poverty,' living on the financial edge, even a small decrease in payments can cause irreparable harm."). The Court agrees with this objection to the statement concerning lack of irreparable harm and so sustains it.

> *e. Recommendation 5's Characterization of Auto Denials and Closures. (Doc. 810) at 10.*

Plaintiffs do not object to Recommendation 5, which recommends reinstating the auto denial and closure functions in ASPEN to eliminate the manual review and completion of Individual Eligibility Review forms. Plaintiffs, however, object to the Special Master's characterization of the new automated functions as being "reinstated." Plaintiffs are apparently concerned that this Recommendation permits Defendant to return to the previous automated functions which did not allow for individualized denials and closures. While the Special Master used the word "reinstate" to describe the installation of the new ASPEN auto denial and closure functions, it is clear from the evidence that Defendant is not going to "reinstate" the old program which the Court found untenable in (Doc. 500). In fact, the parties recently agreed to modify (Doc. 500) to provide for a mutually acceptable auto denial and closure process. The Court entered the parties proposed order to modify (Doc. 500) on March 30, 2018. (Doc. 835).

Consequently, the Court overrules Plaintiffs' objection concerning the characterization of Recommendation 5 as now moot.

*C. Defendant's Response to the Report and Motion to Modify*

    *1. Comments on the Compliance Review Report*

Like Plaintiffs, Defendant provides a section in his response to the Report labeled "Comments on the Compliance Report Summary (Exhibit 5 of Special Master's Report)." (Doc. 813) at 12-16. Because Defendant has separate sections specifically labeled as objections, *id.* at 1-10, the Court does not construe this comments section as setting forth objections to the Special Master's Report. The Court, therefore, does not find it necessary to address Defendant's "comments." *See* Rule 53(f) (providing that court decide "objections" to special master's report).

    *2. Objections to the Report*

Defendant raises objections in his response to the Report, but also, in his Motion to Modify, seeks "an Order modifying the Special Master's report to for the reasons outlined in HSD's objections…." (Doc. 813) at 2. The "objections" Defendant refers to in the Motion to Modify apparently include the entire response to the Report, which includes specific objections and a section entitled "Notes Regarding Other Recommendations." Defendant explicitly objects to several Findings and Conclusions as well as Recommendations 1 and 8. The Court does not construe these objections as requests to modify the Report. Instead, the Court simply will determine whether to sustain or overrule those objections. To the extent the "Notes Regarding Other Recommendations" suggest modifications to the Special Master's Recommendations, the Court will address those suggestions as proposed modifications to the Recommendations. The Court begins its analysis with Defendant's objections.

*a. Finding that the Deputy Cabinet Secretary is responsible for administering ISD. (Doc. 810) at 7.*

Defendant objects to the following statement in the Findings: "the Deputy Cabinet Secretary is responsible for administration of the ISD program." *Id.* Defendant contends that the ISD director is responsible for administering ISD programs while the Deputy Cabinet Secretary only "has supervisory responsibility over the ISD director…." (Doc. 813) at 1. Although this may be the official chain of command, the point the Special Master was making in his Report is that "[u]nder the direction of the [former] Deputy Cabinet Secretary" five major crises occurred in the administration of ISD programs. (Doc. 810) at 7. In other words, the Special Master found that the former Deputy Cabinet Secretary was, in fact, involved in administering ISD programs. Indeed, the record shows that although the former Deputy Cabinet Secretary began his appointment in January 2015, he was the acting ISD director from August 2016 to June 2017. *Id.*; TR at 158. The Court overrules Defendant's first objection.

*b. Finding that five major crises occurred under the direction of the former Deputy Cabinet Secretary. (Doc. 810) at 7.*

Next, Defendant objects to the Special Master's Finding that five major crises occurred under the direction of the former Deputy Cabinet Secretary. Defendant states that the Special Master incorrectly attributed crises one, two, four, and five to the former Deputy Cabinet Secretary because they arose from HSD's actions in 2014, prior to the appointment of the former Deputy Cabinet Secretary in January 2015. Defendant notes that crises one and two, a September 2016 FNS advance warning directive and request for a corrective action plan, and a January 2017 CMS request for a corrective action plan, resulted from Defendant's compliance with (Doc. 500), filed in May 2014, which ordered Defendant to stop the computer system from automatically closing or denying cases without an individualized eligibility review. According

to Defendant, compliance with (Doc. 500), in turn, led to crises four and five: SNAP and Medicaid backlogs in April 2017.

The Court notes, and Defendant acknowledges, that in August 2016, the Court modified (Doc. 500) to reflect that the Court did not intend for Defendant to deny and close cases in a manner that violates federal law and the Consent Decree. (Doc. 749). Even so, crises four and five show SNAP and Medicaid backlogs in April 2017, eight months after the Court modified (Doc. 500).[6] Also, as the Special Master observed at the March 1, 2018, hearing, that the FNS corrective action plan request came about 20 months after the former Deputy Cabinet Secretary was appointed while the CMS request for a corrective action plan came about 24 months after the former Deputy Cabinet Secretary was appointed. TR 31-32.

As to crisis three, when HSD employees added fictional resources to client eligibility screens in ASPEN to deny benefits, Defendant observed, without citation to the record, that this practice began in some offices in 2003 or before, again prior to the appointment of the former Deputy Cabinet Secretary. The Special Master noted that this "scandal" occurred 16-17 months after the former Deputy Cabinet Secretary began his position, at which point it involved the prior ISD director and other management. TR 32. It was at that time, in May 2016, when the Court first became aware of this illegal practice. *See* (Doc. 680) (clerk's minutes of hearing before Magistrate Judge Carmen Garza). The question, however, arises why this practice continued under the former Deputy Cabinet Secretary.

Defendant has not convinced the Court that his objection to the Finding concerning five crises occurring under the direction of the former Deputy Cabinet Secretary has merit. In fact,

---

[6] Defendant points out that during the former Deputy Cabinet Secretary's tenure HSD met the CMS corrective action plan deadline of October 31, 2017, to process all overdue Medicaid renewals.

the evidence demonstrates that the former Deputy Cabinet Secretary had at least some responsibility for the five crises.  Consequently, the Court overrules the objection.

> *c. Finding regarding timelines and deadlines: "Timelines and deadlines for meeting expectations have little or no relevance in the ISD business operations, processes, or methods of administration."  (Doc. 810) at 8.*

Next, Defendant objects to the Special Master's Finding regarding meeting timelines and deadlines.  Defendant notes that at no time in the 30-year history of this case has HSD been as compliant with the Consent Decree as it is now.  According to Defendant, throughout 2017, HSD had "a new work plan, with clear deadlines," to meet compliance.  (Doc. 813) at 4.  Defendant further notes that HSD is even "exceeding federal timeliness standards."  *Id.* at 4-5.

The Court recognizes that Defendant has, indeed, made progress in acting in a timely manner and in meeting some deadlines.  The evidence in the record, however, indicates that Defendant still has problems with respect to timelines and deadlines.  For example, for December 2017, the Compliance Specialist found a SNAP 30-day denial timeliness rate of 62.6% and a Medicaid denial timeliness rate of 59.5%, far below the 95% tolerance level used by the Compliance Specialist.  (Doc. 810) at 19.  The Special Master also explained in his Report that Defendant has not met the timeframes for compliance set forth in the Consent Decree in 1998, time frames which Defendant agreed to.  The Special Master further stated at the March 1, 2018, hearing that he has observed that Defendant's responses to himself, the Compliance Specialist, Plaintiffs, FNS, and CMS have not been timely.  TR 34.  The Special Master has since imposed due dates on Defendant, which has resulted in timely responses a majority of the time. *Id.* Although the Special Master's assessment that "[t]imelines and deadlines for meeting expectations have little or no relevance" may seem harsh, the record demonstrates that Defendant experiences problems in meeting timelines and deadlines, both stipulated and imposed.

Consequently, the Court sustains the objection regarding timelines and deadlines only as to the Special Master's use of "little or no relevance" to describe Defendant's attitude toward timelines and deadlines.

> *d. Finding that "[a]ccountability at all levels is almost nonexistent, creating an environment where failure is an accepted part of the ISD operation and culture." (Doc. 810) at 8.*

Defendant further objects to the Finding that accountability "is almost nonexistent…." *Id.* Defendant explains that staff is accountable for their jobs and that, if necessary, change can be accomplished through "employee discipline or termination" or through other means. (Doc. 813) at 6. Defendant contends that staff is "given an opportunity to discuss the factors responsible for non-performance or lack of performance." *Id.* Additionally, Defendant asserts that it has established tasks, deadlines, and required outcomes for staff. Defendant also states that accountability is present through data gathering which is evaluated daily and required by the Consent Decree and federal agencies. Defendant notes that it is held accountable "by its Federal Partners, State legislature, the Court and Plaintiffs…." *Id.* at 5-6.

Despite these contentions, accountability has continued to be an issue. For instance, Defendant failed to take disciplinary action when a former ISD director and former field operations director instructed staff to fraudulently change the income information on SNAP expedite applications to deny those benefits. In fact, Defendant only moved the former ISD director to the Administrative Services Division where she held the managerial position of Compliance and Financial Systems Bureau Chief. TR 211. Defendant actually promoted the field operations director to director of the Child Support Enforcement Division. (Doc. 822-1) at 3; TR 210. Furthermore, a County Director in Taos, who had knowledge of fraudulently changed applicant income information, remains in her position. TR 210-11. Finally, as recently

as April 2017, managers had a policy to lie to SNAP applicants by stating to them that staff is unavailable for interviews after 3:30 p.m. and to lie "to the office" by informing the office "that the client has requested the interview be rescheduled." (Doc. 822-3). Additionally, the Special Master noted at the March 1, 2018, hearing two instances of poorly performing managers simply being moved to other management positions without facing any disciplinary action. TR 31. Another example of lack of accountability given by the Special Master at the March 1, 2018, hearing is the fact that HSD has yet to complete the FNS and CMS corrective action plans, plans which could have been completed within the required timeframe. *Id.* at 35.

Aside from these instances that show a lack of accountability, the Court is troubled by the woefully inadequate testimony given by the ISD Director. To begin with, the ISD Dirctor has not read the entire Consent Decree despite the significant impact of the Consent Decree on the mission and work of her division. *Id.* at 252. Aside from "meetings" with Plaintiffs' counsel and her deputies, the ISD Director could not articulate what her plans were to comply with the Consent Decree. *Id.* at 252-53. She admits that she has probably not spoken with the Regional Operations Managers "specifically on what ways to address the Consent Decree[.]" *Id.* at 253. In fact, the ISD Director has only met with the Special Master twice: in June 2017, when she began her job, and in February 2018, prior to the March 1, 2018, hearing. *Id.* at 264.

Moreover, although the ISD Director began her position in June 2017, she has only visited eight of the 34 county offices. *Id.* at 254, 158. The Court also notes the ISD Director was not familiar with an "MR," a Manual Revision, nor had she been through the "Champions Academy," the training for ISD workers. *Id.* at 228-29, 231. She did, however, draft and give to the Special Master a "strategic plan" in the fall of 2018. *Id.* at 265.

In contrast to the ISD Director's inadequate testimony, Defendant has a proficient grasp of this case as well as the technical aspects of ISD's programs. The fact that Defendant, the Secretary of HSD, appears more knowledgeable than the director of ISD leads the Court to conclude, like the Special Master, that managerial and accountability issues continue to prevent compliance with the Consent Decree, court orders, and federal law. The Court, therefore, overrules the objection to the Special Master's Finding of accountability problems, but sustains the objections as to the Special Master's use of the phrase "almost nonexistent."

> e. Conclusions that
>
> [t]he management team decision making and communication have proven deficient in recent years and failed to yield progress in the area of client services and employee development. … Due to reactionary management philosophy, the management continues to struggle with strategic decision making and implementation of changes to facilitate improved business processes and outcomes. There is evidence to indicate the current HSD/ISD management team lacks sufficient knowledge, skills and abilities (KSA's) to appropriately manage the program or bring it into full compliance with the Consent Decree. … The evidence shows limited progress by the ISD program management.
>
> (Doc. 810) at 8-9.

Defendant objects to these Conclusions for several reasons. First, Defendant states that the reason HSD has made such substantial progress in compliance is because of staff's KSAs and Defendant's commitment of resources. Defendant also contends that the following evidence shows more than "limited progress:"

> a. approved SNAP applications: 97.6% timely in December 2017.
>
> b. denied SNAP applications: 62.6% timely in December 2017. Defendant contends that this rate will increase with auto denials.
>
> c. combined timeliness for approved and denied initial SNAP applications: 91.4% timely in December 2017. According to Defendant, HSD approves more than 80% of the applications it receives.

d.  approved SNAP recertifications:  86.3% timely in December 2017.  In the last year, Defendant claims HSD "has created a report for public tracking of timeliness for recertification actions.  Recertification timeliness will improve with the reimplementation of the automated closure functions."  (Doc. 813) at 8.

e.  approved Medicaid applications: 95.8% timely in December 2017.

f.  denied Medicaid applications: 59.5% timely in December 2017.  Defendant maintains that "[t]he rate will continue to be low until the reimplementation of auto denial features."  *Id.*

g.  combined Medicaid applications: 87.3% in December 2017.

h.  approved Medicaid renewals:  97.8% timely in December 2017.

(Doc. 813) at 7-8.  Defendant states also that in December 2017 it eliminated the backlog of overdue Medicaid applications and renewals, and the backlog of overdue SNAP applications, interim reports, and renewals.

The Special Master testified at the March 1, 2018, hearing that Defendant has indeed made progress primarily in the area of timely approval of new applications, but that timeliness of denials and recertifications still fall below 95%.  TR 26-27.  *See also* (Doc. 810) at 19.  The Special Master further agreed with Defendant that there is "[n]ot very much of a backlog at this time."  TR 21.  The Special Master, however, explained that Defendant's management, nonetheless, is reactive.  *Id.* at 22.  For example, Defendant caught up on the SNAP backlog by shifting resources to that particular problem but in doing so neglected the Medicaid backlog.  *Id.* Moreover, Defendant's approach to office problems is to move to staff to another office, which merely shifts problems to another office.  *Id.*  The Special Master further observed that some managers, while perhaps "outstanding" in managing another program, "may not have the expertise, they may not have the resources, they may not have the supportive staff in order to get the job done."  *Id.* at 45-46.  Along those lines, the Special Master noted that the flow of

information up and down the chain of command is lacking, which creates mistrust by the field staff with respect to the Central Office. *Id.* at 46.

The Compliance Specialist reported major communications issues as well as "Central Office management/culture" issues, and "Region Management/culture" issues. (Doc. 810) at 18, 28. In her conclusion, the Compliance Specialist acknowledged Defendant's progress, i.e., that "management of the eligibility determination approval timeliness, lobby wait times, and individual region management performance with accountability actions has increased since July 2017," but concluded that "[t]here are inherent issues in the management of the Income Support Division Field Operations." *Id.* at 31. The Compliance Specialist's report supports both the Special Master's conclusion that management lacks sufficient KSAs to bring HSD into compliance with the Consent Decree and his conclusion that while Defendant has admittedly made progress to come into compliance with the Consent Decree, Defendant must still improve management to reach compliance.

While Defendant has undoubtedly made progress in this lawsuit, whether one characterizes it as "limited" or substantial as Defendant would, the Court finds managerial issues related to KSAs prevent Defendant from progressing more rapidly and fully toward compliance and termination of this lawsuit. Hence, the Court overrules Defendant's objection to the Conclusion regarding management's lack of KSAs and overrules the objection to the Special Master's characterization of Defendant's progress as "limited" as immaterial.

> *f. Recommendation 1: remove certain persons from positions which directly or indirectly impact ISD field operations within 45 days of the date of the entry of the order on the Special Master's Report. (Doc. 810) at 9.*

Defendant argues that removing key staff would be counterproductive when one considers the evidence of progress under the current ISD leadership, as noted by the Compliance

Specialist.  Indeed, the Court remains encouraged by the progress Defendant has shown thus far, but much more must be done by management to achieve compliance and to ensure long-lasting, sustained compliance.  In fact, as discussed above, there are reasons for the Court to lack total confidence in the current middle-tier management.  Considering the Special Master's prior recommendations to Defendant on best management practices, Defendant has sufficient information from which to make appropriate personnel decisions as they may relate to this litigation.  For now, the Court sustains Defendant's objection to Recommendation 1.

> g.  *Recommendation 8: "[a]ppoint knowledgeable subject matter experts for the ISD program areas for SNAP, Medicaid, and immigration" within 60 days from the date of the entry of the order on the Special Master's Report.  (Doc. 810) at 11.*

Defendant also objects to Recommendation 8 stating that ISD staff has the KSAs to provide necessary expertise.  Defendant further asserts that he contracts for additional expertise when necessary.  The Compliance Specialist, nevertheless, documented the need for training staff, including an improved policy and procedures document.  (Doc. 810) at 30-31.  In particular, she noted that "staff cited the training is confusing, inaccurate and could create errors for the agency."  *Id.* at 31.  The Compliance Specialist also noted, for example, that only 58.8% of the offices she reviewed followed the SNAP expedite process.  *Id.* at 24.  Additionally, as the Special Master observed in his Report, both FNS and CMS requested corrective action plans for failure to meet requirements in providing SNAP and Medicaid services to clients.  *Id.* at 7.

With respect to an immigration expert, the Special Master stated at the March 1, 2018, hearing that, although Defendant has a person to train on immigration policies and procedures, improvements in that training can be made.  TR 52-53.  An immigration expert is necessary, according to the Special Master, in light of the changing nature and difficulty of immigration issues.  *Id.* at 52.  In addition, an immigration expert, with no other duties, could better respond

to concerns by Plaintiffs, the Court, FNS, and CMS. *Id.* at 53.

Based on the aforementioned evidence, the Court determines that there is a need for SNAP, Medicaid, and immigrations experts to aid Defendant in complying with the Consent Decree, court orders, and federal law. Hence, the Court overrules Defendant's objection to Recommendation 8.

### 3. Defendant's Proposed Modifications to Recommendations

> *a. Recommendation 4: develop and implement ASPEN refresher training within 120 Days from the date of the entry of the order on the Special Master's Report.*

Although Defendant agrees with this recommendation, he proposes aligning the implementation timeframe with due dates found in HSD's contract with Change and Innovation Agency (C!A) to provide staff training.[7] HSD entered into this contract in December 2017. (Doc. 818-9) at 13. Under the contract, staff will be trained about 14 months after the execution of the contract, in February 2019, with a final evaluation of training effectiveness due no later than 20 months after the execution of the contract, in August 2019. *Id.* at 19-20.

Because ASPEN plays a central role in processing both SNAP and Medicaid applications, it is critical that Defendant develop and implement ASPEN refresher training as soon as practicable, as the Special Master recommends. In fact, Mr. Collins stated at the March 1, 2018, hearing that he believed that ASPEN refresher training "in some ways is already going on…." TR 171. Considering the central role of ASPEN in this lawsuit and the fact that some refresher training is apparently already ongoing, the Court will not modify the Special Master's recommendation that Defendant develop and implement ASPEN refresher training within 120 days from the date the Court enters this Memorandum Opinion and Order. Additionally, the

---

[7] Defendant also notes that ISD has implemented a Business Process Review (BPR) unit to identify and implement "best practices" employed by high performing offices.

Court will order that the ASPEN refresher training be completed within 60 days of the implementation of the refresher training.

> b. *Recommendation 5: add auto denial and closure functions to ASPEN by March 1, 2018.*

Defendant agrees with Recommendation 5, but the timeframe has already expired. Defendant stated at the March 1, 2018, hearing that he will have auto denials ready for piloting on March 15, 2018, and auto closures ready for piloting in April 2018. TR at 170. The Court will modify the timeframe for this recommendation to require Defendant to add the auto denial and closure functions to ASPEN no later than May 1, 2018.

> c. *Recommendation 6: enhance and improve new employee training 180 days from the date of the entry of the order on the Special Master's Report.*

While Defendant agrees with Recommendation 6, he requests aligning the implementation timeframe with due dates found in HSD's contract with C!A. The Court concurs with Defendant's requested modification with the qualification that any draft training materials (or deliverables) be provided to the Special Master for review no later than September 1, 2018. The Special Master will, within a reasonable time, offer recommendations, if any, to Defendant and C!A on the draft training materials.

> d. *Recommendation 7: implement an agreed upon tolerance level for timeliness within 60 days from the date of the entry of the order on the Special Master's Report.*

Defendant agrees with this recommendation, but he believes that the tolerance level for timeliness "should align with the monitoring activities of the federal executive branch of the government," which is 95% for FNS. (Doc. 813) at 12; TR 27-28. Plaintiffs do not concede to Defendant's proposed tolerance level for timeliness, but they "have proposed a revised timeliness measure for Decree compliance that accepts a standard below 100% statewide and an

even lower standard for local offices." (Doc. 812) at 3. The Court acknowledges the two different perspectives on a tolerance level for timeliness. Recommendation 7, however, envisions that the parties negotiate an agreed upon tolerance level and implement it within 60 days of the date of entry of this Memorandum Opinion and Order. This is a reasonable recommendation that does not need modification.

*D. Conclusion*

The Court adopts the majority of the Special Master's Report with some modifications. In doing so, the Court considered the Special Master's findings and recommendations related to ISD's personnel, operations, communications, and other activities pertinent to compliance with the Consent Decree, court orders, and federal law. Even so, at the March 1, 2018, hearing, counsel for Defendant noted the Court's consideration of "the details of the day-to-day management of HSD Field Offices in terms of specific training manuals, specific training materials, specific equipment, headsets on telephones."[8] Tr. 181. Additionally, counsel for Defendant urged the Court that such details are best left to the agency, unless they are "tied" to a showing of a federal law violation. *Id.* at 181-82.

The Court construes these comments to suggest that such details are not immediately relevant to the Consent Decree. The Court disagrees. It remains within this Court's purview to assess Defendant's operations and core competence as to (1) whether and when compliance occurs and (2) whether compliance can be sustained for a meaningful period of time. This

---

[8] Although having headsets on telephones may appear extraneous to the requirements of the Consent Decree, headsets facilitate foreign language speakers in communicating with ISD staff. Moreover, the headsets also allow staff to work more efficiently. Added efficiency provides staff with the opportunity to process more SNAP and Medicaid applications in a shorter amount of time and, thus, permits staff to timely process many more SNAP and Medicaid applications than previously. Timely processing of SNAP and Medicaid applications is, after all, the goal of the Consent Decree and federal law.

assessment necessarily includes considering the type of details Defendant's counsel mentions. Indeed, while the Court is encouraged by Defendant's progress thus far in some areas at issue in this lawsuit, the Court also strains for a minimal degree of confidence that progress is occurring in certain other areas.

Moreover, the Court again urges the parties to consider the Special Master's comments, insights, and recommendations. If they do, the Court is confident that when the parties work together in good faith, with at least a modicum of trust between them, the parties will attain the goal of the Consent Decree: to provide prompt SNAP and Medicaid eligibility determinations on a sustainable basis. In striving to attain that goal, the parties must not lose sight of the purpose of the SNAP and Medicaid programs, which is to deliver food and medical care to the neediest of New Mexico's residents.

IT IS ORDERED that

1. the objections to the Special Master's Report are sustained, in part, and overruled, in part, as described *supra*;

2. the "Motion to Modify the Special Master's Report (Doc. 810)" (Doc. 814) is granted, in part, and denied, in part, as described *supra*;

3. the Court adopts the Special Master's Report (Doc. 810) to the extent provided in this Memorandum Opinion and Order; and

4. the parties must meet the following deadlines:

    a. the parties will revise the Consent Decree to reflect the parts that have been completed, update requirements, and dismiss all moot court orders.

    **Implementation Timeframe:** 30 days from the date of the entry of this Memorandum Opinion and Order.

b.      Defendant will implement an unbiased case review process to assist in validating whether the ISD program is meeting the requirements of the Consent Decree.  The case review process will include:

(1)  an independent random selection of the case sample;

(2)  a case sample that includes all case action types; and

(3)  an independent dispute resolution process.

**Implementation Timeframe:**  April 15, 2018.[9]

c.      Defendant will develop, implement, and complete ASPEN refresher training to include functionality and known work arounds for staff success.

**Implementation Timeframe:**  120 days from the date of the entry of this Memorandum Opinion and Order, Defendant will implement the ASPEN refresher training; and Defendant will complete the training within 60 days of its implementation.

d.      Defendant will implement auto denial and closure functions in ASPEN and eliminate manual eligibility review and completion of the Individual Eligibility Review form by workers.

**Implementation Timeframe:**  May 1, 2018.

e.      Defendant will enhance new employee training to align with realistic job expectations, and improve the accuracy of the training materials (e.g.,

---

[9] Although the parties do not object to the original April 1, 2018, timeframe, the Court acknowledges that this timeframe has expired.  Consequently, the Court extends the implementation timeframe to April 15, 2018.

streamline reporting and immigration training).

**Implementation Timeframe:** The timeframe for the development and implementation of this training will track the contract Defendant has with C!A. However, Defendant and C!A will provide draft training materials (or deliverables) to the Special Master no later than September 1, 2018, for review and recommendations, and the Special Master will make any recommendations within a reasonable time.

f.  The parties will implement an agreed upon tolerance level for determining compliance in the area of timeliness to allow for client services and human error.

**Implementation Timeframe:** 60 days from the date of the entry of this Memorandum Opinion and Order.

g.  Defendant will appoint knowledgeable subject matter experts for the ISD program areas of SNAP, Medicaid, and immigration. The three positions will have exclusive responsibility for serving as liaisons between Plaintiffs, Defendant, and the Special Master.

**Implementation Timeframe:** 60 days from the date of the entry of this Memorandum Opinion and Order.

h.  Failure by the parties to complete or make sufficient progress on these recommendations will result in additional recommendations by the Special Master for the Court's consideration.

_____
UNITED STATES DISTRICT JUDGE