IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DEBRA HATTEN-GONZALES, et al.,

      Plaintiffs,

vs.

                                   Civ. No. 88-0385 KG/CG
                                   Consolidated with
DAVID R. SCRASE, Secretary of the          Civ. No. 88-786 KG/CG
New Mexico Human Services Department,

      Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court upon the timely filed Amended Special Master &
Compliance Specialist[1] 2021 Case Review Report (Report), filed June 11, 2021.[2] (Doc. 991);
*see also* (Doc. 989). The parties also timely filed responses to the Report, including motions to
modify or amend the Report. (Docs. 989, 993, and 994); *see also* Fed. R. Civ. P. 53(f)(2) (party
may move to modify special master's report or file objections to the report). Those responses
and motions to modify or amend the Report are now fully briefed.[3] *See* (Docs. 989, 996, 997,
1005, and 1006).

Having reviewed the Report and the briefing on the responses and motions to modify or
amend the Report, the Court, applying a *de novo* standard of review, adopts the Report in its
entirety. *See* Fed. R. Civ. P. 53(f)(3) and (4) (court decides *de novo* objections to special

---

[1] Hereinafter, the Court's use of "Special Master" also refers to both the Special Master and the
Compliance Specialist, collectively.

[2] Generally, a "case" refers to an individual or a household group that includes an entire family.

[3] The Court notes that on July 28, 2021, the Special Master convened a mediation session with
the parties to attempt to amicably resolve issues raised in the above responses and motions. *See*
(Docs. 998, 1000-1003). Apparently, the mediation session was not fruitful.

master's factual findings and legal conclusions); Fed. R. Civ. P. 53(f)(1) (court may adopt or modify special master's report).

*I. Background*

The Second Revised Modified Settlement Agreement and Order (Consent Decree), filed on August 21, 2018, states in Section IV(A)(1) that "[t]he parties agree that a case file review is necessary to measure compliance with Section III [Application Processing Practices] and to verify that systemic or programmatic barriers to proper application determinations and access to benefits do not exist with HSD's application processing practices."[4]  (Doc. 854-1) at 11. The Consent Decree states that "[p]rocessing errors in the sample [selected for the case file review] may be considered systemic or programmatic barriers" when such errors "occur in more than 15% of applications.  This presumption may be overcome with sufficient evidence to show the errors are not actually systemic." *Id.* at 12, Section IV(A)(4)(i).  On the other hand, it is presumed that "[e]rrors that occur in less than 15% of applications are not considered systemic or programmatic barriers." *Id.* at 12, Section IV(A)(4)(ii).  That "presumption may be overcome with sufficient evidence that shows the existence of a systemic or programmatic barrier despite the low-incidence error." *Id.*

In addition to the Consent Decree, the July 10, 2019, Joint Motion to Approve Two Corrective Action Plans (CAPs) states:

> When HSD has fully implemented the provisions of both CAPs, Plaintiffs will then conduct a file review. If that file review does not reveal any systemic barriers as defined in [Section] IV of the Consent Decree, and if Plaintiffs have not learned of other systemic barriers as defined in [Section] I of the Consent Decree, Defendant may move for dismissal of the case at that time.

---

[4] "HSD" is the New Mexico Human Services Department.

(Doc. 878) at 2, ¶ 4; see also (Doc. 879) (Order Approving Corrective Action Plans). The first CAP seeks "to remedy the specific systemic barriers identified in Plaintiffs' most recent file review, the results of which were previously reported to the Court." (Doc. 878) at 1, ¶ 1. The second CAP, known as the non-CAP, seeks "to remedy the systemic barriers identified outside the most recent file review and that have been the subject of previous Orders issued by the Court." *Id.* at 1, ¶ 2.

Subsequent to the creation of the CAP and non-CAP, the latest case file review began in November 2020 and included a sample of "288 randomly selected cases with eligibility determination actions taken from April 1, 2020, through September 30, 2020." (Doc. 991) at 3. The eligibility determination actions "were for SNAP [Supplemental Nutrition Assistance Program] and Medicaid Applications and Renewals and included approval, denial, and closure case actions." *Id.* Notably, the case file review period occurred during the COVID-19 pandemic.

To conduct their respective 2020 case file reviews, the parties were required to complete Case Review Tool forms. The Case Review Tool consisted of 16 "questions and [was] designed to measure both application and renewal eligibility processing performance for SNAP and Medicaid."[5] *Id.* at 4. Once the parties completed the Case Review Tool, the parties each completed a single Case Review Reporting Tool that contained their respective case file review findings. The parties submitted their Case Review Reporting Tools to the Special Master by May 26, 2021. *Id.* at 5.

---

[5] The 16 questions were grouped as follows to answer these five questions: (1) "Eligibility Determination Process/Action Correct for Action Type?" (Questions 1-8, 13, and 14); (2) "Verification Process Action Correct?" (Questions 9, 11, and 12); (3) "Correct Information Requested within Decree and Regulations?" (Question 10); (4) "Notice of Case Action Correct? Information provided within regulations?" (Question 15); and (5) "Benefit Determination Action Correct? Certified, Recertified, Extended or Denied" (Question 16). *See* (Doc. 994-1) at 1.

The Special Master then reviewed the Case Review Reporting Tools and met with the parties before validating the accuracy of the parties' case file readings.  Prior to validation, the parties determined that 146 of the 288 selected case files included an error or exception.  "The validation process did not review cases where parties found 'No error'" so the Special Master validated just those 146 cases.  *Id.* at 6.  Having completed the validation process, the Special Master filed a Report that provides its findings and recommendations.

*II.  The Report*

Of the 146 validated cases, the Special Master "reversed all question level errors cited in **40** sample cases" finding no error.  *Id.* at 7.  The Special Master determined that the remaining "**106** cases included incorrect case action(s)."  *Id.*  "The validation of the 106 final error cases classified the major error(s) into four outcome impact categories—Eligibility-related, Verification-related, Notice-related, and Other-related no impact to benefit."  *Id.*  These four categories of major errors "focused on overall outcome and impact…."  *Id.*  Consequently, "some cases in the major categories may include items cited at the question level for another area…."  *Id.* at 7.  The Special Master also noted that the "no impact to the benefits" category "is not intended to absolve or reverse a requirement Defendant failed to meet during the case action taken."  *Id.*  Rather, "[t]hat information is pertinent to the overall impact of actions."  *Id.*

Of the 106 final error cases, the Special Master found:

- In 51 cases, the major error included Eligibility-related outcomes impacting the client or benefit, representing **17.7%** of all cases sampled.
- In 23 cases, the major error included Verification-related outcomes impacting the client or benefits, representing **8%** of all cases sampled.
- In 19 cases, the major error included outcomes with no impact to the benefits, representing **6.6%** of all cases sampled.
- In 13 cases, the major error included Notice-related outcomes impacting the client or benefits, representing **4.5%** of all cases sampled.

*Id.* at 8.  Significantly, the Special Master found that the major error rate associated with Eligibility-related overall outcomes exceeded the 15% presumptive systemic or programmatic barrier threshold.

In addition to analyzing the major errors related to overall outcomes and impacts of the final error cases, the Special Master examined the specific question level outcomes related to the 16 questions presented in the Case Review Tool and reported in the Case Review Reporting Tools.  For each question, the Special Master determined whether to reverse reported error(s) in the case and what the final count of error cases was for that question, including the error rate.

Question level outcomes for Questions 1-9 and 11-14 had error rates below 15% even prior to validation.  *Id.* at 12.  The Special Master, however, concluded that "question level reversals reduced the error rate for questions 10, 15, and 16, but determined presumptive systemic barrier percentage levels of over 15% exist for Question numbers 15 and 16."[6]  *Id.* Question 15, a notice related question, had a 15.9% error rate while Question 16, an eligibility related question, had a 15.3% error rate (0.9 % and 0.3 % above the presumption, respectively). *Id.*

The Special Master explained that the 15.3% error rate for "Question 16, which measured the accuracy of eligibility determination processing," demonstrated "that overall error outcomes for the final errors were presumptively systemic in eligibility determination and processing…." *Id.*  The Special Master observed that "[t]he largest number of eligibility errors occurred" when staff made "processing errors or … incorrect actions impacting the benefit determination."  *Id.*

---

[6] Question 15 asked: *"Was the notice of eligibility sent timely and contain [sic] information required by the Decree-including correct reason for delay if there is a delay, approval information if approved and denial reason if denied?"*  (Doc. 991) at 12.  Question 16 asked: *"Was the eligibility determination action correct (benefit level, certification months, approval, renewal, or denial action)?" Id.*

Consequently, "[t]he staff data entry, income verification and projection, and attention to detail during processing must be improved." *Id.* at 12-13.

However, with respect to Question 15, the Special Master indicated that despite its 15.9% question level error rate Question 15 demonstrated HSD "failed to meet the 15% systemic levels when determining overall error outcomes related to eligibility" notices. *Id.* at 13.

Furthermore, the Special Master stated that "[t]he second most impactful error in the eligibility category occurred when staff failed to process information received or to renew the eligibility when the client provided a packet or information." *Id.* In addition, the Special Master observed that staff training "regarding requesting verification and using the electronic data sources must be refreshed and received by eligibility staff to ensure staff are making correct eligibility determinations and that those actions are sustainable." *Id.* at 14.

The Special Master further stated that "[a]lthough, the SNAP errors impacting benefit levels were offset by the maximum allotments issued by Defendant to all SNAP recipients during the COVID-19 pandemic, the cases were read for adherence to regulatory and Consent Decree requirements." *Id.* at 13 (footnote omitted). The Special Master noted that HSD issued "maximum allotments" and "extended certification periods for Medicaid during all month [sic] of the sample period and SNAP for most months due to the COVID-19 pandemic." *Id.* at 13 n. 4. While the Special Master acknowledged that HSD "experienced unprecedented reactionary situations" as a result of the COVID-19 pandemic, the Special Master also observed that HSD and other state agencies "may have made some unintentional missteps in strategic planning and execution related to the COVID-19 remedies." *Id.* at 13-14. One such misstep occurred in some Medicaid renewal cases when an "automated [COVID-19] extension overrode a 12-month certification period and replaced it with a three-month COVID-19 extension after an accurate

renewal action performed by the FAA [Family Assistance Analyst] renewing Medicaid coverage." *Id.* at 13.

After recognizing "the improvement in the Defendant's performance in the areas measured by Questions 1-9 and 11-14 during this case review," the Special Master made three specific recommendations:

> *1. Complete targeted remediation training to minimize staff eligibility processing errors in the areas found to be deficient.*
> *2. Correct the errors related to client extension processing to ensure the extensions do not create unintended consequences (packets, incorrect eligibility, and conflicting/confusing notices) for the clients and the staff processing the cases.*
> *3. Explore the feasibility of automated opportunities to allow eligibility staff to be more accurate in their data entries within the eligibility system (e.g., data importation and real-time alerts for data inconsistencies when manual entry errors are committed).*

*Id.* at 14.

III.  *Discussion*

   A.  *Plaintiffs' Response to the Special Master's Case Review Report (Doc. 991) and Motion for Modifications of that Report (Doc. 994)*

As an initial matter, Plaintiffs "ask the Court to adopt the Special Master's determination that systemic barriers, as defined in the Decree, Section I, paragraph (H), exist in making accurate eligibility decisions."[7]  (Doc. 994) at 1.  However, Plaintiffs object to the findings by the Special Master of no systemic barriers as to the following question categories:  (1) eligibility processing,  (2) notices, and (3) verifications.  Plaintiffs also object to the scoring methodology the Special Master used.  Next, Plaintiffs contend that the Special Master was not clear on the reasons for many of its error reversals.  "Finally, Plaintiffs agree with the Special master's [sic]

---

[7] Even so, "Plaintiffs disagree with a small number of the Special Master's reversals of Plaintiffs' findings" with respect to Question 16, the correct eligibility determination question. (Doc. 994) at 11.

recommendations, but believe that they do not go far in [sic] enough in requiring compliance with the Decree and federal law." *Id.* at 2.

### 1. Eligibility Processing Questions

Plaintiffs first argue that the Special Master should have "aggregate[d] processing violations across case review questions…." *Id.* According to Plaintiffs, this failure to aggregate processing violations results in an under-reporting of systemic barriers to correct eligibility determinations. Specifically, Plaintiffs believe that the Special Master should have aggregated the responses to Questions 1-8, 13 and 14, questions grouped under the "Eligibility Determination Process/Action Correct for Action Type?" category. Plaintiffs contend that the prior case review in 2018 aggregated responses and that "the 2020 tool created by the Special Master for the recent case review and agreed to by the parties uses the same groupings." *Id.* at 3.

By aggregating question level eligibility processing errors, Plaintiffs "found Eligibility processing errors in more than 86 cases (30%)." *Id.* at 4. "Aggregating the Special Master's findings results in validation of 57 cases as having errors for questions grouped as eligibility determination processing errors (19.7%)," well over the 15% level of error required to show a presumptive systemic or programmatic barrier. *Id.*

Moreover, Plaintiffs note that for some questions, like Questions 1 and 4, the Special Master incorrectly scored a "N/A" answer as a "Yes," a no error finding. To avoid this situation, Plaintiffs suggest "group[ing] similar errors and those that exist across programs to understand the impact on families." *Id.*

### a. Defendant's Response

Defendant asserts that aggregating question level eligibility processing violations or errors "would effectively reduce the denominator value in the estimated group-level error rate

calculation and artificially inflate the error rates causing upward bias." (Doc. 997) at 5. Defendant also observes that Plaintiffs want to apply a methodology that was not approved by the Court and the parties for the instant case file review.

Defendant further notes that the 57 cases Plaintiffs refer to as having errors for the group of questions concerning eligibility determination processing errors (Questions 1-8, 13, and 14) are "not the total number of cases having errors since some cases have errors in more than one question leading to double counting." *Id.* at 6. Defendant claims that "[t]he actual number of unique cases having errors in the eligibility determination processing category is 48." *Id.* Defendant also points out that Plaintiffs have not provided a mathematical formula for the error rate calculation of 19.7%. At the same time, Defendant suggests that "an arithmetic average of the question-level error rate estimates can be used for categories that include multiple questions." *Id.*; *see also* Defendant's Motion to Modify/Amend the Amended Special Master & Compliance Specialist 2021 Case Review Report and Memorandum in Support (Defendant's Motion to Modify/Amend) (Doc. 993) at 5. Nonetheless, Defendant concludes that the "Report correctly aggregated the agreed upon questions and arrived at percentages by category that are mathematically correct and without error." *Id.* at 7.

Next, Defendant asserts that the Special Master did not treat an "N/A" response as a "Yes." Defendant notes that there are four possible responses to the 16 questions: "No," "Yes," "Waived," and "N/A." *Id.* at 4. According to Defendant, the error rate estimate for a question is calculated by dividing the final count of "No" responses, i.e., errors, by 288, the total number of cases reviewed.

### b. *Special Master's Reply*

The Special Master first observes that he was not required to use the same case file review and validation format as the previous case file review nor did Plaintiffs make that request. *See* (Docs. 981 and 976). In fact, the parties did not object to the Special Master's validation recommendation, which the Court adopted. *See* (Doc. 981) at 17-18. Furthermore, as the Special Master asserts, the case file review process the Court finally approved did not provide for the aggregation methodology Plaintiffs now seek to impose. *See* (Doc. 981). Indeed, the Special Master notes that aggregation was "eliminated with the agreement to change the final case review reporting tool and the Court's adoption of those tools." (Doc. 1006) at 4.

The Special Master also explains that "[t]he individual questions are scored based on a consistent sample of 288...." (Doc. 1006) at 4. The Special Master contends that "aggregation is not required to demonstrate performance of each requirement the questions are intended to measure...." *Id.* In fact, the Case Review Reporting Tool groups the 16 questions into five categories simply "for ease of reporting and not specifically for aggregation scoring purposes." *Id.* at 5. The Special Master observes that "how Defendant performed at the question level without aggregation provides more concise information and consistent scoring for where Defendant is committing his errors when determining eligibility and processing SNAP and Medicaid cases." *Id.* at 11. Furthermore, the Special Master disagrees with Plaintiffs' "statement that the aggregation of the processing errors is required to show that processing errors created substantial eligibility determination errors...." *Id.* The Special Master notes that "[i]n more than half of the applicable cases where a processing error exist there was not an eligibility determination error." *Id.*

With respect to the characterization of "N/A" responses as "Yes" responses, the Special Master states that he did not assign a value to "N/A" responses. The Special Master further states that "[t]he error calculations were accurately and consistently applied across all scoring areas using the sample size of 288 for performance calculations." *Id.* at 5. The Special Master explains that the calculation process he used "allows the court to see equity in measure (exactly how many times in the sample Defendant committed the error or met a requirement) without lowering the denominator based on the household demographic, client action, or program type." *Id.* Interestingly, the Special Master "points out" that Plaintiffs' reference to Questions 1 and 4 carries no weight because Plaintiffs' own case reading of those questions showed that "Defendant's performance for both questions [fell] below systemic levels even prior to [the] Special Master validation (See Doc [sic] 991 pp. 8-9)." *Id.*

### c. Disposition

Plaintiffs cannot now insist on an aggregation methodology to calculate a question level eligibility processing error rate. The time to do so was prior to the case file review when the Special Master filed his recommended case file review process. Moreover, Plaintiffs do not convince the Court that an aggregation methodology is otherwise the "correct" methodology to use. As the Special Master notes, his methodology to which the parties agreed allows the Court and the parties to view specific error rates associated with each question level outcome related to eligibility processing. That specificity provides a more accurate view of Defendant's performance in the eligibility processing area. Furthermore, contrary to Plaintiffs' assertion, an "N/A" response is not a "no error" response.

The Court notes the Special Master, nonetheless, concluded that "[i]n 51 cases, the major error included Eligibility-related outcomes impacting the client or benefit represent[ed] 17.7% of

all cases sampled," well above the presumptive systemic or programmatic 15% barrier threshold.

Finally, the Special Master recommended "targeted remediation training to minimize staff

eligibility processing errors in the areas found to be deficient" as well as exploration of "the

feasibility of automated opportunities to allow eligibility staff to be more accurate in their data

entries within the eligibility system...."[8]  (Doc. 991) at 14.  Clearly, the Special Master

recognizes that presumptive system and programmatic barriers still exist with respect to

eligibility processing.

For the above reasons, and using a *de novo* review, the Court overrules Plaintiffs'

objections to the methodology the Special Master used to evaluate the error rates for eligibility

processing questions. The Court further adopts the Special Master's methodology used to

evaluate the error rates for eligibility processing questions and adopts the Special Master's

findings as to error rates for eligibility processing questions.

2. *Notices Question*

Plaintiffs observe that correct notices are important in providing claimants with the

opportunity to appeal incorrect eligibility determinations (a due process right) as well as a

fundamental understanding of the benefits process so that claimants know whether they are

entitled to benefits or not.  Plaintiffs also state that correct notices avoid client confusion that

results in a high phone call volume.

Plaintiffs note that Question 15, a question related to notices, resulted in a validated error

rate of 15.9%, which demonstrates a presumptive systemic or programmatic barrier to correct

---

[8] The Special Master uses the terms "eligibility staff" and "staff eligibility" interchangeably to
refer to the individuals employed by HSD to make eligibility determinations.

notices.[9]  Plaintiffs object, however, to the Report statement that Question 15 also "failed to meet the 15% systemic levels when determining overall error outcomes related to eligibility" notices. (Doc. 991) at 13.  Plaintiffs believe the Special Master reached this opposite "conclusion because not all the incorrect notices resulted in a loss of benefits."  (Doc. 994) at 5.  Plaintiffs note that "this conclusion is not supported by the Decree or federal law and wrongly discounts the importance of correct notices," because the Consent Decree and federal notice requirements are not conditioned on a finding of loss of benefits.  *Id.*

### a. Defendant's Response

Defendant agrees with the 15.9% error rate the Special Master found with respect to Question 15 and also agrees with the conclusion by the Special Master that "overall performance related [to] Eligibility Determination Notices was not above the 15% systemic threshold." (Doc. 997) at 7.  Defendant notes that "application of the emergency three-month COVID-19 extension waiver processing contributed significantly to the 15.9% error rate...."  *Id.*

Defendant also argues that the Court should reject Plaintiffs' attempt to link the notices error rate with phone call volume.  Defendant acknowledges a huge increase in the volume of phone calls in a four-week period as a result of the economic fallout due to COVID-19, *i.e.*, a dramatic increase in applications.  Even so, Defendant contends that there is no evidence "that the drop in call center performance was the result of conflicting or incorrect eligibility notices." *Id.* at 8.  In addition, according to Defendant, the increase in phone calls began prior to the issuance of any COVID-19 waiver related notices.  Finally, Defendant asserts that there was no presumptive systemic or programmatic barrier related to notices when one considers that the 15.9% notice error rate for Question 15 was linked to a pandemic, "an isolated event."  *Id.*

---

[9] This error rate does not reflect Plaintiffs' dispute with two of the error reversals by the Special Master.

### b. *Special Master's Reply*

The Special Master notes that the Report stated "that Defendant is not absolved from a decree requirement just because of no impact to the client or benefits." (Doc. 1006) at 6. As the Special Master stated in the Report, "the categorization of no impact to benefits … is pertinent to the overall impact of actions." (Doc. 991) at 7. The Special Master emphasizes that "[e]ach question is a requirement of the consent decree, or the regulations…." (Doc. 1006) at 6.

Moreover, the Special Master explains why Question 15, the only notice question, had a question level error rate of 15.9%, but the major error rate was 4.5% for the Notice-related final error case outcome. The Special Master states that "a larger portion of the cases that included a notice error at the question level went into the eligibility-related category" of final error cases. *Id.* That occurred because "[t]he eligibility-related error cases most often included a Notice error due to the action/inaction of the eligibility worker or Defendant's COVID waiver processing." *Id.* In fact, the Special Master stated in the Report that "some cases in the major [error] categories may include items cited at the question level for another area…." (Doc. 991) at 7.

The Special Master further notes that although the question level error rate for Question 15 exceeded the presumptive systemic or programmatic barrier rate the Special Master "did not recommend a specific eligibility notice recommendation in his Report because logically, when the COVID notice, extension proceeding, and FAA eligibility determination errors are remedied, the notice concerns cited in this case review should be resolved." (Doc. 1006) at 7. Nonetheless, one of the recommendations by the Special Master concerned notices: "Correct the errors related to client extension processing to ensure the extensions do not create unintended consequences" like "conflicting/confusing notices…." (Doc. 991) at 14. Another recommendation would also

impact notices: "Explore the feasibility of automated opportunities to allow eligibility staff to be more accurate in their data entries within the eligibility system...." *Id.*

### c. Disposition

The Special Master more than adequately explained why the overall Notice-related outcome for final error cases was below 15% while the question level outcome for Question 15 was above 15%. Furthermore, the Special Master did not ignore the question level outcome on notices because two of the recommendations by the Special Master concern the provision of correct notices. Having considered *de novo* Plaintiffs' objection to the Special Master's conclusion that the major error rate for final error cases in the category of Notice-related outcomes failed to meet the 15% presumptive systemic or programmatic barrier threshold, the Court overrules that objection.

### 3. Verification Questions

Plaintiffs argue that the Special Master erroneously found a 14.2% error rate of improper verification in its validation of Question 10, "*Was verification request accurate and seeking information as required by the Decree and regulations. (Written or Verbal)?*" (Doc. 991) at 10. Plaintiffs object to the Special Master's error reversals for 21 cases and claim that "[m]ost of these errors were caused by HSD's incorrect programming of the eligibility system, not worker error." (Doc. 994) at 7-8.

Plaintiffs assert that the case file review shows that HSD is improperly denying Medicaid administrative renewals when families "fail[] to turn in paperwork that is not necessary to determine eligibility." *Id.* at 8. In the case of "[r]enewal of individuals whose Medicaid eligibility is based on modified adjusted gross income methods (MAGI)," HSD

> must make a redetermination of eligibility without requiring information from the
> individual *if able to do so* based on reliable information contained in the individual's

account or other more current information available to the agency, including but not limited to information accessed through any data bases accessed by the agency....

42 C.F.R. § 435.916(a)(2) (emphasis added).

Plaintiffs observe that income "data obtained from electronic sources need not match exactly or be from a single reported source," it need only be "reasonably compatible." (Doc. 994) at 8.  Plaintiffs explain that "[i]f the income is at or below the relevant threshold based on what is on file for the client and contained in electronic databases, benefits should be automatically ('administratively') renewed." *Id.* at 8-9 (citing 42 C.F.R. § 435.916(a)).  On the other hand, "[w]here income is reported by the client or found in the database to be over the relevant income threshold, administrative renewal is not possible and the family will need to complete a renewal form." *Id.* at 9 (citing 42 C.F.R. § 435.916(b)).

Plaintiffs contend, in a number of cases, that HSD found "that a client's income was not reasonably compatible, however the case files Plaintiffs reviewed did not contain the income information on which this decision was based, in violation of 42 CFR 435.914(a)." *Id.* According to Plaintiffs, "HSD agreed to fix this issue by recording the specific income into the case file comments that is found in the database that shows the family is over income." *Id.* Plaintiffs argue that HSD, nonetheless, is improperly denying Medicaid administrative renewals and requiring renewal paperwork on the basis that the income was over the income threshold for the program, "but there was no justification or explanation of what income was found to demonstrate it was over the income threshold for the program." *Id.*  Plaintiffs allege that the "[R]eport treated this situation inconsistently, reversing several cases in which Plaintiffs had found this error, but upholding it in others." *Id.* (citing Cases Numbers 120706642 and 120195589).  Plaintiffs object to the reversal of errors in six cases by the Special Master "where

16

HSD required families to turn in recertification paperwork based on an unsupported determination that their current income is over the eligibility threshold." *Id.* at 10.

In addition, Plaintiffs assert that "when administrative renewal failed for reasons other than an applicant having documented income over the eligibility threshold," *i.e.*, an information technology (IT) reason, the computer system requires a worker to examine the case and "access electronic records manually for the necessary information." *Id.* at 10. "When the computer system cannot access client information because of a 'data source invocation error' the administrative renewal is wrongly not attempted and the data source is not reviewed." *Id.* Plaintiffs object to the reversal of errors in seven cases (related to Questions 1 and 10) by the Special Master arising from data source invocation errors.

Finally, Plaintiffs object to a total of 22 error reversals by the Special Master with respect to Question 10, including two cases "where HSD was seeking to verify income that was not relevant to an eligibility determination...." *Id.* at 11; *see also* (Doc. 994-3) at 3-5. In another case, Plaintiffs claim that "HSD reduced the participant's benefits from full Medicaid to family planning coverage using electronic databases without a reasonable explanation of income change," as required by federal regulation. *Id.*

### a. Defendant's Response

Defendant observes that the Court adopted the Special Master's recommendation for the case file review process, which included that "[t]he Special Master will review submitted results to resolve error case disagreements and will provide the final outcome to both parties." (Doc. 973) at 6, ¶ 5; *see also* (Doc. 981). That being the case, Defendant argues that Plaintiffs cannot challenge the Special Master's case error reversals. Defendant further argues that, to the extent Plaintiffs challenge reversals based on updated case notes created after the Special Master

completed the Report, "new review of case[s] would be outside of the review period information." (Doc. 997) at 14.  Nevertheless, Defendant contends that the reversal of errors by the Special Master was correct.

In addition, Defendant contends that both he and the Special Master understand the administrative renewal process and its relationship with the verification process.  Defendant acknowledges that "[a]dministrative renewal relies on electronic data sources to verify eligibility."  *Id.* at 11.  Moreover,

> [w]hen electronic data sources are checked and the information is either not there at that time, incompatible with the information from the applicant, or there is a data invocation error, the Defendant cannot proceed with an automated administrative renewal or, in the case of incomplete, missing, or no data, assess the eligibility under the "reasonably compatible" standard.

*Id.*

### b. Special Master's Reply

The Special Master notes that, with respect to Question 10, 12 of the 21 error reversals Plaintiffs challenge "are related to the administrative renewal process failure situations" in which a client was improperly sent a renewal packet.  (Doc. 1006) at 7.  The Special Master explains that the Special Master reversed those "errors because a task for manual intervention is not created for" an administrative renewal failure due to "Data Source Invocation," "Reasonable Compatibility Check," or "Eligibility Income Check."  *See id.* at 8; (Doc. 991-5) at 1.  In Work Request 124796, Defendant agreed that that if the automated "process is **initiated but not successful** (reasonable compatibility does not exist)" then a renewal packet is sent to the client.  (Doc. 994-5) at 1.  A task to manually renew "via the current manual" administrative renewal is required only if "the automated process is **unable to be initiated**" in the first instance "because a case is in case mode or case action."  *Id.*  Importantly, HSD is required to administratively renew

Medicaid benefits "without a packet being returned to the office **if** available information suggests that all beneficiaries remain eligible." *Id.*; *see also* 42 C.F.R. § 435.916(a)(2) (HSD must administratively renew Medicare benefits "if able to do so based on reliable information contained in the individual's account or other more current information available to the agency, including but not limited to information accessed through any data bases accessed by the agency….").

Contrary to Plaintiffs' representation that the case file review showed "multiple cases where the administrative renewal failed due to income," the Special Master states that of the 146 cases validated, "only 1 case failed for reasonable compatibility (See case number ending in 3799)." (Doc. 994) at 9; (Doc. 1006) at 8. Interestingly, in that one case, "the client called and a worker was able to renew based on what was in the database even though administrative renewal failed purportedly due to income." (Doc. 994) at 9.

The Special Master further observes that Plaintiffs' contention that "Defendant agreed to create a task for worker manual intervention at administrative renewal failure for any reason other than income exceeds thresholds" is without a factual basis. (Doc. 1006) at 8. Plaintiffs referred to Work Request 124796 to support that contention. Work Request 124796, however, provides for a manual intervention only "[i]f the automated process is **unable to be initiated** because a case is in case mode or case action…." (Doc. 994-5) at 1. On the other hand, the Special Master states that if an administrative renewal job is initiated and then "assigns a failure for 'income test' … a task is not created for manual worker intervention and renewal action, which was a major basis for the error finding in Question 10 for administrative renewal failures." (Doc. 1006) at 8-9. That statement is consistent with Work Request 124796. Moreover, according to the Special Master, "the reason the income information is not displayed in most

instances is because data sources information is not available to populate comments." *Id.* at 9. The Special Master notes that he "reversed the verification error in four cases where the administrative renewal failed for income test in this validation process." *Id.*

Like the income test failures, the Special Master observes that "[t]he current functionality for Data Source Invocation failures does not create a task for manual intervention." *Id.* Notably, data source invocation failures "can occur because there is no information in the data sources for the client or for other error or exception reasons." Also, "[w]hen the data source invocation is successful, the information is populated into the ASPEN case comments."[10] *Id.* "The Special Master reversed the verification error in seven … data source invocation failure cases…." *Id.*

The Special Master further disputes Plaintiffs' assertion that "the Report treated administrative renewal reversals inconsistently…." *Id.* The Special Master maintains that he read each household the same, noting that "the household and case situation may have played a role in the outcome of the error determination." *Id.* at 9-10. The Special Master also explains how he treated Plaintiffs' cited Case Numbers 120706642 and 120195589 consistently. *See id.* at 10.

Next, the Special Master disagrees with Plaintiffs' other objections to reversals of verification errors. The Special Master specifically observes that five of the reversals reflected correct verification requests while four verification requests were outside the scope of the sample review month. *See id.* The Special Master opines that "based on their response, Plaintiffs may

_____

[10] "ASPEN" stands for "Automated System Program and Eligibility Network." ASPEN is an automated eligibility determination system used by New Mexico and most other states. The system is a federal requirement, but is designed, created, and implemented by the state using a vendor for the technology and ongoing maintenance efforts. The Food and Nutrition Services (for SNAP) and the Centers for Medicare and Medicaid Services (for Medicaid) provide some federal oversight of the system and require states to undergo an approval process when implementing new eligibility systems. ASPEN is used by the Family Assistance Analyst (FAA) staff to determine eligibility and is the system of record for all programs administered by HSD.

not have been able to determine which case reversal reason to apply to the case even after reading the reversal cases a second time." *Id.* at 10-11.

### d. Disposition

Federal law requires HSD to administratively renew Medicaid benefits only if can do so "based on reliable information contained in the individual's account or other more current information available to the agency, including but not limited to information accessed through any data bases accessed by the agency...." 42 C.F.R. § 435.916(a)(2). Work Request 124796 reflects that federal law by requiring administrative renewal of Medicaid benefits "**if** available information suggests that all beneficiaries remain eligible." (Doc. 994-5) at 1. Under this framework, if the administrative renewal "process is **initiated but not successful**" because reasonable compatibility does not exist, then the client will receive a packet to complete, *i.e.*, the HSD worker is not compelled to manually renew the Medicaid benefits through the manual administrative renewal process. *Id.* Thus, the Special Master correctly reversed errors based on a failure to administratively renew Medicaid benefits under that situation.

If income information is not available via ASPEN for an individual applying to renew Medicaid benefits due to an IT related reason, a data source invocation error, federal law does not require an administrative renewal. *See* 42 C.F.R. § 435.916(a)(2). The Special Master, therefore, correctly reversed errors based on a failure to administratively renew Medicaid benefits due to a data source invocation error.

Finally, Plaintiffs have not convinced the Court that the Special Master incorrectly reversed other verification errors related to Question 10. To summarize, after a *de novo* review, the Court overrules Plaintiffs' objection to the determination by the Special Master that the error rate for Question 10 was 14.2%.

### 4.  Unclear Reasoning for Error Reversals

Plaintiffs finally assert that "the reason for many of the Special Master's case reversals is not clear in the Special Master's report."  (Doc. 994) at 11.  Plaintiffs' Exhibit 3 sets forth the cases which Plaintiffs contend the Special Master erroneously found error reversals.  (Doc. 994-3).  Plaintiffs move to disallow "many of those proposed reversals."  (Doc. 994) at 11-12.

### a.  Special Master's Reply

The Special Master states that

> [t]he majority of Plaintiffs' disagreement with the reversals centered around the cases where administrative renewal process invoked and failed, and the client received a packet and if it was not returned a COVID extension was created, or administrative renewal processed successfully, and Plaintiffs disagree the action was correct.

(Doc. 1006) at 12.  According to the Special Master, "75.3% of the question level reversal disagreements across the eight questions [Questions 1, 2, 5, 8, 9, 10, 15, and 16] related to Defendant's administrative renewal process."  *Id.*

After having "reviewed the remaining objections reasons where Plaintiffs believe the reversal is incorrect," the Special Master "determined there was only one question level reversal that could be rescinded."  *Id.*  That rescission "would change Question #8 final error rate percentage from 4.9% to 5.2% overall performance."  *Id.*

### b.  Disposition

For the reasons already stated above, the Court does not find that the Special Master erred in reversing the errors related to administrative renewals.  Moreover, the Court is not in a position to conduct its own validation of the case files in order to evaluate Plaintiffs' assignation of errors and the reversal of some of those errors by the Special Master.  Considering the approved methodology employed by the Special Master to conduct the case file review and relying on the expertise of the Special Master, the Court finds Plaintiffs' objections to the error

reversals unconvincing. Again, upon a *de novo* review, the Court overrules Plaintiffs' objections to the error reversals by the Special Master.

### 5. *Relief Sought*

In addition to the above-described modifications to the Report, Plaintiffs ask that HSD develop and implement a corrective action plan within 60 days as required by the Consent Decree, Section IV(A)(8). Plaintiffs seek a correction action plan that "includes: 1) a plan to transition from COVID extension processing when the time comes, 2) remedies to address the systemic barriers identified by Plaintiffs' case review, and 3) the prevention of the illegal loss of benefits to qualified families." *Id.* at 12. Plaintiffs also request that the Court schedule a subsequent case file review to determine Defendant's compliance with the Consent Decree.

### a. *Defendant's Response*

Defendant responds by noting that the Court ordered that the parties' briefing on the Report contain only objections to the Report or a motion to adopt or modify the Report. *See* (Doc. 989). Defendant maintains that the Court did not allow Plaintiffs to file a motion to comply with the Consent Decree in responding to the Report and before the Court could issue a *de novo* decision on the Report.

To the extent the Court will consider a motion for further compliance with the Consent Decree, Defendant argues the Court should deny that motion for three reasons. First, Defendant argues that the COVID-19 extensions should not be included in the scope of the Consent Decree because those "are emergency actions taken in response to the isolated and one-time (hopefully) global pandemic." (Doc. 997) at 12. Accordingly, "unwinding or transition from the COVID-extensions is not a systemic issue...." *Id.* Defendant also notes that "CMS and FNS will dictate how States will transition and when." *Id.*

Second, Defendant notes that Plaintiffs' reference to "remedies to address the systemic barriers identified by <u>Plaintiffs' case review</u>" is not at issue. *See* (Doc. 994) at 12 (emphasis added). The issue before the Court is whether and to what extent to adopt the Report, an issue based on the case file reviews by all parties and the Special Master's validation of those case file reviews.

Third, Defendant contends that Plaintiffs' request that HSD prevent "the illegal loss of benefits to qualified families" is simply "vague and unsupportable…." (Doc. 997) at 13.

### b. Special Master's Reply

The Special Master agrees, in part, with Plaintiffs' request for a corrective action plan. The Special Master asserts that the corrective action plan should outline how Defendant "will implement the Special Master's recommendations and rectify the errors identified as systemic in his Report." (Doc. 1006) at 15. Like Defendant, "[t]he Special Master disagrees with Plaintiffs' request to have that plan be based solely on Plaintiffs' systemic determination [of] case review findings." *Id.* at 15-16.

### c. Disposition

The appropriate remedy at this time is to require the parties to meet and confer to develop a corrective action plan that addresses the recommendations the Special Master proposes in the Report. The corrective action plan, however, need not include a COVID-19 extension transition plan if FNS and CMS, in fact, will determine that transition. Moreover, a corrective action plan will necessarily prevent "the illegal loss of benefits to qualified families." *See* (Doc. 994) at 12. The Court also specifies in the Order, *infra*, what actions the parties and the Special Master must take to comply with the Special Master's recommendations. After the corrective action plan is

finalized and implemented, and any party desires a case file review, the parties will coordinate with the Special Master on case file review processes.

### B. Defendant's Motion to Modify/Amend (Doc. 993)

"Defendant does not specifically object to the … Report and the conclusions of the Special Mater [sic] and the Compliance Specialist from the reading of the 146 cases reviewed as part of the validation process." (Doc. 993) at 2, ¶ 6. Rather, Defendant seeks to modify/amend the Report or to clarify the Report with respect to four areas: `(1) the overall outcome of the final error cases and question level outcomes for Questions 1-16; (2) the case file review sample; (3) the Eligibility-related outcomes associated with the final error cases and question level outcomes for Questions 15 and 16; and (4) "an additional recommendation regarding Defendant's compliance with the decree." *Id.* at 2-3, ¶ 7.

### 1. Overall Outcome of Final Error Cases and Question Level Outcomes of Questions 1-16

First, Defendant contends that the major error rates for the final error cases associated with the four categories of overall outcomes "seem[] to contradict" the question level error rates associated with Questions 1-16. Defendant, therefore, "seeks a clarification that resolves this apparent contradiction." *Id.* at 3-4.

Second, Defendant notes that "when the error rates are organized using the Case Review Reporting Tool, performance in 3 of 5 areas or 14 of 16 questions are shown to be satisfactory (within 15%), while performance in 2 of 5 areas or 2 of 16 questions are shown to be deficient (above 15%), and the overall error rate is shown to be satisfactory (within 15%)." *Id.* at 4. According to Defendant, the overall or aggregated error rate is 4.38%, well below the 15% presumptive systemic or programmatic barrier threshold. *See id.* at 5. Defendant seems to argue that the Special Master should have emphasized the overall or aggregated error rate rather than

the individual question level outcomes.  Consequently, Defendant "seeks a clarification on how the individual questions, the Case Review Report Tool areas, and the Overall outcome are used in the overall determination of HSD's performance." *Id.*

### a.  Plaintiffs' Response

Plaintiffs disagree with Defendant's methodology in calculating the aggregated error rate for the "Eligibility Determination Process/Action Correct for Action Type?" group of questions (Questions 1-8, 13, and 14).  According to Plaintiffs, Defendant "believes that the incidence of error should be measured as a percentage of the sample multiplied by the number of questions (10x288 cases)."  (Doc. 996) at 3.  Plaintiffs state that this calculation basis "mak[es] the sample appear 10 times larger than it is and the corresponding case processing errors exponentially lower than they really are." *Id.*  According to Dr. Loren Collingwood, Ph.D., a University of New Mexico statistician, "the appropriate analysis is always to measure against the sample size actually gathered." *Id.* at 3-4.  Plaintiffs ask the Court to remand the case file review to the Special Master to aggregate Questions 1-8, 13 and 14 "to properly measure the systemic barrier rate for the question group "Eligibility Determination Process/Action Correct for Action Type?" *Id.* at 4.

### b.  Special Master's Reply

The Special Master provided the clarification Defendant seeks regarding the apparent "conflict between systemic level determinations at the question level and the Final error summary percentage." (Doc. 1006) at 6.  The Special Master also provided "clarification of the case review reporting tool groupings and how the grouping[s] were used in the final error determination." *Id.* at 4.

### c. *Disposition*

The Special Master furnished the clarifications Defendant sought regarding the major

error outcomes of the final error cases and the question level outcomes for Questions 1-16.  The

Court need not order any further action on this topic.

### 2. *Case File Review Sample*

Defendant observes that "HSD experienced an unprecedented increase in new

applications due to the economic and social impacts of the global pandemic" during the review

period, April 1, 2020 to September 30, 2020.  (Doc. 993) at 5.  Defendant further observes that

the "increase in new cases and dramatic increase in active cases" occurred "when HSD was

processing cases remotely, had only limited in-person service (drive-up and drop-off), and was

processing cases and applications under 31 temporary federally mandated Covid-19 waivers and

application processing flexibility measures." *Id.* at 7.  Defendant states that to implement the

COVID-19 waivers it had to make changes to the automated system while adjusting staffing

during a "state-wide hiring freeze" and a "pandemic related legislative budget cut." *Id.* at 7-8.

Defendant also states that "there was not enough time or available resources to reprogram the

system so that communications to the clients was error free.  HSD knew that there would be

errors but was unwilling to delay approval of benefits." *Id.* at 8.

Defendant, therefore, seeks an amendment/modification to the *Sample* section of the

Report acknowledging the increase in new applications and caseloads as well as the above

hardships and issues that arose due to the COVID-19 crisis.  Defendant further seeks an

amendment/modification to the *Conclusion* section of the Report "to reflect HSD performance

during under those circumstance[s] and the fact that the federal-mandated COVID-19 waivers

and any issues that may have arisen in application processing related [to] those waivers are

temporary" and not systemic.  *Id.*  In addition, Defendant seeks a statement in the *Conclusion* section "that processing issues arising in the cases reviewed that are substantially related to the application of the temporary federally mandated waivers should not be held against the Defendant in the assessment of their performance under the Decree."  *Id.*

### a. Plaintiffs' Response

Plaintiffs oppose Defendant's "request that the Court include a section in the Case Review Report regarding new applicant enrollment due to COVID." (Doc. 996) at 5.  Plaintiffs acknowledge that during the COVID-19 pandemic "Defendant utilized a special process granting benefits every three months to families that did not turn in the usual verification or renewal documents."  *Id.*  However, according to Plaintiffs, some families that would have been eligible for a full 12-month approval were given just three months of benefits instead.  Also, assuming that the number of applications was unprecedented during the COVID-19 pandemic, Plaintiffs note that the Consent Decree does not provide any special consideration or exemptions for those times of crisis when the number of applications may be exceptionally high.

### b. Special Master's Reply

The Special Master states that he created the *Sample* section of the Report "to document and explain the sample size and type case actions that were to be included in the sample and read for this case review process...." (Doc. 1006) at 13.  Therefore, the Special Master "does not agree with the addition of the information Defendant[] request[s] to the sample section."  *Id.*

### c. Disposition

The Court notes that the Special Master recognized in the Report that HSD "experienced unprecedented reactionary situations regarding very quick implementation of the COVID-19 remedies during Spring 2020," but also stated that "the cases were read for adherence to

regulatory and Consent Decree requirements." (Doc. 991) at 13-14. Indeed, the Special Master noted in the Report that HSD "may have made some unintentional missteps in strategic planning and execution related to the COVID-19 remedies," as described in Plaintiffs' response. *See id.* at 14.

While the COVID-19 pandemic might have produced a "temporary" surge of applications and cases, Defendant is not discharged from complying with the Consent Decree and federal law, which includes having in place processes for handling crises that may occur. Reactionary responses to a crisis situation will not do when qualified people and families are entitled to benefits that will ensure their physical well-being. For these reasons, and upon a *de novo* review, the Court denies Defendant's request to modify or amend the Report's *Sample* and *Conclusion* sections to reflect HSD's hardships during the COVID-19 pandemic and to suggest that the COVID-19 pandemic provides an excuse for noncompliance with the Consent Decree or federal law.

### 3. *Eligibility-Related Outcomes Related to Final Error Cases and Question Level Outcomes for Questions 15 and 16*

Defendant claims that of the 51 cases with an Eligibility-related major error, the eligibility error in 12 of those cases "can be substantially attributed to the application of the temporary federal-mandated [COVID-19] waivers." (Doc. 993) at 9. Defendant explains that "the automated system in place for the waivers overrode the normal process." *Id.* The eligibility errors in those 12 cases correspond to the question level outcomes for Questions 15 and 16. Defendant requests that the eligibility errors in those 12 cases be excluded from both the final error cases and the question level outcomes for Questions 15 and 16. Doing so would result in an Eligibility-related major error rate of 13.3%, a question level outcome error rate of 12.5% for Question 15, and a question level outcome error rate of 13.2% for Question 16. *Id.* at 12.

Consequently, Defendant asks the Court to modify the Report to conclude that the 288 cases reviewed with respect to Questions 1-9, 11-14, 15, and 16 showed error rates below the presumptive systemic or programmatic barrier threshold of 15%. Defendant also ask the Court to include a recommendation "that Defendant is in substantial compliance with the terms and conditions of the Decree and the Court's Orders." *Id.* at 13.

### a. Plaintiffs' Response

Plaintiffs argue, on the other hand, that "[t]he 12 cases Defendant seeks to reverse involve cases in which benefits should have been fully approved but were instead temporarily continued for there month due to COVID-19 related flexibilities." (Doc. 996) at 6. Plaintiffs maintain that "[r]egular processing would have resulted in an illegal denial of benefits to the families all together." *Id.* Furthermore, Plaintiffs contend that Defendant "has not cited any federal mandate that instructed the state to give families temporary benefits when they qualify for full approval." *Id.* The purpose of the COVID-19 waivers is "to ensure families who would otherwise be properly denied, continue to receive benefits." *Id.* at 7. Moreover, "the federal government did not waive state benefit agencies' responsibilities to comply with federal requirements in the application and renewal processes." *Id.* Plaintiffs assert that "[e]ligibility errors were improperly found by the Special Master only in cases where the families ***were not approved and should have been***."[11] *Id.*

---

[11] In Plaintiffs' response to Defendant's Motion to Modify/Amend, Plaintiffs request that "the parties ... meet with the Special Master to attempt to agree on the bases for error determinations for cases in which Plaintiffs have found errors that add up to a systemic barrier...." (Doc. 996) at 8. Plaintiffs then request that the Court remand "the case review back to the Special Master for a revised recommendation, after individual case counts are resolved...." *Id.* As noted above, the Special Master, in fact, held a mediation session on July 28, 2021, to attempt to amicably resolve issues related to the Report. *See* (Doc. 998).

### b. *Special Master's Reply*

The Special Master notes that his Report acknowledged "that Defendant may have experienced unprecedented responsibilities and may have made some mis-steps in implementing [COVID-19] waiver remedies rapidly." (Doc. 1006) at 14. The Special Master further notes that HSD has been processing COVID-19 waivers for more than 16 months. The Special Master, thus, asserts that "when Defendant identified or recognized the gaps in his implementation of the federal temporary waivers due to the decision to proceed, there should have been further remedial stop gap actions to ensure there were no adverse impact to the client eligibility process." *Id.*

### c. *Disposition*

The Court agrees with Plaintiffs and the Special Master. Once Defendant became aware of the COVID-19 related errors caused by the automated system's override of the normal process, Defendant had the responsibility to address those errors. The Court is not convinced that Defendant did not have enough time to reprogram the automated systems. In addition, although Defendant has struggled generally during the COVID-19 pandemic due to a hiring freeze and budget cut, for instance, Defendant has not specifically demonstrated that he could not muster enough resources to reprogram the automated system to correct the COVID-19 related errors. Having conducted a *de novo* review, the Court overrules Defendant's objection to the Special Master's failure to reverse COVID-19 eligibility related errors in 12 cases associated with Questions 15 and 16. For all of the foregoing reasons, the Court also denies Defendant's request to modify/amend the Report to conclude "that Defendant is in substantial compliance with the terms and conditions of the Decree and the Court's Orders." *See* (Doc. 993) at 13.

*IV. Conclusion*

Having reviewed *de novo* the objections by the parties to the Report and having considered the motions to modify or amend the Report, including the briefing on those motions, the Court overrules the objections and denies the motions to modify or amend the Report. Consequently, the Court adopts the Report in its entirety.

IT IS ORDERED that

1. Defendant's Motion to Modify/Amend the Amended Special Master & Compliance Specialist 2021 Case Review Report and Memorandum in Support (Doc. 993) is denied;

2. Plaintiffs' Motion for Modification of that Report (Doc. 994) is denied;

3. the parties' objections to the Report are overruled;

4. the Amended Special Master & Compliance Specialist 2021 Case Review Report (Doc. 991) is adopted in its entirety;

5. Defendant will submit a targeted remediation or refresher training plan to the Special Master and Plaintiffs within 30 days of the entry of this Memorandum Opinion and Order. Defendant's training plan shall include actions to ensure performance goals are achieved and sustained. The targeted refresher training plan will address staff eligibility determination actions identified in the *Conclusion* of the Special Master's Amended Special Master & Compliance Specialist 2021 Case Review Report (Doc. 991) at 12-14, (Doc. 991-6) at 6-7, and (Doc. 991-7) at 1-2 (*e.g.*, failure to process/renew, incorrect action, data entry, certification period, or program, and correct data source/verification processing). The Special Master will seek input from Plaintiffs on the sufficiency of the training plan and then approve a training plan. Once the training plan is approved, Defendant will have 60 days to implement it;

6.  no later than 60 days from the entry of this Memorandum Opinion and Order, Defendant must correct the errors related to Medicaid COVID-19 recertification extension processing to ensure the extensions do not create unintended consequences (packets, incorrect eligibility, and conflicting/confusing notices) for the clients and the staff processing the cases;

7.  no later than 30 days from the entry of this Memorandum Opinion and Order, Defendant must collaborate with the Special Master to develop feasible and effective automated opportunities that are available to allow eligibility staff to be more accurate in their data entries within the eligibility system (*e.g.*, data importation and real-time alerts for data inconsistencies when manual entry errors are committed).  This collaboration will result in a reasonable deadline for implementing any such opportunities; and

8.  the parties will file a stipulated corrective action plan no later than 45 days from the entry of this Memorandum Opinion and Order.  If the parties need an extension of time to develop a stipulated corrective action plan, they must seek approval for such an extension from the Special Master.  If the parties cannot agree on a stipulated corrective action plan, the Special Master will fill a report recommending a corrective action plan no later than 60 days from the entry of this Memorandum Opinion and Order.  Once a corrective action plan is filed, the parties shall coordinate with the Special Master on a casefile review process.

UNITED STATES DISTRICT JUDGE