**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ABIGALE KNOWLTON, et al.,

Plaintiffs,

v. No. 1:88-cv-00385-KG-JHR

KARI ARMIJO, Secretary of the
New Mexico Health Care Authority,

Defendant.

**MEMORANDUM OPINION AND ORDER DENYING
PLAINTIFFS' MOTION TO ENFORCE COMPLIANCE WITH THE DECREE**

This matter is before the Court on Plaintiffs' Motion to Enforce Compliance with the Decree ("Motion to Enforce"), Doc. 1221. This "long-running class action lawsuit" of almost forty years challenges the State of New Mexico's "administration of federal social benefits programs." *Knowlton v. Armijo*, No. 23-2143, 2024 WL 4615849, at *1 (10th Cir. Oct. 30, 2024). The class includes "[a]ll present and future applicants" to the federal Supplemental Nutrition Assistance Program ("SNAP") or Medicaid program "who have not or will not receive an eligibility determination or benefits under these programs from the New Mexico Health Care Authority ("HCA") within the time limits imposed by law." *Id.* (citation modified). The litigation is now governed by the Second Revised Modified Settlement Agreement ("Consent Decree"). *See* Doc. 853. Given the duration of this case and the parties' progress toward compliance, the Court ordered the case be concluded no later than December 31, 2026. Doc. 1203 at 6.

Plaintiffs now claim that HCA's process regarding the overpayment of SNAP benefits does not comply with Section III of the Consent Decree. Doc. 1221. Defendant Kari Armijo,

Secretary of the HCA, responded to Plaintiffs' contentions. Doc. 1228. Plaintiffs filed a reply in support of their position. Doc. 1229. For the reasons stated herein, the Court denies the Motion to Enforce because the overpayment process falls outside the scope of the Consent Decree and the jurisdiction of this Court.

## *I. Background*

### A. SNAP Benefits Program

SNAP is a federally funded, state-administered food stamp program.[1] *See* 7 U.S.C. §§ 2011-2036d; 7 C.F.R. §§ 271-285. Households must meet certain eligibility requirements and apply to participate in the SNAP program. 7 U.S.C. § 2014(a). Each state must designate an agency responsible for administering the SNAP program and implementing its regulations. § 2020(a). In New Mexico, HCA is the agency tasked with this responsibility. *Id.*; NMAC 8.139.100.12. HCA certifies eligible households for a limited period of time, known as a certification period. 7 U.S.C. § 2020(e)(4); 7 C.F.R. § 273.10(f). The certification process includes filing and completing an application form, an interview, and having certain information such as income verified. 7 C.F.R. § 273.2(a)(2), (b)(2), (f). Households must apply to renew their eligibility, a process called recertification, prior to the expiration of the certification period. *See* §§ 273.10(g)(2); 273.14. The recertification process similarly requires an application, interview, and verification of information. *See* § 273.14.

Most households are required to periodically report changes in unearned income, household composition, residence, and other resources to HCA in addition to applying for

[1] Originally called the Food Stamp Program, the SNAP program was renamed in 2008 to the Supplemental Nutrition Assistance Program. *See* Food Stamp Act of 1964, Pub. L. No. 88-525, § 4, 78 Stat. 703, 704 (1964); Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §§ 4001-02, 122 Stat. 1651, 1853 (2008).

recertification. § 273.12(a)(5)(iii).[2] If a reported change "affects the household's eligibility or level of benefits, the adjustment shall also be reported to the household. The State agency shall also advise the household of additional verification requirements, if any, and state that failure to provide verification shall result in increased benefits reverting to the original allotment." § 273.12(c).

If HCA believes a household is no longer eligible for SNAP benefits, HCA shall in most cases provide "adequate advance" notice, "[p]rior to any action to reduce or terminate a household's benefits within the certification period."[3] § 273.13(a). This notice is referred to as a notice of an adverse action. § 273.13(a)(2). If information in a household's periodic report results in a decrease in benefit levels or the household becomes ineligible for SNAP benefits, HCA is required to issue a notice of adverse action. § 273.12(c)(2). In limited circumstances, HCA is required to provide a fair hearing to any household aggrieved by any action of the HCA which affects participation of the household in the SNAP program. *See* § 273.15(a).

In addition to certifying households' eligibility, HCA is also responsible to "establish and collect" benefits that are overpaid to a SNAP recipient.[4] § 273.18(a). An overpayment of benefits is "a Federal debt subject to [§ 273.18] and other regulations governing Federal debts." § 273.18(a)(2). HCA collects overpaid benefits regardless of whether the household is still eligible for SNAP benefits. *See* 7 U.S.C. § 2022(b)(1). HCA reduces the benefit allotment to the household if it is still receiving SNAP benefits. § 2022(b)(1)(A). If a household no longer receives SNAP benefits, HCA withholds amounts from unemployment

---

[2] Some households are exempt from periodic reporting. *See* § 273.12(a)(5)(iii)(A).
[3] Individual notices of adverse actions are not required in the circumstances listed in § 273.13(b).
[4] The Court uses the terms "overpayment" and "overissuance" interchangeably throughout this Opinion.

compensation for a member of the household, recovers "from Federal pay or Federal income tax refunds," or "any other means." § 2022(b)(1)(B)-(D). To "begin a collection action on any claim," HCA is required to notify a household of an overpayment in benefits via a written notification. 7 C.F.R. § 273.18(e)(3). Pursuant to regulation, HCA issues a specific overissuance notice to households which states the recipients "must continue to pay this amount back even if you do not continue to get SNAP benefits from the HCA." *See* Doc. 1221-2 at 6–7; Doc. 1228-1 at 5–6.[5] If the overpayment amount was "not established at a fair hearing," HCA "must provide the household with a one-time notice of adverse action." 7 C.F.R. § 273.18(e)(3)(iii). The notice of adverse action may be sent separately. *Id.*

### B. The Consent Decree

The Consent Decree entered by the Court in 2018 is a revised settlement agreement between the parties. Doc. 853 at 1. Section I of the Consent Decree defines a variety of terms used throughout the order. The Consent Decree states:

> The "application process" begins when an application for SNAP or Medicaid assistance is submitted to HCA and ends when a notice of eligibility decision and, if eligible, benefits, are deposited in the mail or available through electronic transfer. The application process includes providing relevant written information to applicant, screening an application, holding an application interview, verifying eligibility factors, responding to applicant requests for assistance, extensions of time, and mailing an eligibility decision, and if eligible, benefits.

*Id.* at 3 (citation modified). Section I also contains definitions concerning denials of benefits by HCA. The Consent Decree defines a "Timely Denial" in the following manner:

> "Timely Denial" means, as to initial applications for SNAP benefits, an eligibility determination by a case worker or eligibility system to deny the initial application and to cause a notice to be generated on or before the 30th day after the application was received by the agency, unless the 30th day falls on a weekend or holiday. For

[5] It is noteworthy that the overissuance notice at issue in the Motion to Enforce was previously reviewed and approved by Plaintiffs' Counsel. Doc. 1228-1 at 2. Plaintiffs' Counsel participated in the Notice Work Group that reviewed and commented on HCA notices, including the overpayment related notices, in 2015. *Id.* at 2, 30–34.

> Medicaid, the standard is 45 days or 90 days for disability determinations. If the 30th or 45th day falls on a weekend or holiday, the denial of SNAP and Medicaid benefits shall be timely if the SNAP or Medicaid application is denied on or before the next business day after the weekend or holiday.

*Id.* The Consent Decree defines a "Recertification Application Denial" as: "1) a denial or termination of SNAP or Medicaid benefits at the end of a household's certification period that is a result of an eligibility determination to deny or terminate benefits; or 2) the automatic closure of a household's case at the end of the certification period." *Id.* at 4. A "Timely Recertification Application Denial" is defined as:

> "Timely Recertification Application Denial" means 1) as to timely filed recertification applications, an eligibility determination to deny and mail notice of such denial on or before the last day of the household's current certification period; or 2) as to recertification applications filed after the 15th of the last month of the certification period, but before the end of the certification period, an eligibility determination to deny and mail notice of denial by the 30th day following the date the application was submitted, or in the cases where the 30th day falls on a weekend or holiday, the next business day following the 30th day. For Medicaid, a renewal application is timely denied if an eligibility determination to deny has been made and notice of such denial is mailed on or before the last day of the household's current certification period.

*Id.* Section I does not contain any definitions regarding overpayment notices or process. *See id.* at 3–5. Section II of the Consent Decree addresses the timely processing of SNAP and Medicaid eligibility determinations. *Id.* at 5–6.

Section III addresses the accuracy of SNAP and Medicaid eligibility determinations, i.e. the correct processing of applications. *Id.* at 6–11. Section III states: "Federal law and regulation govern the practice of application processing and the parties recognize the state's requirement to comply with those federal regulations." *Id.* at 6. "Although some variation in offices may exist, the parties recognize that uniformity in office application processing practices is necessary for providing applicants with a fair and equal opportunity to participate in the SNAP and Medicaid programs consistent with the goal of assisting individuals seeking

to apply for benefits." *Id.* Section III(B) further provides that "[d]enial notices shall be provided to applicants with the degree of specificity represented by the notices approved by the court in *Ortiz v. Eichler*, C.A. No. 84-16 MMS (D. Del., April 21, 1989)." *Id.* at 7.

Finally, Section IV of the Consent Decree concerns case file reviews, reports, and other implementation requirements. *Id.* at 11–15. "Each section [of the Consent Decree] identifies the method for measuring compliance." *Id.* at 5.

### C. Motion to Enforce

Plaintiffs request an order requiring HCA's process for an overpayment of benefits to be brought into compliance with Section III of the Consent Decree. Doc. 1221 at 1. They contend that the current overpayment process violates the Consent Decree and federal law "at every stage of the claim process—from the calculation of alleged overpayments, to the notices provided to households, to the collection of alleged debts." *Id.* Plaintiffs rely on the experiences of two class members, Jose Madrigal and Cassandra Gonzalez, to demonstrate the alleged systemic failures of HCA's overpayment process. *Id.* at 7–17. Plaintiffs claim the overissuance notices issued by HCA to all households who are alleged to have received an overpayment of benefits fail to provide specific and individualized explanation required by the Consent Decree. *Id.* at 11–12. They further argue that the claim calculation process is not based on households' "actual circumstances" and that the HCA fails to provide the calculations required to support overpayment claims. *Id.* at 10–11, 13–14. Plaintiffs finally argue that the collection practices do not adequately protect households from unlawful recoupment. *Id.* at 14–15.

In response, Defendant asserts that the overpayment process falls outside the scope of the Consent Decree as it is not part of the application process as defined by the Decree. Doc.

1228 at 1–5. As support for this argument, Defendant relies on the Declaration of HCA Deputy Director of Policy and Work Program Suzanne Duran-Vigil. Doc. 1228-1 at 1–4. According to the HCA, the notices of overissuance concern "SNAP benefits that HCA determined were previously overissued and identifies the resulting overpayment claim. A change to a household's ongoing SNAP eligibility or prospective benefit amount is a separate agency action." *Id.* at 1 ¶ 4. Defendant alternatively argues that if the overpayment process does fall under the purview of the Consent Decree, Plaintiffs have failed to establish the overissuance notice violates the Consent Decree, an unlawful statewide calculation methodology exists, or that the alleged issues regarding the overpayment process are systemic. Doc. 1228 at 6–20.

## *II. Standard of Review*

A consent decree is "a court order that embodies the terms agreed upon by the parties as a compromise to litigation." *United States v. Alshabkhoun*, 277 F.3d 930, 934 (7th Cir. 2002). "A court interprets the meaning of a consent decree in the same way it interprets the meaning of a contract[.]" *Bailey v. Roob*, 567 F.3d 930, 940 (7th Cir. 2009); *see also United States v. Brace*, No. 21-2966, 2023 WL 118466, at *2 (3d Cir. Jan. 6, 2023) ("'[A]s consent decrees have many of the attributes of contracts, we interpret them with reference to traditional principles of contract interpretation.'") (quoting *United States v. New Jersey*, 194 F.3d 426, 430 (3d Cir. 1999)). This standard of interpreting a consent decree as a contract would likely be adopted by the Tenth Circuit because the Consent Decree is a settlement agreement between the parties. *See* Doc. 853. It is well settled in the Tenth Circuit that "[i]ssues involving the formation, construction and enforceability of a settlement agreement are resolved by applying state contract law." *United States v. McCall*, 235 F.3d 1211, 1215

(10th Cir. 2000). The Court will therefore rely on New Mexico state law in reviewing the Consent Decree. *See* Doc. 853.

"The touchstone for interpreting a contract" under New Mexico law "is to ascertain and apply the intent of the parties." *Levenson v. Haynes*, 1997-NMCA-020, ¶ 13, 123 N.M. 106, 934 P.2d 300 (citation modified). When construing a contract, New Mexico courts "'consider the documents as a whole to determine how they should be interpreted."' *Lopez v. Buffalo Thunder Dev. Auth.*, 2026-NMCA-072, ¶ 21, 596 P.3d 97, 103 (quoting *Campbell v. Millennium Ventures, LLC*, 2002-NMCA-101, ¶ 15, 132 N.M. 733, 55 P.3d 429). Courts consider "the plain language of the relevant provisions, giving meaning and significance to each word or phrase within the context of the entire contract, as objective evidence of the parties' mutual expression of assent." *H-B-S P'ship v. Aircoa Hosp. Servs., Inc.*, 2005-NMCA-068, ¶ 19, 137 N.M. 626, 114 P.3d 306.

"'The purpose, meaning and intent of the parties to a contract is to be deduced from the language employed by them; and where such language is not ambiguous, it is conclusive.'" *Lopez*, 2026-NMCA-072, ¶ 21 (quoting *ConocoPhillips Co. v. Lyons*, 2013-NMSC-009, ¶ 23, 299 P.3d 844). '"A term is ambiguous only when it is 'reasonably and fairly susceptible to different constructions."' *Id.* (citation omitted). If the contract is unambiguous, "the words of the contract are to be given their ordinary and usual meaning," and the Court's analysis ends. *Id.* (citation modified).

## ***III. Analysis***

Following the settlement of the parties, this Court has continuing jurisdiction "to resolve disputes and enforce the terms" of the Consent Decree. Doc. 853 at 2. HCA's overissuance notice and overpayment process are outside the scope of the Consent Decree as

they are not part of the application process or eligibility decisions. The Court therefore lacks jurisdiction to enforce the processes raised in the Motion to Enforce.

**A. The Plain Language of Consent Decree does not include Overpayment of Benefits**

Section III of Consent Decree is limited to the applications process—as evidenced by its title: "III. Application Processing Practices." Doc. 853 at 6. The "application process" governed by the Consent Decree "begins when an application for SNAP or Medicaid assistance is submitted to HCA and ends when a notice of eligibility decision and, if eligible, benefits, are deposited in the mail or available through electronic transfer." *Id.* at 3. This clear, unambiguous definition does not include the retrospective accounting by HCA regarding overpayment of benefits. Absent ambiguity, the Court "may not alter or fabricate a new agreement for the parties." *CC Hous. Corp. v. Ryder Truck Rental, Inc.*, 1987-NMSC-117, ¶ 6, 106 N.M. 577, 746 P.2d 1109. The application process governed by the Consent Decree therefore ends either with a notice of eligibility decision, or, if the applicant is eligible, when benefits are made available during the certification or recertification process.

Mindful of this definition, Plaintiffs rely on Section III(B) to support their position. *See* Doc. 1221 at 5–6; Doc. 1229 at 8–9. The Consent Decree, however, is equally explicit about the types of notices that fall within Section III(B)'s purview. Section III(B) states: "*Denial notices* shall be provided to applicants with the degree of specificity represented by the notices approved by the court in *Ortiz v. Eichler* . . . ." Doc. 853 at 7 (emphasis added). The denial notices defined and discussed in the Consent Decree are for applications for SNAP benefits in the certification and recertification processes. *Id.* at 3–4; *see also* 7 C.F.R. §§ 273.2(a)(2); 273.10(a)(2); 273.14. The Court will construe the Consent Decree "as a whole with each part accorded significance and meaning according to its place in the agreement."

*Smith v. Tinley*, 1984-NMSC-011, ¶ 4, 100 N.M. 663, 674 P.2d 1123. The Court cannot ignore the plain language of the Consent Decree as Plaintiffs suggest.[6] *ORP Surgical, LLC v. Howmedica Osteonics Corp.*, 92 F.4th 896, 918 (10th Cir. 2024) ("We take the language as we find it, not as we wish it were.").

Plaintiffs further argue that when HCA determines an overpayment of benefits occurred and that the household was instead "entitled to nothing," that this is "a determination of ineligibility" and a "denial of benefits the household previously received, calculated, and implemented after issuance rather than before." Doc. 1229 at 5. In making this argument, Plaintiffs disregard the language of the Consent Decree. The Consent Decree does not generally apply to any and all eligibility determinations under the SNAP Program. Instead, the Consent Decree specifically identifies the certification and recertification processes as the eligibility determinations at issue in the parties' agreement. *See* Doc. 853 at 3–4, 6–11. It does not mention overpayment of benefits in any section. *See generally id.*

Additionally, the plain language in Section III(B) regarding denial notices indicates the section pertains to "applicants." *Id.* at 7. An "applicant" is defined by the Consent Decree as "a person applying for Medicaid or SNAP assistance, a household, or an authorized representative." *Id.* at 3. But the overpayment of SNAP benefits does not involve applicants. *See* 7 C.F.R. § 273.18. Rather, the triggering event is the previous receipt of benefits by a household that HCA now believes was greater in amount than what the household was entitled to receive. *See* Doc. 1228-1 at 5–6. This is a retroactive accounting of the benefits a household received after its application was reviewed and accepted. *See id.* at 1 ¶ 4. This is further demonstrated by the overissuance notice's language that the amount at issue is a "debt

[6] Notably, Plaintiffs omit the exact language of "Denial notices" when quoting or discussing Section III(B) of the Consent Decree in their briefing. *See* Docs. 1221, 1229.

from all adult household members when the overpayment occurred." *Id.* at 6.

In comparison, the denial notices defined and discussed in Section I are unquestionably eligibility determinations concerning certification and recertification. The "'Timely Denial' means, as to *initial* SNAP benefits, an *eligibility determination* by a case worker or eligibility system *to deny the initial application*[.]" Doc. 853 at 3 (emphasis added). The "'Recertification Application Denial' means . . . a denial or termination of SNAP or Medicaid benefits at the end it of a household's certification period that is *a result of an eligibility determination to deny or terminate benefits*[.]" *Id.* at 4 (emphasis added). Finally, the "Timely Recertification Application Denial" concerns either an *"eligibility determination* to deny and mail notice of such denial" regarding a "timely filed recertification application," or for "recertification applications filed after the 15th of the last month of the certification period, but before the end of the certification period, *an eligibility determination to deny* and mail notice of denial[.]" *Id.* (emphasis added). The defined eligibility denials in Section I are therefore implicated in Section III by its title and the words "denial notices" and "applicants" in Section III(B). Doc. 853. at 3–4, 6–7. By comparison, the HCA overissuance notice does not discuss an application process or denial of any application. *See* Doc. 1228-1 at 5–12. The denial notices in Section III therefore pertain only to denial notices in the certification and recertification processes within the scope of the Consent Decree.

Given the clear language in the Consent Decree, the HCA overissuance notice and the overpayment of SNAP benefits process do not fall within the scope of the Decree because they are separate from the application process during certification or recertification. *See* Doc. 853 at 3–4, 6–7. "In New Mexico, unambiguous contract provisions are applied, not interpreted." *Evanston Ins. Co. v. Desert State Life Mgmt.*, 56 F.4th 899, 908 (10th Cir. 2022)

(citing *Richardson v. Farmers Ins. Co.*, 1991-NMSC-052, ¶ 7, 112 N.M. 73, 811 P.2d 571 ). The Court therefore will not consider Plaintiffs' allegations regarding the overpayment process. It is limited by the unambiguous language of the Consent Decree and only has the authority to enforce those provisions. *See* Doc. 853 at 1.

**B. Overpayment of Benefits is Not an Eligibility Determination**

The Court's interpretation of the plain language of the Consent Decree is further supported by the applicable statutory and regulatory authority. The regulations and statute regarding the overpayment of SNAP benefits do not mention an "application" or "applicant." 7 U.S.C. § 2022; 7 C.F.R. § 273.18. And neither the statute nor any portion of the regulations discuss whether a household is deemed ineligible for the SNAP program if it was not supposed to receive any benefits during the overpaid period. *See* 7 U.S.C. § 2022; 7 C.F.R. § 273.18; *but see* § 273.12(c) (discussing state agency's action when "the reported change affects the household's eligibility or level of benefits").[7] Instead, the relevant authority indicates that the overpayment of benefits is a debt which will be repaid regardless of whether the household is still receiving benefits. 7 U.S.C. § 2022(b)(1); 7 C.F.R. § 273.18(a)(2). This accounting is further reflected by how the titles of the statute and regulations refer to this debt as a separate claim. *See* 7 U.S.C. § 2022 ("Disposition of claims"); 7 C.F.R. § 273.18 ("Claims against households").

The regulations concerning certification and recertification, on the other hand, discuss the submission and review of applications during those processes. *See* 7 C.F.R. §§ 273.2(a)(2); 273.10(a)(2); 273.14; *see also* 7 U.S.C. § 2014(a) ("Assistance under this

---

[7] The word "eligible" is used only once in 7 C.F.R. § 273.18 in reference to the Treasury's Offset Programs ("TOP"). *See* § 273.18(n)(3)(i) ("If you, as a debtor, have your claim referred to TOP, any eligible Federal payment that you are owed may be intercepted through TOP.").

program shall be furnished to all eligible households who make application for such participation."). The applications for certification and recertification conclude with either a "notice of eligibility" or a "notice of denial of benefits." 7 C.F.R. §§ 273.10(g)(1)(i)-(ii), (2). The regulations regarding the overpayment process do not state that the process concludes with a notice of eligibility or denial of benefits. *See* § 273.18. Instead, these regulations discuss the criteria for repayment agreements and determining whether a claim is delinquent. *Id.*

The Court therefore concludes that the overissuance notice and recovery of overpaid benefits are outside not only the "application process" as defined by the Consent Decree, but also the application processes described in the applicable regulations and statutes.

### C. *Ortiz* Does Not Override the Parameters of the Consent Decree

In addition to asserting that generally all notices are subject to the Consent Decree, Plaintiffs argue HCA's overissuance notice must follow the specificity requirements of the "Delaware notices" of *Ortiz v. Eichler*, C.A. No. 84-16 MMS (D.Del. April 21, 1989), because notices of overpayment are included in the District of Delaware's 1989 order cited in Section III(B). Doc. 1221 at 5–6; Doc. 1229 at 5, 8–9. Once again, Plaintiffs misread the governing language of this Consent Decree. By reference to *Ortiz*, the Consent Decree establishes the standard of specificity, stating "*[d]enial notices* shall be provided *to applicants* with the degree of specificity represented by the notices approved by the court in *Ortiz v. Eichler*, C.A. No. 84-16 MMS (D.Del., April 21, 1989)." Doc. 853 at 7 (emphasis added).[8] As discussed previously, Section III(B) clearly applies to the certification and recertification denial notices discussed in

[8] While overpayment notices were included in the District of Delaware's 1989 Order, they do not contain any language that they pertain to any application as required by the Consent Decree. *See* Doc. 1221-1; Doc. 853 at 7.

Section I of the Consent Decree. *See supra* Section III.A. The Court is bound by this unambiguous language in the contract between the parties. *Evanston*, 56 F.4th at 908. Interpreting Section III(B) to apply to HCA's overissuance notice and to expand the Consent Decree to cover the overpayment process would be tantamount to rewriting the Consent Decree. *See* Doc. 853; *Holland v. New Jersey Dept. of Corr.*, 246 F.3d 267, 281 (3d Cir. 2001) ("A court should interpret a consent decree as written and should not impose terms when the parties did not agree to those terms."). The Court declines to read terms into the Consent Decree that were not agreed upon by the parties in their original settlement.

**D. The Court's Ruling Does Not Contradict its Prior Opinions and Orders**

Plaintiffs contend that the overpayment process falls within the Consent Decree because allegedly this Court previously ruled "matters which affect the ultimate question of SNAP eligibility fall within the auspices of the Decree." Doc. 1221 at 4 (citation modified). Plaintiffs misconstrue the Court's prior opinion.

On February 18, 2016, the Court ruled on the issue of whether new work requirements and time limits for a subgroup of SNAP participants known as Able-Bodied Adults Without Dependents ("ABAWDs") fell within the operative consent decree.[9] *See* Doc. 645. Plaintiffs sought injunctive relief, claiming a new regulation implemented by Defendant regarding the new ABAWD requirements failed to comply with the terms of the operative decree. *Id.* at 2–3, 5; *see also* Doc. 623. Defendant responded that the eligibility determinations based on the new work requirements applied only to a particular group of SNAP participants "who are not part of the larger SNAP program, and therefore fall outside the scope of the Decree." Doc. 645 at 3.

[9] The operative consent decree in 2016 was the Modified Settlement Agreement originally entered on August 27, 1998, Doc. 460. Doc. 645 at 2. The Modified Settlement Agreement from 1998 contains the same definitions of "application process" and "applicant" as the current Consent Decree. *See* Doc. 460 at 4; Doc. 853 at 3.

Defendant also argued that the "question of whether an applicant has fulfilled work requirements or meets an exemption under the new rules is not an initial eligibly determination, but a question of continuing eligibility." *Id.* at 3–4.

The Court ruled that the new work requirements and time limit for ABAWDs was not "a separate program distinct from initial SNAP eligibility determinations and general work requirements. To be sure, the time limits imposed on ABAWDs are only relevant to a subset of SNAP applicants, and are described in a different regulatory section than the work requirements for all applicants generally." *Id.* at 6 (citing 7 C.F.R. § 273.24). "However, while the work requirements imposed on ABAWDs by 7 C.F.R. § 273.24 do not apply to all SNAP applicants, they are nevertheless conditions of eligibility for SNAP benefits." *Id.* This Court further noted that "the ABAWD time limit" in § 273.24 "directly incorporates definitions of work programs and exemptions to the work requirements from 7 C.F.R. § 273.7, which describes general SNAP work requirements for all applicants." *Id.* This Court concluded, "[b]ecause these new requirements affect the ultimate question of SNAP eligibility for some applicants, they fall within the auspices of the Decree."[10] *Id.* The Court further reasoned, "[T]he Decree requires that Defendant provide accurate information to applicants about eligibility requirements and that Defendant verify conditions of eligibility pursuant to the terms of the Decree," therefore, "the implementation of the new ABAWD work requirements and time limitations in Defendant's application process falls squarely within the Decree." *Id.* at 6–7.

The Court further ruled that the "application process" in the operative consent decree did

---

[10] Plaintiffs misquote this conclusion in their brief. *See* Doc. 1221 at 4. Plaintiffs' quotation of this sentence states the Court referred broadly to "matters" instead of the more specific phrase "these new requirements." *Compare id., with* Doc. 645 at 6. The word "matters" does not appear in the opinion at all. *See* Doc. 645. The Court cautions Plaintiffs that making such inaccurate edits when quoting the language in its opinions calls into question the reliability of their briefing.

not just concern the initial eligibility determination during certification. *Id.* at 7–8. The question of eligibility for SNAP benefits extended to the recertification process where "individuals must complete an application for recertification, which, like an initial application, ends with either a notice of eligibility or a notice of denial of benefits." *Id.* at 7 (citing § 273.10(g)). The Court further reasoned: "Specifically, the Decree applies to the 'application process,' beginning when an application for SNAP benefits is submitted to Defendant, and ending when a notice of eligibility decision is issued." *Id.* at 7–8 (quoting Doc. 460 at 4). "A fair and equal opportunity to participate in the SNAP program should be afforded to eligible applicants regardless of the stage of the application process, as the most important question under the Decree is whether New Mexicans have applied for and are receiving benefits for which they are eligible." *Id.* at 8.

The Court's ruling that the overpayment process falls outside the scope of the Consent Decree is consistent with its February 18, 2016, opinion. The Court is not narrowing the scope of the Consent Decree. The Court is adhering to the governing language decided by the parties that the Consent Decree applies to the eligibility determinations for the certification and recertification processes. *See* Doc. 853; *Holland*, 246 F.3d at 281. This Court similarly found that the certification and recertification processes fell within the scope of the Consent Decree in 2016. Doc. 645 at 7–9.

Moreover, the overpayment of benefits process is distinguishable from the ABAWD work requirements and time limitations. The ABAWD requirements at issue in the Court's previous opinion were eligibility requirements for applicants for SNAP benefits. Doc. 645 at 6–7. The overissuance notice and the process to recover overpaid benefits raised in the Motion to Enforce are not part of the eligibility criteria for certification, recertification, or any application. *See* 7 CFR § 273.18. The overpayment of benefits is instead a retrospective accounting of

benefits previously awarded to a household. Therefore, Plaintiffs' reliance on the Court's prior opinion concerning ABAWD benefits is misplaced.

In support of its position, Plaintiffs also point to a more recent opinion where Defendant requested removal of the reference to the *Ortiz v. Eichler* case from Section III(B) of the Consent Decree. *See* Doc. 1221 at 5 (citing Doc. 953); Doc. 1229 at 9 (same). In the April 24, 2020, opinion, one of the issues before the Court was Defendant's request under Fed. R. Civ. P. 60(b)(5) that the language in Section III(B) by modified by removing the citation to *Ortiz* and replacing it with: "Denial notices shall be provided to applicants in compliance with federal regulation, federal guidance, and/or model federal notices." Doc. 953 at 3, 12. This Court denied Defendant's request on the grounds that it had not demonstrated the extraordinary remedy under Rule 60(b)(5) was justified. *Id.* at 12–14. Specifically, Defendant failed to demonstrate the circumstances had changed since the Court adopted the Consent Decree in August 2018. *Id.* at 11–12. The Court reasoned that the due process principles discussed in *Ortiz v. Eichler* were still good law and Defendant's desire for a less stringent notice standard did not constitute good cause for the requested modification to Section III(B). *Id.* at 13–14.

This Court's denial of Defendant's request to modify Section III(B) is not implicated in its ruling regarding the language in Section III(B) today. The Court is applying the unambiguous language of Section III(B) to the present Motion to Enforce. *Ortiz* remains the standard for the degree of specificity required for "Denial notices" during certification and recertification as defined by the Consent Decree. *See supra* Section III.A. Therefore, the Court's April 24, 2020, opinion is irrelevant to Plaintiffs' Motion to Enforce.

## ***IV. Conclusion***

The Court takes this opportunity to commend the parties for the progress toward

achieving the aims of the Consent Decree. The Court also takes this opportunity to again remind the parties that "federal consent decrees are" designed to be "*temporary* solutions that may be kept in place only as long as necessary to cure an unlawful condition." *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1192 (10th Cir. 2018) (emphasis added). Consent decrees "do not justify never-ending litigation and federal oversight of state agencies." Doc. 1203 at 5. The application of conditions that are not part of a consent decree certainly risks unnecessarily prolonging litigation.

For the foregoing reasons, the Court denies Plaintiffs' Motion to Enforce, Doc. 1221, on the grounds that the overpayment notice and process at issue therein is outside the scope of the Consent Decree and therefore the Court's jurisdiction.

IT IS SO ORDERED.

/s/Kenneth J. Gonzales
CHIEF UNITED STATES DISTRICT JUDGE

- Please note that this document has been electronically filed. To verify its authenticity, please refer to the Digital File Stamp on the NEF (Notice of Electronic Filing) accompanying this document. Electronically filed documents can be found on the Court's PACER public access system.